# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF __ILLINOIS, EASTERN DIVISION __

UNITED STATES OF AMERICA

v.

**FILED**

MARVEL THOMPSON, et al., MAY 1 1 2004

(SEE ATTACHED LIST) MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE BOBRICK

**CRIMINAL COMPLAINT**

CASE NUMBER **04CR0464**

**UNDER SEAL**

MAGISTRATE JUDGE BOBRICK

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about October 1989 until the present, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants did,

conspire with each other and others to possess with intent to distribute and to distribute a controlled substance, namely, in excess of 50 grams of a mixture and substance containing cocaine base, commonly known as "crack" cocaine, mixtures containing in excess of 5 kilograms of cocaine, mixtures containing in excess of 1 kilogram of heroin, Schedule II Narcotic Drug Controlled Substances, and marijuana, a Schedule I Narcotic Drug Controlled Substance and did aid and abet said conspiracy,

in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## See attached Affidavit

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

DOCKETED
MAY 2004

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

_____
Date: May 11, 2004

at    Chicago, Illinois
     City and State

EDWARD A. BOBRICK, MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

1.  MARVEL THOMPSON, aka "Vel," "Johnny"
2.  DONNELL JEHAN, aka "Darnell Clark," "Scan," "Sacandelous," "Big"
3.  ALBERT SPAN
4.  KENYATTA COATES, aka "Yomo," "Big Roadie"
5.  MELVIN HERBERT, aka "Melbo," "Dad"
6.  COREY EVANS, aka "C-Mack," "Colonel"
7.  JIMMY MCAFEE, aka "Little," "Little Man"
8.  RANDY CARTER, aka "Bird"
9.  JAMES STEWART, aka "Jaymo"
10. VARNEY VOKER, aka "Twin"
11. VARMAH VOKER, aka "Twin"
12. LASEAN FORD, aka "Sean"
13. ALFRED CREAMER, aka "Al-Mack"
14. WILLIE MOTEN, aka "Main"
15. ANTOINE PENNINGTON, aka "Yak"
16. MARVEL MCCRAY, aka "Perk"
17. JEREAL REID, aka Bookie"
18. NINO ASEMOTA
19. RONNEL HUDSON, aka "Rollo"
20. ANTOINE MCDANIELS, aka "Tone"
21. ROYAL GARRETT
22. JERMAINE IRVING, aka "G-Man"
23. GEORGE WASHINGTON
24. JAMES WILLIAMS, aka "Freddie G"
25. JULIAN CHISM, aka "Stank," "Big Stank"
26. TERRANCE STREETER, aka "T"
27. HENRY INGRAM, aka "Pook"
28. SHELBY HURD, aka "Mojo"
29. JULIAN ROBINSON
30. DERRICK WHITE, aka "43"
31. DEON HOLLOWAY, aka "Little Deon"
32. BARRY MICKIEL, aka "Steve," "Big Steve"
33. ERIC JOHNSON, aka "Breeze"
34. FINNIE HAWKINS
35. CARL BROWN
36. KEITH LOCKHART
37. HENRY JENKINS
38. ERNEST CLARK, aka "OZ"
39. DELARIUS REYNOLDS
40. GENERALL VOKER
41. ZEBEDEE THOMAS, aka "Zeb"
42. WILLIE TURNER
43. GREGORY HAMPTON
44. PAUL SLAUGHTER
45. JUANELL COPELAND
46. NICHOLAS BELLA
47. LAWRENCE TATE

STATE OF ILLINOIS   )
                        )
COUNTY OF COOK   )

**UNDER SEAL**

## AFFIDAVIT

I, Michael J. Culloton, being first duly sworn on oath, depose and state as follows:

## I. PRELIMINARY MATTERS

1.     I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed for approximately 6 years. I am currently assigned to the FBI Joint Task Force on Gangs ("JTFG") in the Chicago, Illinois, field office, and have been a member of the JTFG since November 2000. As a Special Agent, I have participated in investigations relating to the illegal distribution of controlled substances and other violations of the narcotics laws of the United States. I have received special training in the enforcement of laws concerning controlled substances. I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, informants and others who have knowledge of the offenses involved in the illegal possession with intent to manufacture, distribute or dispense cocaine, cocaine base, commonly known as "crack" cocaine, and heroin, all of which are controlled substances under Schedule II of Title 21, United States Code, Sections 802 and 812, which activities are in violation of Title 21, United States Code, Section 841(a)(1); and conspiracy to possess with intent to distribute and to distribute cocaine, cocaine base, commonly known as "crack" cocaine, heroin and marijuana, in violation of Title 21, United States Code, United States Code, Section 846.

2.     This Affidavit is made in support of a criminal complaint charging that between on or about October 1989 to the present, the following individuals conspired and agreed with each other

1

and with others known and unknown to possess with intent to distribute and distribute a controlled

substance, namely, in excess of: 50 grams of cocaine base, commonly known as "crack" cocaine

("crack"), in excess of 5 kilograms of cocaine, in excess of 1 kilogram of heroin, and marijuana, in

violation of Title 21, United States Code, Section 846; and with aiding and abetting said conspiracy,

in violation of Title 18, United States Code, Section 2:

MARVEL THOMPSON, aka "Vel," "Johnny" ("THOMPSON");
DONNELL JEHAN, aka "Darnell Clark," "Scan," "Sacandelous," "Big" ("JEHAN");
ALBERT SPAN ("SPAN");
KENYATTA COATES, aka "Yomo," "Big Roadie," "Tony" ("COATES");
MELVIN HERBERT, aka "Melbo," "Dad" ("HERBERT");
COREY EVANS, aka "C-Mack," "Colonel" ("EVANS");
JIMMY MCAFEE, aka "Little," "Little Man" ("MCAFEE");
RANDY CARTER, aka "Bird" ("CARTER");
JAMES STEWART, aka "Jaymo" ("STEWART");
VARNEY VOKER, aka "Twin" ("VARNEY VOKER");
VARMAH VOKER, aka "Twin" ("VARMAH VOKER");
LASEAN FORD, aka "Sean" ("FORD");
ALFRED CREAMER, aka "Al-Mack" ("CREAMER");
WILLIE MOTEN, aka "Main" ("MOTEN");
ANTOINE PENNINGTON, aka "Yak" ("PENNINGTON");
MARVEL MCCRAY, aka "Perk" ("MCCRAY");
JEREAL REID, aka "Bookie" ("REID");
NINO ASEMOTA, ("ASEMOTA");
RONNEL HUDSON, aka "Rollo" ("HUDSON");
ANTOINE MCDANIELS, aka "Tone" ("MCDANIELS");
ROYAL GARRETT ("GARRETT");
JERMAINE IRVING, aka "G-Man" ("IRVING");
GEORGE WASHINGTON ("WASHINGTON");
JAMES WILLIAMS, aka "Freddie G" ("WILLIAMS");
JULIAN CHISM, aka "Stank," "Big Stank" ("CHISM");
TERRANCE STREETER, aka "T" ("STREETER");
HENRY INGRAM, aka "Pook" ("INGRAM");
SHELBY HURD, aka "Mojo" ("HURD");
JULIAN ROBINSON ("ROBINSON");
DERRICK WHITE, aka "43" ("WHITE");
DEON HOLLOWAY, aka "Little Deon" ("HOLLOWAY");
BARRY MICKIEL, aka "Steve," "Big Steve" ("MICKIEL");
ERIC JOHNSON, aka "Breeze" ("JOHNSON");

2

FINNIE HAWKINS ("HAWKINS");
CARL BROWN ("BROWN");
KEITH LOCKHART ("LOCKHART");
HENRY JENKINS ("JENKINS");
ERNEST CLARK, aka "OZ" ("CLARK")
DELARIUS REYNOLDS ("REYNOLDS");
GENERALL VOKER ("G. VOKER");
ZEBEDEE THOMAS, aka "Zeb" ("THOMAS");
WILLIE TURNER ("TURNER");
GREGORY HAMPTON ("HAMPTON");
PAUL SLAUGHTER ("SLAUGHTER");
JUANELL COPELAND ("COPELAND");
NICHOLAS BELLA ("BELLA");
LAWRENCE TATE ("TATE").

3. I have received special training in all aspects of the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code ("U.S.C."), including but not limited to, the authorized interception of wire communications, the use of pen registers, undercover operations, various types of surveillance, debriefing of defendants, witnesses, and informants having knowledge of the distribution and transportation of controlled substances, the operation of street gangs and the laundering and concealing of proceeds from drug trafficking.

4. As an FBI Special Agent, I have participated in a number of drug trafficking and street gang investigations. Based on my training and experience, I am familiar with the ways in which street gang members, drug traffickers and their associates conduct their gang and drug related business, including, but not limited to: their methods of distributing drugs, their use of telephones, their use of codes and code words to identify themselves and the nature of their communications, their methods of establishing and maintaining territory in which to distribute drugs, including acts of violence, and their means and methods of enforcing gang rules and regulations, including acts of violence.

3

5.     The information contained in this Affidavit is derived from Affiant's knowledge of and prior experience in drug and gang related investigations including: those at the local, state and federal levels; published sources of information concerning Chicago area street gangs; information obtained during interviews with numerous drug traffickers, gang members and confidential informants conducted by Affiant and other law enforcement officers; and information obtained by the Affiant from other local, state and federal investigators experienced in drug and gang investigations. As a result of my participation in this investigation, my interviews with and review of reports prepared by agents in the FBI as well as other federal and local agencies and other law enforcement agents and officers, I am familiar with all aspects of this investigation as described in this Affidavit.   The information contained in this Affidavit includes the results of physical surveillance; information provided by cooperating witnesses ("CWs"); agents' interviews of witnesses; agents' review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications; and review of statements of witnesses and defendants.  Since this Affidavit is being submitted for the limited purposes of establishing probable cause to arrest the individuals identified above, I have not included each and every fact known to me concerning this investigation.

6.     Based on the information contained in this Affidavit, I submit that there is probable cause to believe: that between on or about October 1989 to the present, the above named defendants conspired and agreed with each other and with others known and unknown to possess with intent to distribute and distribute controlled substances, namely, in excess of 50 grams of cocaine base, commonly known as "crack" cocaine, in excess of 5 kilograms of cocaine, in excess of 1 kilogram of heroin and marijuana, in violation of Title 21, United States Code, Section 846, and did aid and

4

abet said conspiracy, in violation of Title 18, United States Code, Section 2.

## II.   BACKGROUND OF THE INVESTIGATION

7.      This complaint is based on an investigation into the drug trafficking and related criminal activities involving members of the Black Disciples street gang ("BD"), including the BD leader, THOMPSON, in Chicago, Illinois, the surrounding suburbs and elsewhere. The investigation has been conducted by the FBI, the Chicago Police Department ("CPD") the Internal Revenue Service ("IRS"), the Department of Housing and Urban Development ("HUD"), the Bureau of Immigration and Customs Enforcement ("ICE") and the Illinois Department of Corrections ("IDOC"), who have jointly investigated the criminal activities of BD members.

8.      During the course of the investigation, I and other agents and officers have used the following investigative tools to gather evidence against the above listed BD members: debriefing of CWs, many of whom are current or former BD members, regarding their knowledge of the BD and its members; physical surveillance; the execution of search warrants and seizures of contraband, including drugs, money and firearms; controlled purchases of drugs from BD members; electronic surveillance, including Court authorized wire taps of telephones utilized by BD members, and consensual recordings made of telephone calls and in person meetings between BD members and various CWs; interviews of BD members, including some which followed their arrests for crimes related to their gang activity, such as distributing drugs, possessing firearms and shooting at individuals; interviews of members of rival gangs of the BD; interviews of witnesses; and the use of grand jury subpoenas, which resulted in the collection of documents regarding financial crimes related to BD members' criminal activities.

9.      This Affidavit is organized as follows. Section III sets out an overview of the

5

conspiracy. Section IV lists defendants in order of rank, with a brief description of their role in the conspiracy. At the end of each description, the places in the Affidavit are listed that contain evidence relating to that defendant. Section V sets out a summary of the evidence in the investigation, in four parts.

A.     <u>Cooperating Witnesses</u>. A large number of BD members have cooperated with the investigation, some of whom have had recorded conversations with various defendants. The evidence from 25 of the cooperating witnesses is listed in Part A.

B.     <u>Defendant Statements</u>. At least four defendants have made statements to law enforcement officers during the course of the investigation, as listed in Part B, while others have made statements listed in Part D.

C.     <u>Wiretaps</u>. In March, May, and June 2000, the government had Court-authorized wiretaps on three cellular telephones, two of which were used by a BD member who is now cooperating with the investigation (CW-18), and one board member, COATES. The evidence from the wiretaps is set out in Part C.

D.     <u>Seizures, Consensual Recordings and Other Events</u>. Various CWs recorded conversations with other BD members during the investigation. A substantial number of BD members were arrested for drug or firearm offenses as part of the conspiracy. There were a large number of drug seizures linked to various defendants, as part of the conspiracy. Defendants committed other acts during the course of the conspiracy that evidenced their participation in the BD drug trafficking conspiracy. All of this evidence is set out in Part D.

## III.   OVERVIEW OF THE CONSPIRACY

10.     Based on my knowledge of this investigation, I am aware that the BD is a large,

6

violent, well-organized street gang that controls drug distribution in many sections of Chicago, its surrounding suburbs and elsewhere in Illinois and other states. The principal profit making endeavor of the BD is drug trafficking. The BD has existed in various forms in Chicago for approximately 2 decades and is one of the largest gangs in Chicago. It was formed as a result of an internal split in the "Black Gangster Disciple Nation" that resulted in the creation of the "Black Disciples," the "Gangster Disciples," and the "Black Gangsters" (now usually known as the "New Breeds"). The BD operates through a hierarchy of rank and authority allocating duties and responsibilities among themselves.

11.     The top rank of the BD is the king. Prior to his incarceration within the IDOC in approximately 1989, the rank of king was held by Coconspirator A. Presently, the king of the BD is THOMPSON. At times during the conspiracy, there was a second in command called the chairman of the board. Next in the line of authority are the board members, who are appointed by the king. Board members oversee the distribution of drugs and act as a representative of the king in a particular BD controlled territory. The next tier of authority consists of ministers, who operate areas within a board member's territory. Ministers and co-ministers deliver orders to BD members residing in or selling drugs in their respective territories. Next is the rank of co-minister, followed in descending order of responsibility and authority by: director, sometimes called a demetrius or 1st D; co-director, sometimes called a 2nd D; chief of security; and members or soldiers. Some BD members, who do not hold a designated rank in the gang, nevertheless receive a certain level of respect from other BD members due to their close association with high ranking BD members, or for their ability to sell large quantities of drugs. The hierarchy of the BD was confirmed by a number of cooperating witnesses, including CW-1, CW-2, CW-3, CW-4, CW-8, CW-9, CW-10, CW-12,

7

CW-13, CW-17, CW-18 and CW-21.

12.     The BD is a violent gang, and it uses violence as a tool to establish and maintain its drug trafficking territory, to make its drug trafficking operation succeed in other ways, and to enforce order and loyalty among its members who work in the drug trafficking operation. BD members who do not follow the orders or directions of BD leaders (principally THOMPSON and the BD board members) relating to drug trafficking, or who do not show the proper respect to BD leaders, will likely be beaten, (ranging from punching and kicking to severe beatings), shot or killed. In one instance, as set out below, a BD board member, believing that a BD member had not followed his drug trafficking directions, sent another BD member on a plane to Minneapolis to find the offending BD member. The evidence shows that the BD board member intended to kill the other BD member if it was determined that he had acted contrary to the board member's directions. In addition, on more than one occasion, high-ranking BD members have shot, shot at, or assaulted CPD officers who were attempting to disrupt their drug trafficking operation.

13.     The BD has developed rules and regulations, called "laws," which govern the conduct of its members. New members are made to learn and obey the laws or face a "violation," the severity of which depends on the law that is broken. Violations range from monetary fines to beatings administered by fellow BD members. The BD has a law which requires every BD member to "aid and assist" other BD members in criminal acts when called upon. Another of these laws requires "silence and secrecy" among BD members. This law requires BD members not to discuss BD business with non-BD members, especially law enforcement. Refusal to follow these laws usually results in a violation being administered. The violation for cooperating with law enforcement includes severe beatings and being killed. The BD laws were confirmed by numerous witnesses,

8

including CW-4, CW-7, CW-9, CW-10, CW-12, CW-16, CW-17, CW-18, CW-19 and CW-21.

14.     Throughout the conspiracy, BD members claimed various parts of the city of Chicago as their territory, within which only BD members were allowed to sell drugs. On occasion, non-BD members would be allowed to sell drugs in BD controlled areas only with the permission of ranking BD members. BD members often purchased kilogram quantities of powder cocaine, "crack" and heroin, which were re-packaged into smaller quantities, and eventually put into "dime bags" for sale to drug users. A "dime bag" is a small plastic bag or tinfoil wrapper that contains approximately .1 grams of drugs and is sold for $10 each.

15.     In an effort to keep their street level drug trafficking operations safe from law enforcement officials and from encroachment by rival gang members, BD members often utilized younger members of the gang as "look-outs." These individuals were stationed at various locations surrounding the actual drug selling locations. Approaching vehicles that were not known to the area, or those believed to be associated with law enforcement or rival gangs, were recognized and identified to BD members who were transacting the street level drug deals. Many BD members utilized cellular telephones, digital pagers and/or two-way radios to communicate with each other concerning drug transactions.

16.     Other security measures included having BD members armed with firearms in the area where drug sales were taking place to ensure that nobody attempted to rob drugs or money from the sellers. At certain BD drug selling locations situated in or on the grounds of public housing buildings, BD members routinely physically searched individuals entering those buildings for the presence of firearms or recording devices. Additionally, BD members used intimidation, force and violence to establish and maintain areas within Chicago where they sold drugs.

17.     During the conspiracy, both high ranking BD members and those members without rank but who sold large quantities of drugs in BD territory, were required to make periodic payments called a "street tax" to BD leaders like THOMPSON and JEHAN.  The amount of the street tax depended on the amount of money generated through the sale of drugs at the drug spots, sometimes called "lines."  At times, BD members had to sell "nation work," which consisted of BD members having to sell drugs like "crack" and heroin supplied by high ranking BD members.  All of the money made from the sale of "nation work" was to go directly to the higher ranking members who supplied the drugs.

18.     Higher ranking BD members frequently held meetings among themselves to discuss their drug distribution business; to settle disputes among lower ranking members; to determine if BD laws were broken and what the appropriate punishment should be; and to discuss rival gang members selling drugs in their respective territories.  Lower ranking BD members also held meetings to discuss similar topics.

## IV.     ROLES OF DEFENDANTS IN THE BD

19.     This investigation has revealed the following about the roles of defendants in the BD:

### A.     King

a.      **MARVEL THOMPSON** is the leader of the BD.  He maintains the power and authority over all aspects of BD members' criminal activities.  Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records.  THOMPSON is referred to in the statements of CWs-1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 21, 22 and 23,

was referred to during a Title III wire interception, see paragraphs 338 and 402, is referred to in the events summarized in paragraphs 409, 410, 412, 417, 419, 432, 436, 437, 438, 441, 444, 448, 452, 454, 454, 456, 464, 467, 475, 484, 485, 488, 494, 498, 499, 500, 502, 516, 519, 544, and was referred to in the statements of BELLA and THOMAS.

### B.    Board Members

20.    Board members typically have authority over drug distribution and other BD related criminal activities in certain assigned geographic areas.

a.    **DONNELL JEHAN** is a BD board member who has authority in the area from approximately the Dan Ryan Expressway to Cottage Grove Avenue, and from 61st to 71st streets. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. JEHAN is referred to in the statements of CWs-1, 3, 4, 7, 8, 12, 17, 18, 19, 20, 21, 23 and 24, was intercepted during a Title III wire interception, see paragraphs 300 and 354, is referred to in the events summarized in paragraphs, 411, 412, 414, 423, 425, 432, 441, 442, 445, 451, 453, 455, 499, 502, 516, 540, 541, and 544, and was referred to in the statement of THOMAS.

b.    **KENYATTA COATES** is a BD board member who has authority in the Englewood neighborhood of Chicago. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed

11

records. COATES is referred to in the statements of CWs- 4, 5, 8, 9, 16, 17, 18, 19, 20, 21, 23 and 26, was intercepted during a Title III wire interception, see paragraph 279, 282, 284 through 292, 294 through 296, 298 through 303, 313, 317, 320, 326, 327, 328, 336, 339, 340, 341, 343, 344, 345, 352, 354 through 365 and 367 through 408, is referred to in the events summarized in paragraphs 415, 433, 439, 443, 445, 446, 447, 448, 450, 480, 481 and 494 and was referred to in the statement of THOMAS.

      c.    **ALBERT SPAN** is a BD board member who has authority for the west side of Chicago. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance and information derived from public, law enforcement and subpoenaed records. SPAN is referred to in the statements of CWs-11, 12, 13, 14, 15, 24 and 25 and is referred to in the events summarized in paragraphs 416, 475, 484, 485, 491, 492, 493, 496, 498, 499 and 501.

      d.    **MELVIN HERBERT** held the rank of Chairman of the Board, or second in command under THOMPSON. He also was a BD board member in the area of 55th to 60th Streets from Indiana to Michigan Avenue. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. HERBERT is referred to in the statements of CWs-4, 8, 17, 18, 19, 20, 21, 23 and 24, was intercepted during a Title III wire interception, see paragraphs 339 through 342, is referred to in the events summarized in paragraphs 428, 430, 432, 436, 444, 481 and 494 and was referred to in the statement of THOMAS.

e.   **COREY EVANS** is a BD board member who, at different times during the conspiracy, has had authority at the public housing, multi-unit, high rise apartment building located at 6217 South Calumet Avenue, Chicago ("the Calumet building"). Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. EVANS is referred to in the statements of CWs-4, 8, 17, 18, 19 and 20, was intercepted during a Title III wire interception, see paragraphs 286, 325 through 333, 336, 356 and 391, is referred to in the events summarized in paragraphs 421, 424, 429, 432, 442, 451, 477 and 541 and was referred to in the statement of WASHINGTON.

f.   **JIMMY MCAFEE** is a BD board member who, at different times during the conspiracy, has had authority at the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. MCAFEE is referred to in the statements of CWs-8, 17, 18, 19, 20 and 24, was intercepted during a Title III wire interception, see paragraphs 402 and is referred to in the events summarized in paragraphs 463, 495 and 502.

g.   **RANDY CARTER** is a BD board member who has authority for the west side of Chicago. CARTER is SPAN'S nephew and operates under SPAN'S authority. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance and information derived from public, law enforcement and subpoenaed

13

records. CARTER is referred to in the statements of CWs-11, 12, 13 and 14 and is referred to in the events summarized in paragraphs 465, 475, 486, 487, 489, 490, 491, 492, 493, 496 and 498.

h.      **JAMES STEWART** is a BD board member who has had, at different times during the conspiracy, authority at the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. STEWART is referred to in the statements of CWs-4, 8, 17 and 18, was intercepted during a Title III wire interception, see paragraphs 334 through 337, is referred to in the events summarized in paragraphs 421, 424, 441, 457, 460 and 478 and was referred to in the statement of WASHINGTON.

i.      **ALFRED CREAMER** was a BD board member who, at different times during the conspiracy, has had authority at the Calumet building, and is a close associate of JEHAN. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. CREAMER is referred to in the statements of CWs-1, 4, 7, 12, 17, 18, 21, 23, 24 and 25, is referred to in the events summarized in paragraphs 423, 425, 427, 442, 516 and 544 and was referred to in the statement of THOMAS.

**C.      Outstanding BD Members**

21.      Outstanding members are BD members who do not hold official rank in the BD, but are able to exert influence over BD members either because of their relationships with BD board

14

members and/or the BD king, or because of the money they generated from heroin and "crack" sales.

        a.    **VARNEY VOKER** controls heroin and crack sales in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. VARNEY VOKER is referred to in the statements of CWs-1, 4, 7, 8, 9, 12, 17, 18, 19, 20, 21, 23 and 24, was referenced in paragraph 284, was intercepted during a Title III wire interception, see paragraph 364 and is referred to in the events summarized in paragraphs, 449, 4790, 511, 529, 530, 532 and 541.

        b.    **VARMAH VOKER** controls heroin and crack sales in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. VARMAH VOKER is referred to in the statements of CWs-1, 4, 7, 12, 17, 18, 19, 20, 21, 23 and 24, was referenced in paragraph 284, was intercepted during a Title III wire interception, see paragraph 364 and is referred to in the events summarized in paragraphs 440, 470, 528, 529, 530, 532 and 541.

        c.    **LASEAN FORD** controls crack sales in the area of 64th to 66th Streets and Stewart. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. FORD is referred to in the statements of CWs-1

2, 3, 4, 9 18, 17 and 21 was intercepted during a Title III wire interception, see paragraphs 343 through 345, 365, 393 and 394, is referred to in the events summarized in paragraphs 415, 466, 521, 531 and 534 and was referred to in the statement of ROBINSON.

d. **WILLIE MOTEN** once held the rank of minister in the BD, and more recently exerts influence over BD members because of his relationship with JEHAN, and because of the success of his heroin and crack distribution operations in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. MOTEN is referred to in the statements of CWs-17, 18, 19 and 20 and is referred to in the events summarized in paragraphs 445, 517, 529, 530, 540, 541 and 542.

e. **JAMES WILLIAMS** exerts influence over BD members because of his relationship with THOMPSON and his ability to conduct kilogram sized drug transactions. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. WILLIAMS is referred to in the statements of CWs-4, 9, 17, 18, and19, was referenced in paragraph 284, was intercepted during a Title III wire interception, see paragraphs 301, 339, 340, 345, 388 and 392 and is referred to in the events summarized in paragraphs 415, 426, 432, 435 and 451.

f. **BARRY MICKIEL** exerts influence over BD members because of his relationship with THOMPSON and his ability to conduct kilogram sized drug transactions.

16

Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. MICKIEL is referred to in the statements of CWs-17 and 18, was intercepted during a Title III wire interception, see paragraph 351 and 352 and is referred to in the events summarized in paragraphs 420, 426, 432 and 518.

### D. Ministers/Co-Ministers

a. **ANTOINE PENNINGTON** is a BD minister in territory controlled by COATES. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. PENNINGTON is referred to in the statements of CWs-1, 4, 9, 18 and 21, was intercepted during a Title III wire interception, see paragraphs 350, 365, 380, 388, 389, 390 and 402 and is referred to in the events summarized in paragraphs 422 and 448.

b. **MARVEL MCCRAY** is a BD minister in territory controlled by CARTER. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. MCCRAY is referred to in the statements of CWs-11, 12, 13 and 14 and is referred to in the events summarized in paragraphs 413, 475, 482, 485, 486, 487, 489, 490, 492, 493, 497, 498, 499 and 510.

c. **JEREAL REID** is a BD minister in territory controlled by SPAN. REID is also a drug supplier for BD spots. Evidence against this defendant includes information provided

17

by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. REID is referred to in the statements of CWs-11, 12 and 14 and is referred to in the events summarized in paragraphs 489, 498 and 543.

d. **RONNELL HUDSON** is a BD minister in the area of 69th and Halsted streets, and is a close associate of THOMPSON. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. HUDSON is referred to in the statements of CWs-3, 16 and 25 and is referred to in the events summarized in paragraphs 417, 418, 437, 467,502 and 519.

e. **JULIAN CHISM** held the rank of minister for the area of 49th and Laflin Streets and most recently was working for VARNEY VOKER'S, VARMAH VOKER'S and MOTEN'S drug selling operation near the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. CHISM is referred to in the statements of CWs-20, 22 and 17, was intercepted during a Title III wire interception, see paragraphs 230 and 249 and is referred to in the events summarized in paragraphs 508, 516, 528, 535 and 540.

**E.     Directors/Co-Directors**

a. **HENRY INGRAM** is a director in the Englewood area. Evidence against this defendant includes information provided by CWs, defendant's own statements to law

18

enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. INGRAM is referred to in the statements of CWs-18 and 21, was intercepted during a Title III wire interception, see paragraphs 355 through 363, 376, 387 and 388 and is referred to in the events summarized in paragraph 480.

      b.    **ROYAL GARRETT** is a director on the west side of Chicago under CARTER. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. GARRETT is referred to in the statements of CWs-11, 12 and 13 and is referred to in the events summarized in paragraphs 465, 475, 486, 489, 491, 493 and 498.

      c.    **GEORGE WASHINGTON** is a director in the area of 64th to 66th Streets and Cottage Grove to Langley. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. WASHINGTON gave a statement.

      d.    **JERMAINE IRVING** is a BD director under HUDSON. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. IRVING is referred to in the statement of CW-16 and is referred to in the events summarized in paragraphs 417, 469 and 512.

19

e.   **JULIAN ROBINSON** is a BD director under FORD and managed the drug distribution location operated by FORD in the area of 64th to 65th and Stewart Streets. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. ROBINSON is referred to in the events summarized in paragraphs 521, 526, 527, 536, 537 and 538 and in his statement.

f.   **SHELBY HURD** is a BD director in the area of 55th to 58th and Indiana streets. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. HURD is referred to in the statements of CWs-4 and 17, was intercepted during a Title III wire interception, see paragraph 284, is referred to in the events summarized in paragraphs 432 and 445 and was referred to in the statement of THOMAS.

**F.   BD Members**

a.   **KEITH LOCKHART** is part of the drug distribution operation conducted by VARNEY VOKER, VARMAH VOKER and WILLIE MOTEN in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. LOCKHART is referred to in the statement of CW-20 and is referred to in the events summarized in paragraphs 477, 524 and 529.

20

b.    **HENRY JENKINS** is part of the drug distribution operation conducted by VARNEY VOKER, VARMAH VOKER and WILLIE MOTEN in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. JENKINS is referred to in the statement of CW-19 and is referred to in the events summarized in paragraph 504.

c.    **ANTOINE MCDANIELS** is part of the drug distribution operation controlled by COATES. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. MCDANIELS is referred to in the statement of CW-18 was intercepted during a Title III wire interception, see paragraphs 353, 354, 371, 372, 374, 376, 377, 378, 379, 384, 385, 386 and 387 and is referred to in the events summarized in paragraphs 422 and 447.

d.    **TERRANCE STREETER** is part of the drug distribution operation controlled by COATES. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. STREETER is referred to in the statement of CW-9 and was intercepted during a Title III wire interception, see paragraphs 358, 359, 360, 364, 365, 366, 367 and 368.

e.    **PAUL SLAUGHTER** is part of the drug distribution operation at the

21

Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. SLAUGHTER is referred to in the events summarized in paragraph 477.

        f.      **ERIC JOHNSON** is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes information provided by CWs, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. JOHNSON is referred to in the statements of CWs-1, 3, 2, 17 and 18, was intercepted during a Title III wire interception, see paragraphs 289, 292, 293, 312 and 318 through 324 and is referred to in the events summarized in paragraph 540.

        g.      **DELARIUS REYNOLDS** is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes information provided by CWs, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. REYNOLDS is referred to in the statements of CWs-17 and 18 and was intercepted during a Title III wire interception, see paragraphs 346 through 349.

        h.      **JUANELL COPELAND** is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. COPELAND is referred to in the statements of CWs-17 and 18 and is referred to in the events summarized in paragraphs 509 and 541.

22

i.     **LAWRENCE TATE** is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes information provided by CWs, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. TATE is referred to in the statement of CW-18 and was intercepted during a Title III wire interception, see paragraphs 304, 305, 306, 307, 308, 309 and 310.

j.     **ERNEST CLARK** is JEHAN'S brother and is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, law enforcement surveillance and information derived from public, law enforcement and subpoenaed records. CLARK is referred to in the statements of CWs-17 and 18 and is referred to in the events summarized in paragraphs 442, 445, 517 and 541.

k.     **ZEBEDEE THOMAS** is part of the BD controlled drug distribution operation in the area of the Parkway Gardens public housing complex located at approximately 63rd street and King drive, and in the area of the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. THOMAS is referred to in the statements of CWs-4, 18 and 26 and is referred to in the events summarized in paragraphs 432 and 434.

l.     **DEON HOLLOWAY** sells drugs and works armed security for the gang's drug operation at the Calumet building. Evidence against this defendant includes information provided by CWs, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law

23

enforcement and subpoenaed records. HOLLOWAY is referred to in the statement of CW-21 and is referred to in the events summarized in paragraphs 468, 477, 479, 505 and 513.

      m.    **CARL BROWN** is part of the drug distribution operation in the area of 61st street and Michigan Avenue. BROWN also assisted CW-18 in the distribution of crack to BD members at the Calumet building. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. BROWN is referred to in the statements of CWs-17 and 18, was intercepted during a Title III wire interception, see paragraphs 297, 311, 312, 313, 314, 315, 316 and 317 and is referred to in the events summarized in paragraphs 443, 473 and 516.

      n.    **NICHOLAS BELLA** sells drugs for the BD drug operation in the area of 100th and State to Michigan. Evidence against this defendant includes defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. BELLA is referenced in his statement.

      o.    **GREGORY HAMPTON** is part of the drug distribution operation at the Calumet building. Evidence against this defendant includes defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. HAMPTON is referred to in the events summarized in paragraphs 463 and 477.

      p.    **DERRICK WHITE** sold crack for the BD drug operation located at the

24

public housing high rise apartment buildings at 45th Street and Federal. WHITE also was an armed security worker for that drug operation. Evidence against this defendant includes information provided by CWs, recorded conversations, defendant's own statements to law enforcement, law enforcement surveillance, seizures of drugs, firearms and/or United States currency law enforcement and subpoenaed records. WHITE is referred to in the events summarized in paragraphs 458 and 459.

q.    **WILLIE TURNER** sells drugs for the gang's drug operation in the area of 59th and Normal. Evidence against this defendant includes information provided by CWs, law enforcement surveillance, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. TURNER is referred to in the statement of CW-18, was intercepted during a Title III wire interception, see paragraphs 295, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382 and 383 and is referred to in the events summarized in paragraphs 415 and 450.

**F.    Non-BD Members Involved in the BD Drug Conspiracy**

a.    **FINNIE HAWKINS** is a member of the Black P Stone nation street gang. HAWKINS is related to CW-18, who is a BD member. HAWKINS bought multi-kilogram quantities of powder cocaine from COATES, which he in turn distributed to his own customers in the Chicago area. Evidence against this defendant includes information provided by CWs, Court authorized Title III intercepted calls and information derived from public, law enforcement and subpoenaed records. HAWKINS is referred to in the statement of CW-18 and was intercepted during a Title III wire interception, see paragraphs 294, 297, 298, 301, 397, 398, 399 and 408.

b.    **NINO ASEMOTA** is a wholesale supplier of heroin for MOTEN, VARNEY VOKER and VARMAH VOKER. Evidence against this defendant includes information provided

25

by CWs, recorded conversations, law enforcement surveillance, seizures of drugs, firearms and/or United States currency and information derived from public, law enforcement and subpoenaed records. ASEMOTA is referred to in the statement of CW-24 and is referred to in the events summarized in paragraph 542.

       c.     **GENERALL VOKER** is the father of VARNEY VOKER and VARMAH VOKER. G. VOKER assisted his sons in laundering the monetary proceeds they made through the sale of heroin and crack. Evidence against this defendant includes information provided by CWs, law enforcement surveillance and information derived from public, law enforcement and subpoenaed records. G. VOKER is referred to in the statements of CWs-7and 19 and is referred to in the events summarized in paragraph 511.

## V.    PROBABLE CAUSE

### A.    Historical Information

#### 1.    CW-1

22.    On or about February 11, 1997, CW-1, entered into a plea agreement and agreed to cooperate with the government in exchange for a reduced sentence. CW-1 pled guilty to federal drug charge, and was sentenced to 122 months in the federal Bureau of Prisons ("BOP").

23.    CW-1 became a BD member at 15 and was a board member from 1994 through 1995. According to CW-1, Coconspirator A was the king of the BD prior to Coconspirator A's incarceration in the late 1980s. Presently, the king of the gang is THOMPSON. The leaders of the BD are the board members. Coconspirator A's most trusted board members included THOMPSON, Coconspirator A's nephew and JEHAN. Other BD board members that CW-1 knows are: PENNINGTON, CREAMER, VARNEY and VARMAH VOKER, known as "the Twins." CW-1

also knew the two main BD ministers in the early to mid-1990s, who managed THOMPSON'S drug operation during that time. In the late fall or summer of 1995, CW-1 was with THOMPSON and heard him say that certain ministers had been promoted to board member positions in an attempt to confuse law enforcement about the gang's hierarchy.

24.     As board members, PENNINGTON controlled the area from 61st and Normal to 61st and Western, and CREAMER controlled heroin sales at various public housing buildings located at: 220 East 63rd street, 6200 South Wabash avenue and at the Calumet building.     CW-1 stated that, prior to CW-1's incarceration, all BD board members controlled their own drug selling operations, and were expected to pay THOMPSON at least $2,000 every two weeks.  THOMPSON passed the money collected from the board members to Coconspirator A's daughter.  CW-1 gave the required amount of money to Coconspirator A through THOMPSON during the time CW-1 was a board member.

25.     CW-1 first met THOMPSON in 1988.  CW-1 learned that THOMPSON was Coconspirator A's right hand man, and managed drug sales and money for Coconspirator A.  With Coconspirator A's help, THOMPSON bought buildings throughout the south side of Chicago, including: the building which contained the Nice & Easy Lounge at 73rd and Halsted; a building housing a currency exchange, liquor store, and restaurant at 69th and Halsted; and a house at 101st and Church streets.  THOMPSON also owns a record production company which produces rap music.  One of the groups that THOMPSON produces music for has two BD members.

26.     The BD board members held meetings every other week, which CW-1 typically attended.  Meetings were often held at THOMPSON'S building at 69th and Halsted streets, in the offices of a construction company THOMPSON owned, and at other locations.  The last board

27

meeting CW-1 attended was in the summer of 1995.

27.     CW-1 first began using THOMPSON as a supplier of both powder and crack in 1994 and bought approximately 4 and 1/2 ounce quantities of either crack or powder cocaine at a time. During one of these purchases of crack from THOMPSON, CW-1 met THOMPSON in the area of 68th and Emerald Streets where THOMPSON gave CW-1 the crack. According to CW-1, THOMPSON kept cocaine at a home THOMPSON had at 66th and Union, where Coconspirator A's daughter later lived. After CW-1 bought the crack on that occasion, CW-1 gave it to FORD, who broke it down into 50 individual dime bags of crack. CW-2 and another BD member actually packaged the cocaine for street sales. In 1995, CW-1 became partners with FORD in a crack selling operation. Prior to that, FORD sold crack in the area of Marquette and Normal near a laundromat. CW-1 sold crack with FORD throughout the year in 1995 and made the required $2,000 bimonthly payment to THOMPSON. THOMPSON also supplied many BD drug operations with cocaine, including the BD operation at 68th and Emerald.

28.     FORD had another supplier of cocaine. FORD took the cocaine to a residence in approximately the 400 block of West Marquette, where another BD member cooked the powder cocaine into crack. CW-2 and another BD member then packaged the crack into dime bags for individual sales. FORD brought the crack to apartment #101 at 755 West 68th Street. Apartment #101 belonged to CW-3, but it was CW-1 and FORD who paid the rent. CW-1 and FORD also used apartment #103 at 755 West 68th street to stash crack.

29.     FORD and CW-1 not only paid the rent for CW-3's apartment, but also paid CW-3 $300 per week to pass out crack to the drug sellers for the operation. The sellers sold each packet of crack for $10. Besides cash, drug workers who sold crack for CW-1 also accepted food stamps,

28

cellular telephones and firearms in exchange for crack. The sellers were allowed to keep $100 for every 50 packets of crack that was sold. One of the sellers was JOHNSON. FORD controlled another crack selling operation at approximately 6548 South Stewart. On two occasions, FORD paid CW-1 to protect him from BD leaders who wanted to take over his distribution location. CW-1 passed the money collected from FORD for protection to THOMPSON.

30.     During CW-1's partnership with FORD, a number of BD members were arrested while working the drug spot, including JOHNSON and CW-3, and FORD posted bail for them using CW-1's and FORD'S money. Around this same time, FORD bought a GMC Yukon from CW-1 through a straw purchaser, meaning that FORD paid $17,500 for the Yukon but the title was placed in his stepfather's name.

31.     After CW-1's arrest in 1996, FORD continued to sell crack, and told CW-1 that PENNINGTON took control of the crack selling location at 755 West 68th street.

### 2.     CW-2

32.     On or about February 13, 1997, CW-2, entered into a plea agreement and agreed to cooperate with the government in exchange for a reduced sentence. CW-2 pled guilty to a federal drug charge and was sentenced to 160 months in the BOP.

33.     CW-2 became a BD in 1987 when CW-2 was a freshman in high school. CW-2 attended BD meetings held on Fridays at a gym in the area of 64th and Sangamon streets in Englewood. The minister for CW-2's area and the co-minister ran the meetings. According to CW-2, the BD hierarchy as of February 1996 was as follows: Coconspirator A was known as the king; THOMPSON was the high supreme minister; under THOMPSON were board members including CW-1, JEHAN and others. There were also about 30 to 35 BD ministers, including PENNINGTON.

29

Some ministers worked directly for THOMPSON, and they had a rap group. THOMPSON had a recording studio where he produced this group's rap records, near 69th and Halsted.

34.     The principle source of income for the BD was drug sales, and many of the board members had their own drug distribution territories in Chicago. Because of his rank, THOMPSON could have his drugs sold anywhere in BD territory throughout Chicago. As of February 1996, JEHAN controlled BD drug sales along 63rd Street from Stony Island to Wentworth or Yale, including the public housing building at 220 East 63rd Street. On occasion, BD leaders ordered BD members to sell "nation dope," meaning that the drug workers had to sell cocaine supplied by the BD leaders. CW-2 attended board members' meetings because he was invited by CW-1. The meetings were in the area of 69th and Halsted, and elsewhere, although CW-2 was not allowed to sit with the board members during the actual meeting.

35.     As a board member, CW-1's territory was bounded by 66th, Halsted, 73rd and Wentworth Streets. In late 1994 or early 1995, FORD became partners with CW-1 in a crack selling operation in this area. CW-2 worked for the operation. CW-2's job was packaging larger quantities of crack into smaller bags for street sales, 50 of the bags were put into larger bags called "packs." This was done at FORD'S girlfriend's upstairs apartment on Marquette Road, east of Stewart. Other BD members also worked for the operation.

36.     After CW-2 packaged the crack, CW-2 and FORD took the crack to CW-3's apartment at 755 West 68th Street. FORD had a key to this apartment. CW-2 or FORD stashed the packs in hiding spots in the apartment. Also in those hiding spots were stacks of cash and firearms. CW-2 has seen FORD armed with 9 millimeter and .380 caliber pistols. CW-3 sold the crack or gave it out to other drug sellers, like JOHNSON, to sell. Later, the selling location moved to 66th

30

and Stewart, where customers had to give the sellers a password in order to buy crack. This was done to avoid undercover police officers from catching the sellers. The selling locations alternated between 6610 South Stewart and 410 West 66th Place on CW-1's and FORD'S orders, in order to keep the police from raiding the locations.

37.     While CW-2 worked for the drug operation, CW-2 picked up drug proceeds from the apartment at 755 West 68th Street and brought it to FORD or CW-1. The amount of money was between $2,000 and $3,500, and was not the entire amount made from 1 day of crack sales. In 1995, CW-2 delivered $5,000 to Coconspirator A's daughter, who resided in the area of 66th and Emerald Streets, on behalf of CW-1 and FORD.

38.     FORD and CW-1 ordered violations, including beatings, for individuals who violated BD rules. For example, CW-3 was violated after being accused by FORD of stealing drug proceeds. FORD also ordered that a drug worker be given a "pumpkin head" as a violation for allowing drug proceeds to be robbed. A "pumpkin head" means that a person is beaten so severely, that the person's head swells to the size of a pumpkin.

### 3.     CW-3

39.     On or about December 16, 1996, CW-3, entered into a plea agreement and agreed to cooperate with the government in exchange for a reduced sentence. CW-3 pled guilty to a federal drug charge and was sentenced to 96 months in the BOP.

40.     CW-3 was a BD member and has been associated with the gang most of CW-3's life. According to CW-3, THOMPSON is the highest ranking member of the BD not in prison. Prior to his incarceration, Coconspirator A was the king and THOMPSON was the co-leader. The BD governing board consisted of: CW-1, JEHAN, PENNINGTON and other BD members.

31

41.     Beginning in about 1993, CW-3 sold crack in the area of 73rd Street and Vincennes for a BD minister. CW-1 was a BD board member and controlled a large crack selling operation at 755 West 68th Street in the apartment complex where CW-3 lived. CW-1 controlled a BD area bordered by Stewart, Morgan , 63rd and 74th. FORD, JOHNSON, CW-2 and other BD members sold crack for CW-1's operation at 755 West 68th Street. CW-1 paid the rent for CW-3's apartment, #101. JOHNSON moved into the apartment after CW-3 moved out sometime in 1995, and CW-1 continued to pay the rent.

42.     As a board member, CW-1 attended high level gang meetings, which were often held at the Royal Improvement construction company office and elsewhere.[1] THOMPSON is the highest ranking BD other than Coconspirator A. CW-3 has known THOMPSON since CW-3 was a child. CW-3's family and THOMPSON'S family had a very close relationship.  CW-3's cousin is HUDSON.

43.     CW-3's role in CW-1's and FORD'S drug operation at 755 West 68th Street was to collect, count and keep drug proceeds and store crack in CW-3's apartment. CW-3 counted the money and FORD collected it a few times each day for several months in about 1994 and 1995. FORD and CW-2 brought 50 dime bag packs of crack for the sellers to sell. The crack was hidden in CW-3's apartment until it was ready for sale. CW-3 also stored various firearms to be used by BD drug workers. When the sellers, like JOHNSON, sold a couple of 50 packs, they brought CW-3 $500 for each 50 pack and CW-3 gave them additional crack to sell. The workers made up to $2,000 per week. CW-1 allowed BD workers to sell their own crack at the locations. After CW-3 collected

---

[1] Through a review of public records and interviews with BD members, your Affiant has learned that Royal Improvement was owned by THOMPSON and had an office at 765 West 69th Street.

and counted the drug proceeds, CW-3 gave the money to CW-1. The operation typically made $7,000 to $10,000 each day. CW-3 also kept a notebook accounting for the daily crack sales at 755 West 68th Street, and estimated that 1,000 bags of crack were sold on an average day and as many as 2,000 bags of crack were sold on days when public aid checks were issued.

44.     CW-3 kept the accounting notebook for two reasons: (1) to protect CW-3 from allegations by CW-1 of stealing drug proceeds; and (2) because THOMPSON directed CW-3 to determine how much money CW-1's drug operation was making, because THOMPSON did not believe that CW-1 was paying enough "street tax" to Coconspirator A for CW-1's operation. All BD board members had to provide a percentage of their drug sales to THOMPSON, who, in turn, provided it to Coconspirator A's family. On one occasion, JOHNSON gave CW-3 drug proceeds and CW-3 took the money to CW-1, who told CW-3 to take the money to THOMPSON. CW-3 delivered the "street tax" directly to THOMPSON, who was holding a board member meeting at a house around 67th and Union Streets. THOMPSON owned two houses at 6621 and 6623 South Union Street, and owned other properties in Chicago including: (a) a building at 8331 South Seeley; (b) 6440 South Parnell; (c) 6727 South Parnell; (d) 765 West 69th Street; and (e) a house on the far south side of Chicago in the 100s, where CW-3 saw a large quantity of cash in $20, $50 and $100 bills.

45.     CW-1's drug operation worked in the following manner. First, FORD would obtain wholesale quantities of cocaine from another BD supplier. Next, FORD would transport the cocaine to 442 West Marquette, where it was cooked into crack. Third, FORD, CW-2 or another BD member then brought the crack to apartment #101 at 755 West 68th Street. Fourth, drug workers, including JOHNSON, then sold the crack from various apartments within the building for $10 per

33

packet. Finally, JOHNSON collected the money from the drug sellers and gave it to CW-3, who, in turn, gave it CW-1. When the drug operation at 755 West 68th Street closed down, the operation moved to the 6600 block of South Stewart and 6437 South Stewart.

### 4. CW-4

46.     In or about May 1999, CW-4, entered into a plea agreement and agreed to cooperate with the government in exchange for a reduced sentence. CW-4 pled guilty to a federal drug charge and was sentenced to 240 months in the BOP. Also, a motion for a further sentence reduction is pending. CW-4 is currently participating in the witness security program.

47.     CW-4 became a BD at the age of 15, and remained a member through 1998. CW-4 became familiar with many ranking BD members through CW-4's affiliation with the gang. CW-4 became a BD through CW-4's relationship with CW-1, a board member. THOMPSON is the current king of the BD. Coconspirator A was the king before THOMPSON, but is now incarcerated in state prison.

48.     CW-4 began selling drugs for THOMPSON in 1991, when THOMPSON became a BD minister. THOMPSON ultimately was appointed leader by Coconspirator A, and immediately held a meeting of top BD leaders at "the Castle," at 60th and Normal Streets, a multi-unit apartment building. THOMPSON announced his authority and introduced everyone else to his guys, including HUDSON and others.

49.     THOMPSON declared that BD members would make money through the "Freeman Family Rules," meaning BD members sold drugs on behalf of the BD or risked being beaten or killed by members of the Vanguard, which were the enforcers for the gang. In 1992, CW-4 attended a meeting called by THOMPSON at a house on 113th and Yale. CREAMER, JEHAN and others were

present. THOMPSON called the meeting to acquaint ranking BD members with each other and to try and promote harmony among the leaders, hoping to spread harmony through the ranks. At this meeting, THOMPSON stressed the BD law of "aid and assistance," and that failure to follow that law would result in fines or violations. Violations, according to CW-4, were given for breaking BD rules such as stealing another BD members' drugs or talking to the police. Violations ranged from a single punch to beatings with fists or bats, to being shot in the leg or murdered.

50.     At that time, BD members working drug spots were paid about $200 per week. Workers selling drugs or collecting money were paid $500 per week, and workers packaging drugs made $600 per week. In the early 1990s BD members sold powder cocaine at their drug spots and later in the 1990s began selling crack. CW-4 packaged cocaine into smaller bags for Street sales for THOMPSON. CW-4 worked at 438 West 60th, an apartment belonging to BD board member COATES. THOMPSON mixed kilograms of cocaine with powder dietary supplements, and stretched each kilogram to 1 and 1/2 kilograms of cocaine to sell. THOMPSON began putting $20 worth of cocaine in "nickel bags," which are bags of cocaine that would ordinarily sell for $5 on the Street, to boost sales at his drug spots, which numbered 15 to 20. Sales were about $15,000 to $20,000 a day at each of THOMPSON'S spots. CW-4 also helped count money from different drug spots run by THOMPSON.

51.     When a particular drug spot ran out of cocaine, a worker brought in the money generated from the sales, and CW-4 provided the runner with more cocaine packets to sell. CW-4 counted the money and bundled it into stacks of $1,000 each. CW-4 kept records of how much money each spot brought in and how much cocaine the spots were given. As THOMPSON'S drug spots grew, he allowed higher ranking BD members to run the spots, while he supplied the cocaine

35

and collected the profits. THOMPSON "fronted" workers the cocaine and told them what proceeds he expected in return. "Fronting" means that drugs are given to customers on credit, with payment due after the drugs are sold.

52.     In 1991, THOMPSON extended the BD operation to the Calumet building where many ranking BD members, their families and friends lived. The Calumet building became the gang's east side headquarters, replacing the Castle. THOMPSON acquired the Calumet Building in a deal with JEHAN, who was formerly a GD. THOMPSON offered JEHAN a minister position in the BD over the Calumet building and other east side public housing buildings. In return, JEHAN agreed to use THOMPSON as his source of cocaine, and agreed to sell "nation work," meaning that all of the proceeds of drug sales went directly to Coconspirator A's family. JEHAN accepted THOMPSON'S offer and all of his crew became BD members. Some of JEHAN'S crew were given ranking positions in the BD. CREAMER was made co-minister, VARMAH VOKER was made head director and STEWART was made co-director. VARNEY VOKER is VARMAH VOKER'S twin brother, and also held a position in the gang.

53.     THOMPSON supplied cocaine to the Calumet building and JEHAN ran the day-to-day operations. JEHAN administered harsh violations to BD members who violated gang rules, including shooting them in the leg. During this time, a war erupted between the BD and the Gangster Disciples Street gang ("GD") over drug territory. JEHAN ordered BD members to shoot GD members. On one occasion, CREAMER shot at some GD members. This occurred at 61st and Calumet. After that, the police stopped JEHAN while he was driving in a car near the Calumet building and JEHAN fought with the police then fled into the building. JEHAN went to Texas for a period of time and left CREAMER in charge of the drug operation at the Calumet building.

JEHAN ultimately returned and took over again. JEHAN'S spots, including the Calumet building, were making $200,000 to $300,000 a day from drug sales.

54. THOMPSON gave Coconspirator B control of the area around 68th to 69th and Normal to Sangamon to sell drugs. Coconspirator B was loyal to THOMPSON and carried out shootings on THOMPSON'S orders. Coconspirator B had a drug spot. CW-4 packaged cocaine and counted money with other BD members, including HUDSON'S cousin for Coconspirator B's drug operation, in Coconspirator B's apartment at 68th and Union. Coconspirator B provided THOMPSON with a portion of the proceeds. Later, CW-4 opened a cocaine spot near 65th and Normal. THOMPSON fronted CW-4 with kilograms of cocaine to begin the operation. The operation ran well and CW-4 was able to pay THOMPSON within 2 or 3 days.

55. During the late 1980s and early 1990s, the BD and the GD had an ongoing dispute over gang membership and drug territory. At one point, THOMPSON held a meeting and demanded that all ranking BD members donate $5,000 to a BD fund used to provide lawyers and bond money to BD members who were arrested on murder charges. Those BD members who did not pay would be violated and stripped of their rank. During the gang wars, BD membership increased as people sought to avoid becoming targets of BD shootings.

56. In 1992 or 1993, CW-4 held the rank of director for the area at 64th and Normal. THOMPSON later elevated CW-4 to co-minister. While acting as co-minister, CW-4 met HERBERT, who was the security director for the Calumet building. During this time period, CW-4's board member was CW-1. In 1993, CW-4 was promoted by CW-1 and Coconspirator A to head co-minister for the area of 59th to 95th and State to Western. CW-4's responsibilities included: ensuring BD members below CW-4 attended gang meetings, ordering violations and ensuring fair

37

treatment of lower ranking gang members. While CW-4 was co-minister for this area, THOMPSON continued to front CW-4 kilograms of cocaine. Shortly thereafter, CW-4 simply bought kilos from THOMPSON. THOMPSON charged CW-4 about $2,000 less per kilogram of cocaine if CW-4 paid on the spot instead of having it fronted.

57.    CW-4 learned how to "blow up" kilograms of cocaine, meaning mixing cocaine with powder supplements, thus doubling the quantity of drug and the money that could be made from drug sales. CW-4 helped other BD members "blow up" cocaine, including: COATES, JEHAN, CREAMER and THOMPSON. CW-4 did this work near 64th and Normal and charged $200 per ounce for "blowing up" the cocaine. COATES was the director in the area around 60th and Normal. CW-4 occasionally fronted COATES powder cocaine and cooked powder cocaine into crack for COATES. CW-4 also cooked powder cocaine into crack for THOMPSON, making about six kilograms of crack from three kilograms of powder cocaine once a week for about one month. THOMPSON then learned how to do it himself and did not need CW-4's help.

58.    In about late 1992, JEHAN and another BD member came to see CW-4 and demanded that CW-4 pay $10,000 a month for the right to sell drugs in their territory. JEHAN outranked CW-4 so CW-4 went to visit Coconspirator A in prison. Coconspirator A told CW-4 that CW-4 did not have to pay and the subject was dropped. In 1992 or 1993, THOMPSON was in charge of all of Chicago for the BD. In this position, THOMPSON continued to supply other BD members with cocaine. The amounts supplied by THOMPSON ranged from 1/8 of a kilogram to a kilogram. THOMPSON began to invest some of the money he earned from cocaine sales into real estate and buildings. THOMPSON threw king David picnics to honor the Disciples founder, David Barksdale.

59.     During this time, THOMPSON also began selling nickel bags with $20 worth of cocaine in the housing projects that ran along State and Federal Streets from 35th to 49th. THOMPSON appointed a BD member to run the Stateway Gardens public housing buildings on 35th Street, and other BD members to run the drug selling at the public housing buildings on 45th and 49th Streets.

60.     CW-4 made BD members in CW-4's area contribute to the poor box, which was used to help BD members who were arrested. An assistant BD director was in charge of the poor box. CW-4 had approximately 200 BD members under CW-4's command in the areas of 65th and Normal and 66th and Lowe. CW-4 employed workers in three different 8 hour shifts to act as drug sellers, look-outs or security. CW-4's spots sold crack and powder cocaine supplied by THOMPSON and others. CW-4 sold about 400 $10 bags of crack a day at spots CW-4 controlled. Eventually, THOMPSON stopped supplying the drug spots directly and used others to supply some of the spots in return for $5,000 a week for this privilege. All BD spots had to pay THOMPSON a percentage of the gross sales. The proceeds were collected by THOMPSON'S brother or other board members. Typically, each spot paid THOMPSON 10% of the gross proceeds.

61.     From 1991 to 1993, CW-4 sold FORD 1/8 to 1/4 kilogram quantities of cocaine 2 to 3 times per month. CW-4 also cooked powder cocaine into crack for FORD and charged him $200 per ounce of crack cooked.

62.     In about 1996, CW-4 was released from prison following a drug conviction. Upon release from prison, THOMPSON met with CW-4 and asked CW-4 why CW-4 had not come to see him upon CW-4's release. THOMPSON offered CW-4 a board member position in the BD, but CW-4 declined. CW-4 then began selling crack at his own drug spot in Englewood.

39

63.     COATES was a board member for the area of State to Western and 50th to 80th. CW-4 occasionally sold 1/8 to 1/2 kilogram quantities of cocaine to COATES and his crew. THOMPSON approached CW-4 and asked if CW-4 cared if THOMAS sold heroin in CW-4's area, then THOMAS began to sell heroin for a short period of time.

64.     After becoming king of the BD and with the arrest of GD leaders, including their top leader Larry Hoover, THOMPSON began to insulate himself by only dealing with BD board members and hanging around the building at 69th and Halsted. HUDSON was a close associate of THOMPSON'S. THOMPSON and THOMAS bought buildings and rehabilitated them with BD workers who knew construction. THOMPSON bought the buildings to launder the proceeds of his drug sales. Because of his rank, if police attempted to search THOMPSON, other BD members would step in and fight with the police so that THOMPSON could get away.

65.     In about 1998, THOMPSON spoke with CW-4 over the telephone and asked CW-4 to pay for the funeral of CW-4's cousin, who was shot and killed. THOMPSON promised to repay CW-4 because CW-4's cousin was a BD member who sold drugs and paid "street taxes" to the BD. THOMPSON asked CW-4 to pay at that time because THOMPSON told CW-4 that he did not have time to get donations from other BD members. This benefit was expected for any BD member like CW-4's cousin. THOMPSON resolved disputes between BD members, including the kidnaping of a BD member by other BD members over a drug debt. Present during the meeting to resolve this dispute were: THOMPSON, JEHAN and CREAMER. THOMPSON ordered a BD member beaten as a violation and ordered him to pay the kidnaped BD member $10,000. A dispute arose regarding the payment that THOMPSON ordered and another meeting with THOMPSON was held. At that meeting, THOMPSON again ordered the same BD member to pay. THOMPSON again offered CW-

40

4 a ranking position in the BD and CW-4 again refused.

66. At the time of CW-4's arrest in about 1998, COATES controlled the Englewood neighborhood and FORD worked for him. The far south side area called the "100s" was run by THOMPSON'S body guard who was always armed. EVANS was a minister and JEHAN was the board member for the Calumet building, where crack and heroin were sold. HURD, a BD, was a source of heroin for the Calumet building. STEWART sold cocaine for EVANS at the Calumet building, and the operation made $20,000 to $150,000 a day in drug sales. CW-4 previously sold 1/8 to 1/4 kilogram quantities of cocaine to EVANS. A BD member also occasionally supplied EVANS with cocaine if JEHAN was unable to. HERBERT was the board member for the "New Town" area of the south side during this time. There were BD members who ran drug spots in Peoria for the BD. VARNEY VOKER and VARMAH VOKER sold heroin on the south side, and from about 1996 to 1998, WILLIAMS, a BD member, brokered cocaine deals between CW-4 and other BD members. Following CW-4's arrest in 1998, CW-4 spoke to PENNINGTON about a $20,000 drug debt PENNINGTON owed CW-4.

### 5. CW-5

67. On about January 24, 1999, CPD officers arrested and charged CW-5 for possession of 2 kilograms of cocaine at the Calumet building. Following a continuing investigation by the FBI and CPD, that state charge was dropped. CW-5 entered into a proffer agreement with the state in 1999, and on about March 27, 2000, CW-5 entered into a proffer agreement with the government and also agreed to cooperate in the BD investigation.

68. CW-5 was a drug dealer who sold drugs with a GD member. The GD member told CW-5 that one of his sources of cocaine was COATES. On about January 24, 1999 CW-5 and the

41

GD member met with COATES at the Parkway Gardens public housing complex at 64th and King Drive. CW-5 remained in the car while the GD member went inside the housing complex and came out with COATES, and they both entered the car. The GD member drove with COATES in the front and CW-5 was in the back seat.

69.     They drove to the Calumet building. On the way, the police began to follow them. The GD member and COATES jumped out of the car at the Calumet building and ran into the building. CW-5 saw COATES drop 2 kilograms of cocaine as COATES ran into the Calumet building, which the police recovered. CW-5 could not get out of the car and was arrested by the police.

### 6.     CW-6

70.     On about October 31, 1998, CPD officers executed a search warrant at 5212 South Cornell, apartment #305 and recovered approximately 1/4 kilogram of crack, some cash and drug paraphernalia. On about December 21, 1998, CW-6 was arrested and charged in state court with possession of the crack. CW-6 entered into a proffer agreement with the state in 2000, and later with the government, and also agreed to cooperate in the BD investigation. After further investigation, and based on CW-6's cooperation, the state charge was dismissed.

71.     In the fall of 1997, CW-6 met HERBERT and they began a sexual relationship. On about September 23, 1998, CW-6 leased apartment #305 at 5212 South Cornell. HERBERT paid for the apartment and instructed CW-6 to put the apartment lease in CW-6's name. HERBERT also paid for a telephone and a car and had CW-6 put those items in CW-6's name as well. In about October 1998, CW-6 observed HERBERT packaging crack in CW-6's apartment. Around this same time, CW-6 observed HERBERT talking to guys who referred to him as "Daddy," and traveled with

42

him to the Wabash building.

72.     After CW-6 was arrested in December 1998, CW-6 told officers that the crack, cash and drug paraphernalia they found during the October 31, 1998 search of the Cornell apartment were HERBERT'S. After the officers left, HERBERT came home and CW-6 told HERBERT about the raid. HERBERT hit CW-6 in the face and swore at CW-6. HERBERT brought CW-6 to see a lawyer and the 3 of them discussed the raid, then the attorney and HERBERT spoke alone. Over the next 2 months, HERBERT beat CW-6 on several occasions, including a particularly bad beating after HERBERT found a CPD officer's card in CW-6's possession. HERBERT instructed CW-6 to call the CPD officer and tell him that the crack seized on October 31, 1998 belonged to CW-6.

73.     On about December 21, 1998, CW-6 met with the CPD officer and an Assistant State's Attorney. CW-6 told them that the crack and cash belonged to CW-6. CW-6 lied because CW-6 was scared of what HERBERT might do to CW-6 and CW-6's family. After CW-6 was charged with possession of the crack, HERBERT told CW-6 that he paid for the attorney to represent CW-6. After CW-6's release from jail, HERBERT told CW-6 that if anything ever happened to him, whether he was in custody or not, he could have CW-6 and CW-6's family killed.

7.     **CW-7**

74.     In about June 2002, CW-7 voluntarily contacted law enforcement regarding CW-7's knowledge of BD members. CW-7 cooperated in the BD investigation. As a result of CW-7's cooperation, CW-7 and CW-7's children were relocated at the expense of law enforcement. CW-7 has convictions for prostitution. CW-7 is the estranged wife of VARNEY VOKER, and they have a child together.

75.     In about 1997, CW-7 met VARNEY VOKER at a car wash in Atlanta that he owned

43

with his twin brother VARMAH VOKER. One week after CW-7 met VARNEY VOKER, he bought CW-7 a Mercedes Benz vehicle and told CW-7 that VARMAH VOKER had given him $1,000,000 after he, VARNEY VOKER, got out of prison. VARNEY VOKER told CW-7 that he got out of prison in 1995, and that he had been in prison for drugs.

76.     CW-7 and VARNEY VOKER moved to Las Vegas, Nevada and were married in about January 2000. In Las Vegas, CW-7 worked for an escort service and VARNEY VOKER sold drugs. VARMAH VOKER flew to Las Vegas from Chicago on a regular basis and the brothers often drove back to Chicago together. VARNEY VOKER did not have a legitimate job, and his only source of income was drug dealing. While living in Las Vegas, VARNEY VOKER received a stuffed teddy bear through the mail, cut it open, and retrieved a large quantity of heroin, which VARMAH VOKER had sent to VARNEY VOKER. In about October 2000, VARNEY VOKER used drug proceeds to buy a gold Range Rover SUV. VARNEY VOKER and CW-7 drove to Chicago in the Range Rover and stayed with VARMAH VOKER at his home in Country Club Hills, Illinois. While in the Chicago area, CW-7 met VARNEY VOKER'S father, G. VOKER, who lived at 7246 South Claremont, Chicago. CW-7 learned that VARNEY VOKER and VARMAH VOKER were known on the Streets of Chicago as "the Twins," and that they ran the heroin operation for the BD at the Calumet building.

77.     VARNEY VOKER and VARMAH VOKER stored drug proceeds at G. VOKER'S home, as well as at their uncle's home on Drexel in Chicago. G. VOKER helped his sons hide the source of their drug money by buying property and buildings. After staying at VARMAH VOKER'S home for a short period of time, CW-7 and VARNEY VOKER moved into an apartment in River City, located in the south loop area. She and VARNEY VOKER obtained false employment

44

documents, which cost from $500 to $3,000 per document, that VARNEY VOKER bought. CW-7 and VARNEY VOKER used the documents to obtain their River City apartment. VARNEY VOKER provided CW-7 with $10,000 cash per week while they lived at River City. CW-7 was present in CW-7's apartment when VARNEY VOKER and VARMAH VOKER brought in large garbage bags full of money, about every other week. The VOKER brothers were sometimes assisted by their younger brother or their nephew.[2] The money was bundled and marked with pieces of paper identifying the drug seller, dollar amount and/or shortage.

78.     In about late 2000, CW-7 was with VARNEY VOKER and VARMAH VOKER when they met with JEHAN. VARNEY VOKER told CW-7 that JEHAN was the head BD member for the Calumet building, and that VARNEY and VARMAH VOKER had to pay JEHAN $80,000 a month to sell heroin in the Calumet building. VARNEY VOKER said STEWART, a BD member, typically made the money pick-ups for JEHAN. VARNEY VOKER told CW-7 that JEHAN collected the money on behalf of THOMPSON, who VARNEY VOKER referred to as "the man." While CW-7 lived with VARNEY VOKER in Las Vegas, THOMPSON occasionally called him on the telephone. VARNEY VOKER feared THOMPSON but they developed a relationship because VARNEY VOKER made so much money for THOMPSON. VARNEY VOKER drove CW-7 around Chicago and pointed out buildings that THOMPSON owned, and told CW-7 that THOMPSON laundered his money through a music shop he owned. VARNEY VOKER also told CW-7 that THOMPSON sold marijuana out of the music shop.

79.     In about May 2001, at VARNEY VOKER'S direction, CW-7 helped him count bags

_____

[2] As discussed by other CWs below, their nephew was killed in a intra-BD dispute about BD drug territory following the law enforcement raid on the Calumet building in December 2001.

of money VARNEY VOKER had brought to their apartment in River City. CW-7 helped VARNEY VOKER count $3,000,000 on that night alone. VARNEY VOKER referred to $1,000,000 as a "meal ticket." VARNEY VOKER bragged to CW-7 that he had made three meal tickets in a 6 month period, and that he made $45,000 a day in heroin sales at the Calumet building. According to CW-7, the BD drug operation at the Calumet building works as follows. Sentries are posted at the north and south entrances of the Calumet building as well as 2 other look-outs at the grocery store across the Street. The sentries use walkie talkies that were provided by VARNEY VOKER to communicate. The sentries alert the drug sellers of police presence. The sellers sold heroin on the first and third floors of the building. EVANS, a BD member, was in charge of handing out the work assignments for the building. EVANS determined who worked security, who sold drugs and when. EVANS also handed out beating violations.

80. VARNEY VOKER said that another BD member, CREAMER, was also responsible for ordering violations and assigning BD members to carry out violations. A BD member CW-7 only knew by nickname controlled the collection of drug money and the delivery of heroin to servers on behalf of VARNEY VOKER at the Calumet Building. In about January 2001, CW-7 traveled with VARNEY VOKER to the Calumet building. Prior to their arrival, VARNEY VOKER called his BD collector at the building and told him they were on their way. When CW-7 and VARNEY VOKER arrived, CW-7 waited in the car while VARNEY VOKER entered the building. VARNEY VOKER returned a short time later with a bag full of money which VARNEY VOKER said was provided to him by his collector. For a time, VARNEY VOKER and VARMAH VOKER stored their heroin for sale at the Calumet building in a Range Rover which they kept parked behind the building; this was the same Range Rover that CW-7 and VARNEY VOKER drove from Las Vegas

to Chicago. VARNEY VOKER told CW-7 that in about January or February of 2001, VARNEY VOKER instructed his collector to obtain a quantity of heroin from the Range Rover. The collector informed VARNEY VOKER that three "bricks," or kilograms of heroin, were stolen from the Range Rover. A BD member later told CW-7 that "the Twins" had discovered the identity of the thief and "took him for a ride."

81.     In conversations with VARNEY VOKER and through conversations CW-7 overheard which VARNEY VOKER was part of, CW-7 learned the following. VARMAH VOKER had a BD member that mixed heroin for Street sales for him. VARNEY VOKER also discussed "cooking" heroin with a BD member, using code words when they spoke over the telephone. "The Twins" maintained their stature at the Calumet building because their relatives lived in the building and looked out for their interests. One of these relatives transported money from Chicago to Atlanta on behalf of VARNEY VOKER and VARMAH VOKER via Greyhound bus. On one occasion, that relative brought $60,000 to Atlanta for VARNEY VOKER.

82.     VARNEY VOKER purchased wholesale quantities of heroin from some African individuals, and from a Puerto Rican supplier who also supplied COATES. COATES took over the heroin sales at the Calumet building when VARNEY VOKER left town following the Calumet building raid. VARNEY VOKER also laundered drug proceeds by purchasing luxury automobiles for cash and using nominee purchasers to hold title to the vehicles. VARNEY VOKER and VARMAH VOKER purchased two Bentleys, several Jaguars, a Mercedes Benz car and truck, a Yukon truck and motorcycles. VARNEY VOKER also had other vehicles in the past.

83.     CW-7 helped VARNEY VOKER and VARMAH VOKER buy two Bentleys at a car dealership called the Toy Store in Fort Lauderdale, Florida. CW-7 contacted someone CW-7 knew

47

who worked at the Toy Store, and told that person "the Twins" were interested in buying two Bentleys. That person instructed CW-7 not to talk over the telephone and that "the Twins" should each bring $100,000 with them. "The Twins" then traveled to Fort Lauderdale with $100,000 each, bought the Bentleys and drove them to Atlanta, Georgia. "The Twins" also bought G. VOKER a Mercedes. CW-7 also accompanied VARNEY VOKER to buy a Jaguar in Chicago at American Leasing Company on North Avenue. At the car lot, VARNEY VOKER told CW-7 to get $50,000 in cash out of their car, which CW-7 did, then VARNEY VOKER used the money to buy the Jaguar. On another occasion, VARNEY VOKER bought CW-18 a white Lexus truck at American Leasing Company.

84.     VARNEY VOKER and VARMAH VOKER owned homes in Kennesaw, Georgia, a suburb north of Atlanta. They each paid $100,000 for the houses. "The Twins" also own a car wash in Atlanta called "2WINZ," for which they paid $7,000 a month in cash. This was the location where CW-7 first met VARNEY VOKER; they also owned a nightclub in Atlanta named "2WINZ." They acquired the nightclub by paying $20,000 every three weeks in cash until they paid either $160,000 or $180,000. VARNEY VOKER told CW-7 he spent $300,000 to fix up the club.

85.     On about September 29, 2001, CW-7 was driving with CW-7's child, CW-7's stepchild, and VARMAH VOKER'S then girlfriend on the Dan Ryan expressway when they got a flat tire. Prior to leaving in the car that day, VARNEY VOKER told CW-7 that he had six "meal tickets" ($6,000,000) and that he was planning on retiring from the drug business. While CW-7 was changing the flat tire at 87th Street, CW-7 noticed a red car that had followed them from the Calumet building, and called VARNEY VOKER. VARNEY VOKER instructed CW-7 to go to the River City apartment. When CW-7 arrived at the parking garage, 2 black males got out of an older model

car and began firing a machine gun at their car. CW-7 drove through the gates of the parking garage, called VARNEY VOKER, and flagged down a police car. CW-7 told the officer what happened. VARNEY VOKER quickly arrived on the scene. The police recovered cash from VARNEY VOKER. VARMAH VOKER'S girlfriend was shot in the neck during this incident and survived.

86.     A few weeks after the shooting, CW-7 received a federal grand jury subpoena and told VARNEY VOKER about it. VARNEY VOKER flew CW-7 to Chicago and had CW-7 meet with an attorney. VARNEY VOKER told CW-7, "Shut the fuck up and do whatever he (the attorney) says." CW-7 did not testify and returned to Atlanta. Since returning to Atlanta, CW-7 received death threats from VARNEY VOKER, and as a result began to cooperate in the BD investigation.

### 8.     CW-8

87.     In about November 2002, while incarcerated within the IDOC for drug, firearm and stolen car convictions, CW-8 approached law enforcement and agreed to cooperate with the BD investigation in exchange for protection from BD members in the IDOC and relocation upon CW-8's release from prison, which CW-8 received.

88.     In about 1996, at age 15, CW-8 joined the BD. CW-8's cousin, EVANS, was a ranking BD member. EVANS asked CW-8 to join the gang and told CW-8 that CW-8 could make money working in the BD drug operation at the Calumet building. CW-8 was blessed into the gang during a BD meeting at the Calumet building. Subsequently, CW-8 attended literature meetings at the Calumet building where CW-8 learned the BD rules from older BD members. CW-8 learned the BD laws, including that the violation for cooperating with law enforcement was death.

89.     In 1996, THOMPSON was the BD king. Each ranking BD member was in charge

49

of an area of Chicago called a "set." The BD set that CW-8 joined was at the Calumet building. EVANS was the board member in charge of day-to-day drug sales at the Calumet building. JEHAN was above EVANS and was in charge of all drug spots at the Calumet building. From 1996 until his arrest in November 1999 for selling drugs and possessing a firearm, CW-8 sold crack at a drug spot in the Calumet building for EVANS.

90.     CW-8 sold crack on the first floor of the building. CW-8 worked with other BD members, and BD members also lived in the Calumet building. When CW-8 arrived for work at the Calumet building, CW-8 proceeded to apartment #1007. There, CW-8 received packs of crack to sell from EVANS or STEWART, another ranking BD member. These packs contained 25, 50, or 1,000 dime bags containing .1 grams of crack each. Thousand packs were called "G bundles." The BD have names for the dime bags which had different symbols on the bags, including: an ice cream cone (ice cream bag); a green bag (green monster); and blue bags (blue raspberry). EVANS controlled all of the crack sold in the Calumet building.

91.     The BD drug operation in the Calumet building ran 24 hours a day. CW-8 worked from 8:00 a.m. until 10:30 p.m., 5 days a week and sold five or six 25 or 50 packs of crack each day. Because CW-8 was EVANS' cousin, CW-8 was allowed to keep half of the money CW-8 made from crack sales. Other sellers made $50 per 25 pack, $100 for 50 pack, and $1,000 for each "G bundle." After CW-8 sold a pack, CW-8 took the proceeds to apartment #1007 where EVANS had a safe and CW-8 received more crack to sell.

92.     EVANS also sold larger quantities of crack, including ounce quantities. The BD also sold powder cocaine and heroin. JEHAN supplied the powder cocaine and heroin to other BD members at the Calumet building. CW-8 saw JEHAN pick up money from the Calumet building,

50

and saw him driving various vehicles. On the first and fifteenth of each month, the day government checks were issued, drug sales at the Calumet building increased significantly. The BD operated security at the Calumet building, and MCAFEE was the chief of security during the time CW-8 sold drugs there. Security would alert the drug sellers to police presence or attempts by rival gang members to rob or assault drug workers. Security workers had two way radios and firearms while working security. EVANS kept firearms in apartment #1007 for BD members to use. At times when the BD were at war with the GD, BD members were stationed on the roof of the Calumet building with SKS assault rifles.

93.    The BD also blocked the rear alleyway to the Calumet building with large green dumpsters to prevent the police from driving directly up to the rear of the building. BD members were also stationed, with radios, at 61st and 63rd Streets as look-outs for the police. All persons entering the Calumet building were frisked for weapons or to see if they were wearing recording devices.

94.    CW-8 attended BD meetings on the 16th Floor of the Calumet building. MCAFEE was a 1st D and ran the meetings. MCAFEE is now a board member. At these meetings, the BD discussed problems with the drug operation and violations were given out. CW-8 witnessed BD members receive violations, including violations ordered by EVANS that involved head to toe, no cover up beatings. At one BD meeting in the Calumet building, ranking members issued a new law changing the BD prayer that referred to Coconspirator A and replaced that name with THOMPSON'S.

95.    At times, when BD members were arrested JEHAN or EVANS gave money to drug users called "hypes" to bail the BD member out of jail so that the ranking BD members could avoid

51

signing the bond slips themselves. JEHAN and EVANS also paid for attorneys to represent BD members who got arrested. CW-8 identified other ranking BD members including: HERBERT, who frequented the Calumet building and ran a crack spot on 63rd and King Drive and VARNEY VOKER and VARMAH VOKER, who distributed drugs out of the Calumet building. CW-8 has seen "the Twins" obtain kilogram quantities of powder cocaine and drop off money in apartment #1007. On one occasion, CW-8 observed "the Twins" deliver a Nike gym bag full of money to EVANS in this apartment. "The Twins" drove silver and green Bentleys. Other ranking BD members CW-8 identified are: Arthur Robinson, a board member from 55th and Indiana; and COATES a board member from Normal Street in Englewood.[3] CW-8 saw COATES meet with JEHAN and EVANS at the Calumet building.

96.     CW-8 observed THOMPSON at the Calumet building, particularly when the BD were at war with the GD or when a BD member got shot. THOMPSON also came to the Calumet building to provide bond money for BD members who were arrested. THOMPSON owns a building at 69th and Halsted. On one occasion, CW-8 went with other BD members to a liquor store in that building and hung out in front of the store drinking. THOMPSON told them not to hang out in front of the building because the building, including the record shop, belonged to him and he did not want to attract police attention to the building.

97.     On November 10, 1999, CW-8 was arrested at the Calumet building with a .357 handgun and approximately 43 dime bags of crack. At the time of CW-8's arrest, EVANS was downstairs in the Calumet building. EVANS was holding the .357 revolver. EVANS had previously

---

[3] As part of the BD investigation, Arthur Robinson was charged with distributing crack in case number 01 CR 907, pled guilty and was sentenced to 262 months in the BOP.

told CW-8 that the .357 was stolen and advised CW-8 not to get caught with that firearm. BD security workers called out "heads up," meaning police were in the area, and EVANS gave the firearm to CW-8. CW-8 and EVANS then fled up separate stair wells, but CW-8 was caught by the police after discarding the firearm and 43 bags of crack in a garbage bag. The police officers subsequently recovered the firearm and crack.[4] In about January 2001, CW-8 went to the Calumet building and asked EVANS for some money, and EVANS gave CW-8 $400 but told CW-8 to get out of town. EVANS told CW-8 to stay with a relative in Minnesota because "things were hot around the Calumet building," meaning that there was a lot of police activity. EVANS told CW-8 that if CW-8 came back to Chicago, EVANS would kill CW-8 because EVANS thought that CW-8 had cooperated with law enforcement. In fact, CW-8 was not cooperating with law enforcement at that time.

98.    Evans was incarcerated in the IDOC with a BD member who, after his release, sent word to CW-8 that CW-8 should not return to the Calumet building because BD members wanted to kill CW-8.

### 9.    CW-9

99.    In about August 2001, CW-9 cooperated with CPD officers against FORD. Then, in about March 2003, while incarcerated within the IDOC for drug and stolen car offenses, CW-9 agreed to cooperate in the BD investigation in return for relocation upon CW-9's release from the IDOC. CW-9 has state convictions for firearm and other drug offenses.

100.   CW-9 joined the BD in 1979 when CW-9 was 9 years old. CW-9 was instructed by

---

[4] At the time of CW-8's arrest, CW-8 told officers that he was working security for the drug spot. The firearm had been reported stolen.

older BD members to learn the gang laws and prayers when CW-9 joined, and did so. A violation is a punishment for breaking BD laws that range from a fine to a beating to being killed.

101.    THOMPSON is the current BD king, and before him, it was Coconspirator A. CW-9 learned that THOMPSON was the new king at a BD meeting within IDOC. A BD minister told all BD members that Coconspirator A appointed THOMPSON as the new leader of the BD. In about 1997, CW-9 was released from IDOC and began associating with COATES, a board member, and FORD at the building on the corner of 68th and Halsted. COATES told CW-9 that THOMPSON was now the king of the BD.

102.    COATES told CW-9 that the following buildings in Chicago belonged to THOMPSON: 69th and Halsted with a record store; 67th and Parnell; and 65th or 66th and Stewart. COATES also instructed CW-9 not to sell drugs or "gang bang" near any of these buildings because THOMPSON did not want the "heat," meaning police activity, near his buildings. CW-9 identified other ranking BD members CW-9 was familiar with: HERBERT; COATES, who controls Englewood; CW-1, who is incarcerated in federal prison; JEHAN, who is from 62nd and Wabash; VARNEY VOKER and VARMAH VOKER, who sell heroin at the Calumet building; WILLIAMS, who is a close associate of COATES and handles drug tasks for COATES; FORD, who assists COATES in running the Englewood area; and SPAN, a west side BD.

103.    The BD have members and territories all over Chicago, as well as the suburbs. BD headquarters was located at the "Castle" on the south side, and now is located at the Calumet building. BD members sell heroin, crack, powder cocaine and marijuana in amounts ranging from nickel bag (.05 grams) all the way up to kilogram (1,000 grams) quantities.

104.    Beginning in about 1989, CW-9 began selling small amounts of cocaine for various

BD members at BD spots at 59th and Normal, 60th and Normal and 61st and Normal in the Englewood neighborhood. Later, CW-9 sold powder cocaine for a BD member at 60th and Princeton.

105.    CW-9 next sold nickle bags of powder cocaine for Coconspirator A's nephew at 308 West 60th Street. CW-9 sold cocaine this way until PENNINGTON got into a fight over control of the drug spot. During this time, a violation ordered by COATES on FORD was carried out by CW-9 and the remainder of the drug crew at 308 West 60th Street because FORD was bad mouthing other BD members. FORD then moved to 67th and Normal. CW-9 continued to sell cocaine from that location until CW-9 was convicted in state court of a drug offense. The cocaine that CW-9 possessed when arrested belonged to PENNINGTON and another BD member. CW-9 was incarcerated at IDOC and released in 1994.

106.    Upon being released in 1994, CW-9 began selling crack for FORD at his spot at 67th and Normal. CW-9 sold dime bags of crack, and this drug spot was generating about $3,500 a day in crack sales. FORD obtained the crack from another BD member. CW-9 was arrested on three separate occasions for possessing or selling crack at FORD'S spot. FORD posted bond for CW-9 following the first two arrests. After CW-9's third arrest, CW-9 pled guilty to all three cases and was again sentenced to the IDOC. CW-9 was released in 1997. While incarcerated at IDOC, CW-9 stayed in contact with BD members on the outside, including FORD, and learned that FORD ran a drug spot in the basement of a building located at 66th and Stewart.

107.    Upon CW-9's release from IDOC in 1997, CW-9 reunited with FORD. FORD told CW-9 he was making $10,000 a day selling crack and that he had two locations in the vicinity of 66th and Stewart where he sold crack. CW-9 began to work for FORD again selling crack. They

55

were selling 50 packs of nickel bags, making $250 per pack, and selling eight packs during the day and fourteen packs at night. CW-9 oversaw the operation, which included: managing BD workers who worked 12 hour shifts, collecting money and replenishing the workers with more crack to sell.

108.　FORD obtained powder cocaine from COATES. CW-9 occasionally picked up multi-kilogram quantities of powder cocaine for FORD from COATES, and FORD cooked the powder cocaine into crack. FORD and CW-9 used about six kilograms of cocaine every two weeks. CW-9 and another BD member broke down the crack from big chunks down into nickel bag sized pieces. CW-9 was also in charge of security at FORD'S drug spots, meaning that CW-9 supervised those BD members who worked as look-outs for the police. FORD provided workers with headphones and a police scanner to track sales and watch out for the police. Some security workers were also armed with firearms to protect the drug operation. FORD also sold crack in larger quantities at the location and CW-9 delivered 4 and 1/2 ounce quantities of crack to customers in these larger transactions. FORD paid CW-9 $700 per week.

109.　In early 1998, FORD and another BD were kidnaped and the kidnappers demanded $50,000. FORD called when CW-9 and COATES were present. COATES demanded that the kidnappers release FORD or the other BD member before they would pay the ransom, and FORD was released. COATES directed CW-9 to deliver ounces of crack to pay the ransom. CW-9 delivered eight ounces of crack to a house on the south side and the other BD member was released.

110.　In 1998, CW-9 was arrested for possessing a stolen car and again incarcerated at IDOC. CW-9 was released in about October 2000. Upon CW-9's release, CW-9 went back to selling crack for FORD, now at a drug spot located at 6437 South Stewart Street. This drug spot operated 24 hours a day, 7 days a week selling nickel bags and larger amounts of crack. FORD paid

56

CW-9 $700 per week to oversee the operation. COATES was FORD'S supplier of powder cocaine for the drug spot. COATES and WILLIAMS delivered eight to ten kilograms of powder cocaine to FORD in a basement apartment at 67th and Stewart every two weeks. FORD cooked the powder cocaine into crack. The operation lasted until FORD was evicted by the landlord in spring or summer of 2001.

111.    FORD moved his operation to the Parkway Gardens housing buildings at 64th and King Drive at the apartment of FORD'S baby's mother. FORD then rented and used the first floor rear apartment at 6502 South Harvard for the drug operation. FORD had someone else sign the lease, even though he paid the rent. FORD had a hiding spot for drugs, money and firearms built into the upper part of a wall unit in that apartment. FORD had the hiding spot built in the upper part of the unit because he thought that if the police ever raided the apartment, the police dogs would not be able to smell the drugs that high up. FORD and CW-9 cooked the powder cocaine into crack. The crack was packaged in multi-colored bags and when the sellers turned in the proceeds from the crack sales, CW-9 used different colored rubber bands to bind and identify the different sellers. CW-9 did this to monitor whether any of the drug sellers were stealing from the operation. The sellers were allowed to keep $20 from each $250 pack of crack. FORD paid CW-9 in crack and also sold larger quantities of crack from the Harvard apartment.

112.    CW-9 began cooperating with law enforcement in about August 2001 because CW-9 feared that FORD was going to harm CW-9's girlfriend. CW-9 told CPD officers about the Harvard apartment. The police searched the Harvard apartment and found FORD'S crack, money and firearms. The crack that was recovered had been provided to FORD by COATES. CW-9 also told the police that FORD hid drug proceeds inside a computer at CW-9's mother's house at 7157 South

57

Sangamon, which the police seized. After his arrest based on the search of his apartment, FORD called CW-9 and asked CW-9 to obtain bond money from FORD'S girlfriend. CW-9 also called COATES and told him what had happened to FORD. COATES sent another BD member, STREETER, to meet CW-9 and gather information about FORD'S arrest.

113. After FORD made bail, FORD questioned CW-9 about how the police found the money at CW-9's mother's house. FORD also said, "I hope you didn't tell, because you know what's up." CW-9 understood FORD'S comment to mean CW-9 would receive a death violation for telling the police about BD drug business. A few days later, FORD asked CW-9 to get a blank apartment lease, and FORD had someone else sign the lease and made some dummy rent receipts showing rent paid on the Harvard address. FORD learned that law enforcement talked to his landlord at 10130 South Normal, and told CW-9, "We have to take the landlord out."

114. After his arrest, FORD did not trust CW-9 and had CW-9 sell crack on the Street to prove that CW-9 did not cooperate with the police. On December 7, 2001, CW-9 was arrested for selling crack, provided by FORD, near 6437 South Stewart.

### 10. CW-10

115. On about May 2, 2000, CW-10 was arrested by the CPD for selling crack to an undercover officer and began to cooperate in the BD investigation. Part of CW-10's cooperation included secretly recording conversations with BD members and making undercover purchases totaling over 50 grams of crack from BD members in the 55th and Indiana area, including from board member Arthur Robinson and from another BD member, Jermaine Weeden.[5] Subsequently,

---

[5] Jermaine Weeden pled guilty in case number 01 CR 907, where he was charged with two counts of distributing crack, and was sentenced to 188 months in the BOP.

CW-10 pled guilty to a federal drug charge. In exchange for CW-10's cooperation, CW-10 received a reduced sentence of 24 months in the BOP, was relocated, might be placed in the witness security program and had a drug and a stolen car state court case dismissed. CW-10 also has convictions in state court for drug offenses.

116. CW-10 became a BD member at the age of 14 in about 1993. CW-10 began working for a BD first director in the area of 55th and Prairie selling marijuana then crack.

117. Arthur Robinson was the minister at the time CW-10 began to sell drugs. There were about ten to fifteen members for CW-10's set. CW-10 attended mandatory BD meetings. On one occasion, CW-10 was given a violation and was taken to the Calumet building, where CW-10 received a beating violation, while at the same time another BD was given a pumpkin head as a violation. At the meetings CW-10 attended, money was collected to support members in custody. For example, Arthur Robinson hired an attorney for CW-10 when CW-10 was arrested by the police with Arthur Robinson's crack in about May 2001.

118. CW-10 worked security in the 55th Street area for the BD and warned the members if rival gang members or police were in the area. The workers sold crack provided by Arthur Robinson in $5 or $10 bags of 25 packs. The sellers got $50 for every 25 dime bags sold and turned $200 over to Arthur Robinson. The sellers sold Arthur Robinson's crack or other ranking members' crack on certain days, called "nation work," and for doing so, were allowed to sell crack they procured themselves at the 55th Street operation on the remaining days. CW-10 sold seven to eight 25 bag packs per 6 hour shift, while the members working the other shift at the operation sold eight to ten 25 packs of crack.

119. Robinson went to prison in about 1995. Another BD member became the minister

59

in CW-10's area until about 1999, when HERBERT took over. THOMPSON, the BD king, appointed HERBERT to run the area. HERBERT'S area ran from 47th to 60th and from King Drive to Wabash. HERBERT appointed BD members to fill minister and director spots under him. In 1999 the BD went to war with the GD. As a result, BD members, including CW-10, working security began to carry firearms. HERBERT held BD meetings at 212 East Garfield and ordered violations because members were not showing up to work security for the drug operation. A number of BD members from the area were unhappy with how HERBERT was running things and complained to THOMPSON. In response, HERBERT ordered the violation of three or four members. About the same time, Arthur Robinson was released from prison, he told CW-10 that THOMPSON made him a board member for the area around 55th and Indiana as his territory to sell drugs.

### 11. CW-11

120.    In about August 2001, CW-11, a BD member, was shot by GARRETT. Following that shooting, CW-11 began to cooperate with law enforcement in the BD investigation. Part of CW-11's cooperation included making an undercover purchase of crack from MCCRAY, a BD member.[6] During the course of CW-11's cooperation, CW-11 was arrested and charged with possession with intent to distribute over 50 grams of crack. CW-11 pled guilty and received a reduced sentence in that case based on CW-11's cooperation in the BD investigation. In CW-11's plea agreement, CW-11 also admitted to participating in the BD crack distribution conspiracy over the course of several years. CW-11 has convictions for attempted murder as a juvenile and robbery.

---

[6] On March 6, 2003, MCCRAY pled guilty to distributing in excess of 50 grams of crack to CW-11 in the Northern District of Illinois under case number 03 CR 109. MCCRAY was sentenced to 120 months in the BOP.

CW-11 was accepted into the witness security program.

121.    CW-11 joined the GD in 1983. After leaving prison in about 1990, CW-11 began selling powder cocaine for SPAN, who was a BD minister at that time, at a spot near Monroe and Leavitt Streets. There were about ten to fifteen BD members working the drug spot for SPAN. CW-11 was allowed to work the spot even though CW-11 was not a BD member at that time because CW-11 knew how to make money and was close to SPAN. Several BD members selling cocaine at SPAN'S spot did not like CW-11 selling there because CW-11 was not a BD member.

122.    In the early 1990s, SPAN was a BD minister for the west side. There were also other ranking BD members on the west side. CW-11 ran a crack selling spot for another BD member at the 2111 West Lake Street building of the Henry Horner Homes after SPAN went to prison. CW-11 was in charge of five to seven BD members, and those members resented CW-11 because CW-11 was a GD member. CW-11 was able to maintain this position because of CW-11's relationship with another ranking BD member, and CW-11's ability to make money. The spot ran for about six months and sold about $5,000 worth of crack each day. While working at this spot, the BD put out "nation work," which was drugs supplied by the BD leaders that had to be sold at the BD spots. All of the proceeds from the "nation work" sales went to the BD leaders. THOMPSON was the highest ranking BD then and now. Another ranking BD member told CW-11 that THOMPSON had put out "nation work" to be sold.

123.    CW-11 argued with another ranking BD member over "nation work" money. CW-11 then began selling crack on CW-11's own at 2215 West Lake Street. This was in BD territory. Shortly thereafter, six to seven BD members got in a gun battle with CW-11 and one of CW-11's workers, and one BD member was shot. CW-11 and a ranking BD member eventually reconciled

61

and CW-11 continued selling at the 2215 building. Eventually, because CW-11's spot was making so much money from crack sales, the BD only allowed the spot to be open for half the day, which CW-11 did not abide by. This resulted in another shooting, but nobody was hit. A ranking BD member and CW-11 again made peace and CW-11 was allowed to return to selling crack at 2215.

124.    The 2215 spot was selling 1/2 to 1 kilogram of crack each week. The BD again moved to shut CW-11 down because the spot was in BD territory. CW-11 refused to close down. In about 1992, the BD got into a war with Traveling Vice Lord Street gang ("TVL") members. CW-11 offered to help the BD in their war, but was shot 21 times by two BD members. CW-11 recovered and resumed selling crack out of 2215 and "warring" with the BD from about late 1992 through early 1995.

125.    In about January 1995, CW-11 left the GD and joined the TVL to spite the BD. The BD and the TVL were rivals. After that, there was a meeting at Bennigan's restaurant in downtown Chicago between the leaders of the TVL, the GD, the BD and CW-11 about CW-11. THOMPSON, and other BD members attended for the BD. THOMPSON did not want to accept a TVL having control of a building in BD territory, which the 2215 building was. THOMPSON stated that 2215 was a BD building and that it would stay a BD building. The Bennigan's meeting concluded with an agreement that CW-11 would keep the 2215 building, but THOMPSON was extremely upset with this outcome. Later that same night, CW-11 was shot in the ankle by two BD members.

126.    CW-11 remained a TVL from 1995 through 1999 and sold crack from the 2215 building. The BD controlled all of the surrounding buildings in the Henry Horner Homes, and the ranking board member for the BD at that time was CARTER. CW-11 eventually broke from the TVL. BD members again pressured CW-11 to join the BD, and in 1999 CW-11 agreed and was

blessed into the gang by CARTER and another BD member at Victor Herbert park, located at 2100 West Monroe, which serves as a BD meeting location. About three members of CW-11's crew also joined the BD, but some remained TVL. Ultimately, CW-11 was made a co-minister in charge of the West Haven Apartments or "New Homes" located at Maple and Leavitt Streets. The BD ministers on the west side were MCCRAY and GARRETT. During this time period, CW-11 met directly with MCCRAY and THOMPSON at one of THOMPSON'S buildings at 67th and Parnell. There, THOMPSON told CW-11 that he was happy CW-11 joined the BD.

127.    CW-11 had six to eight gang members working for CW-11 as the co-minister in charge of the New Homes. MCCRAY and REID supplied CW-11 with 2 and 1/4 to 4 and 1/2 ounces of crack daily, and eventually 9 to 13 ounces a week. In about June 2001, MCCRAY instructed CW-11 to sell a 1/4 kilogram of crack for SPAN, who was the board member for the west side. CW-11 did so and turned all of the proceeds from this sale over to MCCRAY who, in turn, gave them to SPAN.

128.    In 2001, CW-11 was selling about $4,000 to $5,000 of crack a day at the spot, but began to have trouble with other BD members because some members of CW-11's crew were still TVL members and the BD members only wanted other BD members to make money in BD territory. The spot was open 7 days a week with the workers selling 25 packs of dime bags for $250. A BD member began supplying BD members with crack to sell at CW-11's drug spot. CW-11 first went to CARTER to resolve the problem, and subsequently to SPAN. The conversation with SPAN occurred at Victor Herbert park in about June 2001. SPAN, MCCRAY, other BD members, along with two members of CW-11's crew were present. SPAN and CW-11 argued about TVL members selling in BD territory.

129.     The BD members continued to sell from CW-11's spot, and CW-11 threatened them. Those BD members left and returned with BIRD and other BD members. BIRD asked CW-11 to get into his car to go talk to SPAN and CW-11 refused. Shortly thereafter, numerous BD members returned and had a shoot out with CW-11 and CW-11's crew. CW-11 heard that SPAN had put a hit out on CW-11. During early August 2001, CW-11 reached out to SPAN through MCCRAY, and MCCRAY said that SPAN called the hit off, but that a number of BD members were angry with CW-11.

130.     On August 8, 2001, CW-11 was riding in a car on the west side with CW-11's wife and two young children, aged 6 and 9. CARTER pulled up along side with GARRETT in the passenger seat and another BD member in the back of the car. GARRETT got out of the car and began shooting at CW-11. Both CW-11 and CW-11's six year old child were shot. Because of this shooting, CW-11 decided to cooperate with law enforcement. CW-11 identified CARTER and GARRETT as being involved in the shooting.

131.     CW-11 testified in a state court preliminary hearing regarding this shooting against CARTER and GARRETT. During this time, CARTER offered CW-11 $3,500 and a trip to Disney World if CW-11 stopped cooperating. CW-11 rejected this offer. CW-11 also received a message, through CW-11's brother, a BD member, from SPAN. SPAN said he was sorry that CW-11's child was shot but that CW-11 should have known better, and that if CW-11 testified, CW-11 better wear a bullet proof vest for the rest of CW-11's life.                                    .

132.     During the course of CW-11's cooperation with law enforcement, CW-11 recorded telephone calls and in person meetings with MCCRAY, SPAN, REID, CARTER and other BD members about the shooting. SPAN told CW-11 that CW-11 could get back into the BD good

64

graces if CW-11 recanted the prior testimony against CARTER and GARRETT. SPAN also instructed CW-11 not to have non-BD members working at the drug spot. MCCRAY and the BD counseled CW-11 on drafting a recantation about the shooting. SPAN added that THOMPSON was instituting some new BD laws. While cooperating with law enforcement, CW-11 made a written recantation of the facts surrounding the shooting that was done with the knowledge of the Cook County State's Attorney's Office. The information in the recantation was false, and was provided to MCCRAY for use by CARTER and GARRETT.

133.    In 2001 to 2002, the structure of the BD was: THOMPSON was at the top, SPAN was the board member in charge of the west side; CARTER was a board member below SPAN; MCCRAY was a minister; another BD member was a co-minister who took over CW-11's drug spot at the New Homes; and other ranking BD members ran the BD drug operations at 18th and Komensky and at 16th and Pulaski.

### 12.    CW-12

134.    In about 2001, CW-12, a BD member, began to cooperate with law enforcement. Part of CW-12's cooperation included secretly recording conversations with other BD members. In exchange for CW-12's cooperation, CW-12 was given money and relocated. CW-12 has a state conviction for a drug offense and a stolen car offense.

135.    CW-12 joined the BD at the age of 14 and became a west side BD member. At the time CW-12 became a BD, Coconspirator A was the king, but later THOMPSON became the leader. The west side board members that CW-12 has become familiar with include CARTER and MCCRAY. Victor Herbert park, near Monroe and Leavitt Streets, is a regular BD hangout and meeting spot. CARTER ran a drug spot at California and Wilcox; MCCRAY had a drug spot near

Victor Herbert park; there were also BD controlled drug spots at 16th and Pulaski and at 18th and Pulaski. CW-12 is also familiar with a BD minister who worked under MCCRAY.

136. Through CW-12's time in the BD, CW-12 knows of ranking BD members on the south side as well. JEHAN is THOMPSON'S right hand man. COATES, CREAMER, VARNEY VOKER and VARMAH VOKER are south side board members. The BD controls drug sales at its headquarters in the Calumet building.

137. In about 1987, SPAN held the rank of minister, and had a 7 day a week drug spot at Oakley and Monroe. CW-12 sold powder cocaine for SPAN at this spot for almost two years. CW-12 had the job of supplying other sellers with bags to sell. The operation sold about $1,000 of cocaine per day and CW-12 made $400 per week. Sellers in SPAN'S operation included: MCCRAY, CARTER and GARRETT. SPAN also used CW-12 to collect money from drug sales when he could not do so himself. CW-12 worked SPAN'S cocaine spot until 1992, when SPAN was arrested. During this time, SPAN sold kilogram quantities of cocaine to BD, TVL and other gang members at a price of $20,000 per kilogram. SPAN told CW-12 that he sold up to 25 or 50 kilograms of powder cocaine per week.

138. After SPAN was released from prison in 2000 or 2001, CW-12 began to hang out with him again. SPAN was now the highest ranking west side BD member. SPAN and MCCRAY supplied CW-13 with firearms and drugs during this time period. CW-13 had a crack selling spot in the building at 340 South Western Avenue.

139. From about 2000 until his arrest in 2003, MCCRAY, along with other BD members supplied all of the west side BD spots with crack and heroin. MCCRAY got the crack he sold from REID, and sells amounts ranging from 1/4 ounce through a kilogram. The BD spots MCCRAY

66

supplied include: (a) Washington and Leavitt; (b) the West Haven or New Homes; and (c) the Damen Courts Homes at Jackson and Hamlin Streets.

140.   MCCRAY also ran a heroin operation near Jackson and Hamlin Streets. CW-12 worked at that spot during 2002, while cooperating with law enforcement and without informing law enforcement. CW-12 supervised and worked security for the operation and was paid about $300 to $400 per week. MCCRAY shut the spot down in June or July of 2002. BD members sold bags of heroin for $10. There were two shifts at the heroin spot. Sellers were given 25 packs of heroin and were required to turn in $200 from the 25 pack and allowed to keep $50. MCCRAY collected money and stored heroin at a house at Washington and Washtenaw Streets. When a seller needed more heroin, CW-12 called MCCRAY to order more heroin or tell MCCRAY money was ready to be picked up.

141.   During the summer of 2002, the heroin operation was moved to a BD member's home located near Adams and Bell Streets. Later, that member was arrested and caught with 50 dime bags of heroin and several thousand dollars in cash, all of which was MCCRAY'S. After that arrest, MCCRAY shut down the heroin spot. Prior to its closure, the operation was making $40,000 per day.

142.   On Father's Day 2002, the BD held their annual party at Victor Herbert park. At the party, CW-12 observed SPAN meeting with THOMPSON, MCCRAY and JEHAN. On about July 10, 2002, SPAN told CW-12 to provide security for an upcoming meeting because THOMPSON and other ranking BD members were coming to Victor Herbert park, and CW-12 was supposed to keep the police away. CW-12 notified law enforcement about the meeting. JEHAN came to the meeting in his black Cadillac Escalade SUV. THOMPSON, SPAN, JEHAN, and at times MCCRAY, all met

and talked at the meeting. While THOMPSON was at the park, he asked CW-12 when CW-12 was coming down to the south side.

143.    During the summer of 2002, CW-12 was also present when SPAN collected "street tax" of about $1,500 to $2,000 per week from BD drug spots on the west side. CW-12 was present when MCCRAY handed SPAN a bag of money.

144.    In about August 2001, CW-11 and CW-11's child were shot by CARTER and GARRETT. SPAN told CW-12 that he was not happy with CW-11's situation and that was the reason for the shooting of CW-11. CARTER told CW-12 that he made efforts to get CW-11 to drop the charges related to the shooting of CW-11.

145.    In about September 2002, a number of GD members from the Rockwell Gardens public housing projects were arrested and charged in federal court. CW-12 went to federal court and saw another BD member, who told CW-12 that he was there to see if SPAN or MCCRAY were mentioned during the proceedings because SPAN had supplied crack and heroin to many of the GD members who were arrested in that case.

### 13.    CW-13

146.    In about 2003, CW-13, a ranking GD member, began to cooperate with law enforcement. CW-13 has been charged with a drug conspiracy unrelated to the BD investigation. In exchange for CW-13's cooperation in their investigations, the government will recommend to CW-13's sentencing judge that CW-13 receive a reduced sentence. CW-13 has been convicted of burglary, armed robbery, firearm and other drug offenses in state court.

147.    CW-13 became a GD in 1976 at the age of 13. In the 1980s CW-13 became friends with SPAN, a BD member. In about 1991, SPAN fronted CW-13 two ounces of crack to sell. From

that point, CW-13 has been involved in crack and heroin distribution on the west side of Chicago. In about 2001, SPAN was the leader of the BD for the west side. MCCRAY was a west side BD minister, and SPAN'S nephew, CARTER, was a board member.

148. In about June 2001, SPAN told CW-13 and CW-14 that he wanted CW-11 killed. Some time after that conversation, SPAN, MCCRAY and other BD members came to the GD controlled building at 340 South Western and asked CW-13 if they could hide and wait for CW-11. CW-13 saw MCCRAY and other BD members armed with firearms, and that they were using binoculars and walkie-talkies. Several weeks later, CW-11 was shot by CARTER and GARRETT; SPAN told CW-13 that CW-11 told the police who shot CW-11, and that SPAN should have killed CW-11 when he had the chance. In about September 2001, CW-13 spoke to a GD member on the telephone who was with CARTER. CW-13 told the GD member to tell CARTER that CARTER could stop hiding from the police because SPAN and MCCRAY talked to CW-11 about recanting CW-11's testimony about being shot by CARTER and GARRETT. On about November 27, 2001, CW-13 spoke with SPAN on the telephone and SPAN said that MCCRAY and others were meeting with CW-11 to have CW-11 change CW-11's testimony about the shooting by CARTER and GARRETT. In later conversations with SPAN, SPAN said that CW-11 had agreed to change the testimony.

149. In about November 2001, CW-13 spoke with MCCRAY, who was upset because firearms were stolen from a BD member then sold to GD members at the 340 Western building. Later that day, SPAN, MCCRAY and another BD member came to the 340 Western building and paid the GD members for the return of some of the firearms. In about summer 2000, CARTER fronted 9 ounce and 4 and 1/2 ounce quantities of crack to CW-13 for $5,200 and $2,200

respectively. MCCRAY and SPAN have supplied other west side GD members with drugs.

150. Following CW-13's arrest, CW-13 was housed at the Metropolitan Correctional Center ("MCC") with SPAN. In about March 2003, SPAN threatened to harm CW-13 and CW-13's family and told CW-13 to make a typed, notarized statement recanting CW-13's prior statements to law enforcement that implicated SPAN in a drug conspiracy. CW-13 made the recantation, although the information in the recantation was false, and passed it on to SPAN.

### 14. CW-14

151. In about 2001, CW-14, a GD member, was arrested and charged with armed robbery. CW-14 subsequently began to cooperate with law enforcement. CW-14 entered into a plea agreement with the Cook County State's Attorney's Office and received a reduced sentence on the armed robbery case as a result of CW-14's cooperation. Also, the government agreed not to prosecute CW-14 based on the information provided by CW-14 to law enforcement in exchange for CW-14's cooperation in drug and gang related investigations. CW-14 has other state court convictions for armed robbery as well.

152. CW-14 met SPAN in 1982 or 1983 while hanging out with other BD members. During the summer of 2001, SPAN brokered a 1 ounce heroin deal for CW-14 by putting CW-14 in touch with REID, who sold CW-14 the heroin for $2,500. CW-14 contacted SPAN again to buy more heroin, and SPAN put CW-14 in touch with MCCRAY, who sold CW-14 an ounce of heroin for $2,500. MCCRAY told CW-14 that MCCRAY could provide wholesale amounts of both powder and crack. Around June 2001, CW-14 sought SPAN'S permission to sell heroin in a BD controlled area at Monroe and Western. SPAN told CW-14 that he would check with the BD members in that area to find out if CW-14 could open a spot. While waiting for SPAN'S answer,

CW-14 asked another BD member from the west side if he would run a drug spot with CW-14, which the BD member agreed to do. SPAN agreed to allow CW-14 to work with the BD member if they bought crack and heroin to sell at the spot from BD drug suppliers. CW-14 and the BD member sold dime bags of crack and heroin for only one week because the BD member was arrested with their drugs. In that one week, they sold about $2,500 worth of crack and $2,500 worth of heroin. Around this same time, SPAN asked CW-14 and CW-13 to help him kill CW-11.

### 15. CW-15

153. In about 2002, CW-15, a GD member, began to cooperate with law enforcement. CW-15 has been charged federally with a drug conspiracy unrelated to the BD investigation. In exchange for CW-15's cooperation in their investigations, the government will recommend that CW-15 receive a reduced sentence. CW-15 has been convicted of other drug offenses and for possessing a stolen car in state court.

154. CW-15 became a GD governor, the equivalent of a minister in the BD. From about May 1992 through April 1993, CW-15 was incarcerated at the Vienna IDOC prison. CW-15's cell at Vienna was located near Larry Hoover's, the leader of the GD. CW-15 became a member of Larry Hoover's personal security staff. While at Vienna, CW-15 spoke with Larry Hoover and was present when Larry Hoover had visitors. CW-15 heard Larry Hoover talk about THOMPSON, the Street leader of the BD. Larry Hoover sent word to Coconspirator A about gang business. Some days later, THOMPSON came to visit Larry Hoover.

155. In about summer 1994, CW-15 attended a GD meeting in the area of 51st and Federal to try and end the gang war between the GD and the BD over drug and gang territory. The meeting was called by THOMPSON and "Shorty-G" for the GD. There were many ranking BD and GD

members present. Besides THOMPSON, other BD members present were: either VARMAH VOKER or VARNEY VOKER, a west side BD minister and JEHAN, the Calumet building minister. After the two gangs' leaders met, THOMPSON and "Shorty-G" announced that there would be a truce.

### 16.     CW-16

156.     On January 30, 2003, CW-16 was arrested by CPD officers after selling 3 dime bags of crack to an undercover officer. Following that arrest, CW-16 began cooperating with law enforcement. CW-16's cooperation included secretly recording conversations with BD members. In exchange for CW-16's cooperation, CW-16 has yet to be charged with selling crack to the undercover officer. Also, CW-16 has been relocated. CW-16 has prior state court convictions for an armed robbery and a drug offense.

157.     CW-16 joined the BD in about 1997 at the age of 15. CW-16 was required to learn the BD laws. King David was the founder of the BD. Coconspirator A was the next king of the BD and is currently incarcerated at IDOC.

158.     According to CW-16, THOMPSON is the current BD king. The headquarters for the BD is the Calumet building. The BD control this building and sell drugs there.

159.     CW-16 sold marijuana and crack at a BD drug spot at 60th and Carpenter. From 1997 to 1999, CW-16 worked 7 days a week and sold about 150 dime bags of crack per day. CW-16 sold drugs for whatever BD member provided the best price. About twenty other BD members were also selling drugs at this spot.

160.     COATES was the board member who controlled this area, and had ordered BD members, including CW-16, to participate in a violation of ranking BD members from the area.

72

Violations are punishments handed down by ranking BD members that range from getting your hand smashed in a car door to death. For a ranking BD member to receive a violation, the order had to come from a board member. COATES ordered three minute head to toe no cover violations of those ranking members. In addition, after the violation, one of the members was replaced as the minister for this area.

161.    CW-16 was arrested and convicted for selling drugs from this spot. CW-16 was also caught by the police with a .357 revolver in the area of 60th and Campbell. The firearm was a BD firearm, meaning a firearm available for all BD members to use for protection or to commit violent acts against rival gang members. Other BD controlled drug spots CW-16 was aware of include: 59th and Hermitage, 59th and Normal, 64th and Lowe, 79th and Carpenter, 73rd from Union to Green, 65th and Justine, 65th and Laflin and 64th and King Drive.

162.    In about late 2002, CW-16 began selling crack again at 60th and Carpenter, and was supplied with crack by another BD. During CW-16's cooperation with law enforcement in 2003, CW-16 frequented a BD controlled area at 71st and Emerald. The first director for this area offered CW-16 the chief of security job for that set. The chief of security was responsible for keeping track of how many BD drug workers were working the area, keeping track of BD firearms in the area to ensure there were enough firearms in the area to protect any ranking BD members who came to that spot, as well as to protect the drug operation, and keeping track of how many bags of drugs were being sold from the spot. CW-16 took the job and worked two of the drug spot's shifts.

163.    HUDSON was in charge of this drug spot. The drugs were kept in an abandoned house on the block and delivered to drug workers in 20, 30, 40 or 50 packs of dime bags. The spot sold about 150 dime bags a day. CW-16 collected cash from the workers and delivered it to

73

HUDSON'S apartment located in a building at 67th and Parnell, which was owned by THOMPSON. CW-16 delivered the money to HUDSON or another BD member. On one occasion, CW-16 delivered $400 of drug proceeds to HUDSON and then drove with him to a building owned by THOMPSON at 69th and Halsted. THOMPSON has a computer on the second floor. There is also a record store located in the building. HUDSON delivered the money to THOMPSON. CW-16 had previously delivered drug money to the 67th and Parnell building.

164.    In about February 2003, a ranking BD member asked another BD member that CW-16 was with to gather some BD members and send them upstairs to 69th and Halsted. About twenty BD members including CW-16 went to the second floor at 69th and Halsted where they met with THOMPSON and other ranking BD members. CW-16 and about five other BD members then went to the area of 52nd and Ashland. The group returned to the 69th and Halsted building where THOMPSON paid them $25 each.

165.    At the direction of law enforcement, CW-16 attended a BD meeting around 67th and Lowe where all members were required to pay their dues. Dues were collected from BD members and used to post bond for BD members who got arrested. In about March 2003, CW-16 was given a copy of the BD laws by another BD member, who printed the laws from a computer located on the second floor at 69th and Halsted. That BD member did not give CW-16 a full set of the laws because some of them were missing. On May 24th of each year, the BD celebrate king David day in honor of the gang's founder's birthday, and BD members hold a picnic. Prior to the picnic in 2003, a BD member told CW-16 that the BD soldiers were required to purchase three tee shirts honoring king David for $60 and keep one while selling the other two. In May 2003, CW-16 paid for three of those shirts with funds provided by law enforcement. CW-16 gave the money to an older

BD member on the second floor at 69th and Halsted while THOMPSON was working on a computer nearby.

166. The BD operate a pirate radio station on 104.7 FM in the Englewood area. One of the radio personalities, "Ghetto Man," is a BD member.

167. CW-16 testified before the federal grand jury investigating the BD on August 26, 2003. Following that appearance, officers transported CW-16 to an area near CW-16's neighborhood. Later that evening, CW-16 was walking to a store on 69th Street when HUDSON drove up in THOMPSON'S black Ford Excursion. Another BD member was in the SUV. HUDSON told CW-16 to get into the SUV to talk, which CW-16 did. HUDSON then drove towards CW-16's grandmother's house. HUDSON said, "That was a nice car your were in today," (CW-16 had only been in an unmarked police car that day). HUDSON then stopped and began to hit CW-16 along with the other BD member. IRVING, another BD member, pulled CW-16 from the SUV. All three BD members beat CW-16 about the head, body, and legs and HUDSON said, "Trick ass police motherfucker." CW-16 was able to break free and run to CW-16's grandmother's house.[7]

### 17. CW-17

168. In about April 1999, CW-17 was charged in state court with drug and firearm offenses. Following that arrest, CW-17 began cooperating with the FBI and CPD. As part of CW-17's cooperation, CW-17 made undercover purchases of crack from BD members and secretly recorded telephone calls and in person meetings with several BD members. CW-17 is a BD member.

---

[7] On December 11, 2003, HUDSON and IRVING pled guilty in the Circuit Court of Cook County to battery based on the attack of CW-16. During their plea colloquy, they stipulated that they were BD members and that they beat CW-16 because they believed CW-16 was cooperating with law enforcement.

CW-17 understands that CW-17 will be charged in the BD drug conspiracy. In exchange for CW-17's cooperation, CW-17 expects the government to recommend a reduced sentence. The government has offered to relocate CW-17 and CW-17 has been paid approximately $750 by the FBI. During the course of CW-17's cooperation, CW-17 was arrested and charged in state court with burglary. CW-17 also has a pending state court aggravated discharge of a firearm and drug case that CW-17 was charged with in about September 1997. CW-17 has prior state court convictions for burglary and possession of a stolen vehicle.

169. CW-17 was a GD member from 1984 until 1989. CW-17 sold drugs on behalf of the GD during that time. CW-17 eventually joined the BD. CW-17 knew CW-18 most of their lives.

170. While incarcerated at IDOC in the early 1990s, CW-17 met older BD members. CW-17 learned that BD members who cooperate with the police are subject to being murdered. CW-17 also learned the BD laws in prison.

171. CW-17 learned that CW-17 was expected to learn the BD laws or face violations, typically beatings by other members. Violations were typically handed down by ranking members and executed by lower ranking members. CW-17 observed a violation of a BD member that was handed down by EVANS, for failing to assist EVANS when EVANS was robbed at a gas station near 63rd and Wentworth. The BD member was beaten at the Calumet building and during the violation, other BD members took his money and drugs. COATES eventually negotiated the return of these items. COATES had fronted the drugs to the violated member.

172. On another occasion, a BD member stole a kilogram of cocaine from WILLIAMS, who was partners with COATES. COATES had the BD member who stole the cocaine, that member's brother and CW-18 brought to COATES in the trunk of a car. COATES shot the brother

in the hand, and had the robber beaten. CW-18 related what had transpired during this incident to CW-17. After that incident, CW-18 told CW-17 that CW-18 began to buy cocaine from COATES and that COATES had fronted CW-18 cocaine on occasion. In about 1999, CW-17 worked for CW-18 selling dime bags of crack at 60th and Wabash.

173. CW-17 said that THOMPSON was the BD king and JEHAN is the highest ranking board member. Since about 1998, THOMPSON and JEHAN have promoted and demoted BD members. CW-17 has attended BD meetings where promotions and demotions were announced. EVANS was promoted to board member of the Calumet building over some of the crack and heroin selling spots. EVANS replaced CREAMER. Prior to going to prison in about 1994, CW-17 was selling cocaine fronted to CW-17 by CREAMER. CW-17 sold the cocaine in dime bags at a BD controlled spot at 60th and Michigan and at the BD controlled Calumet building. CW-17 sold about two ounces of cocaine per week that was fronted by CREAMER for five to six months. Sometimes, CREAMER directed CW-17 to a BD at the Calumet building to pick up cocaine.

174. After CW-17 was released from prison in about 1997, CW-17 went to the Calumet building, and met with CREAMER and JEHAN, a board member, who said they would take care of CW-17. CREAMER fronted CW-17 two ounces of crack. CW-17 distributed the crack in the row houses on 61st and Michigan, which were public housing buildings where BD members sold drugs.

175. For about six months, CW-17 collected "street tax" from non-BD members selling drugs in BD territory on behalf of CREAMER. CREAMER'S territory at that time was bounded by 60th, 63rd, State and Vernon. THOMPSON gives board members their territories, and a BD member must obtain permission from the board member to sell drugs in that person's territory, and

77

also must pay the board member for that right, which is a "street tax." CW-17 collected tax from a non-BD drug dealer who sold drugs for a BD board member, who controlled crack sales in the Calumet building for JEHAN.

176.    The area around 60th and Wabash was previously GD territory. In about 1997 or 1998, BD leaders, including CREAMER and JEHAN ordered lower ranking BD members to drive out GD members. Some younger BD members, on orders from CREAMER and JEHAN, attempted to burn down a building in that area and shot at people there.

177.    VARNEY VOKER and VARMAH VOKER do not have rank in the BD but make a lot of money selling crack and heroin in the Calumet building and therefore have power within the gang. They have relatives who live in the Calumet building. In early to mid-1997, a BD director controlled dime bag sales of crack in the area of 60th and Wabash. The director's partner was WILLIAMS, a non-ranking BD member who sold a lot of drugs for the gang and thereby had some influence within the gang. CW-17 and other BD members sold crack for the director and WILLIAMS, selling about 100 to 200 dime bags per day for a few weeks. CW-17 then sold crack in the area of 60th and Wabash. JEHAN and CREAMER gave CW-17 authority to sell in that area. CW-17 paid BD members to work security for that operation.

178.    Typically, BD security workers are armed with firearms belonging to the gang and stored in the Calumet building. HERBERT supplied CW-17 with firearms for security purposes on occasion. CW-17 paid the security workers or gave the money to CREAMER, who paid the chief of security for the area. CREAMER and other ranking BD members used 12 and 13 year olds to sell drugs.

179.    In 1997 or 1998, a BD, member sold dime bags containing larger amounts of crack

than the typical dime bag for only $10. That member's spot at 61st and Wabash became popular and made a lot of money. It was within HERBERT'S territory. HERBERT told CW-17 that he collected a "street tax" from that member. HERBERT ultimately took over this operation himself.

180. CW-17 attended BD meetings at various locations including the Calumet building and Parkway Gardens housing projects. At meetings, the gang would discuss who they were at war with, drug sales, violations, and they would distribute money to BD members who were recently released from prison. At one BD meeting at the Calumet building, JEHAN instructed CW-17 and other BD members to attend a meeting conducted by EVANS at Parkway Gardens. During that subsequent meeting, EVANS announced he was the new board member for the Calumet building. In another meeting at the Calumet building in the mid-1990s, JEHAN passed down orders from THOMPSON that all BD members were not to talk about a murder committed by another BD member, and anyone who did not comply would be violated.

181. In about 1997, HERBERT and other BD members from 39th Street had a shootout with BD members at the Calumet building. HERBERT later told CW-17 that THOMPSON told the Calumet BD members not to retaliate. In September 1997, CW-17 and other BD members were selling crack in the area of 61st and Wabash, territory belonging to HERBERT. Undercover CPD officers were shot at by a BD member when they attempted to purchase crack from one of the sellers and to arrest him.

182. In 1999, CW-17 was arrested on a drug and firearms case, an attorney told CW-17 the attorney was paid by a BD member to represent CW-17. In the late 1990s and as recently as 2003, CW-17 saw THOMPSON with JEHAN in the neighborhood, and particularly at the Calumet building. THOMPSON had other BD members selling tee shirts at the king David picnic in 2003

79

there.

183. CW-17 has purchased crack from MICKIEL, who associates with another BD member. CW-17 bought 1/4 ounce quantities of crack from MICKIEL for a few months, and on one occasion was present when another BD member bought 4 and 1/2 ounces of crack from MICKIEL. Within the last year, MICKIEL told a BD member that after he left his Mexican cocaine supplier, he was caught with a kilogram.[8] Other BD members that CW-17 knows include: COPELAND, CW-18's cousin, a marijuana and crack seller at the Calumet building; BROWN, a partner of CW-18's who sold crack at 61st and Indiana; MCAFEE, a board member for the Calumet building; and FORD, who controls a drug spot in the area of 66th and Stewart.

### 18. CW-18

184. In February 2002, CW-18, a BD member, was arrested by East Hazel Crest police officers for unlawful possession of firearms. Following that arrest, CW-18 began to cooperate with law enforcement. Part of CW-18's cooperation included secretly recording a conversation with a ranking BD member and reviewing hundreds of telephone calls intercepted pursuant to Court authorized wire taps of cellular telephones used by CW-18 and COATES in 2000. Subsequently, CW-18 was charged federally and pled guilty to drug and firearms charges. The government will recommend that CW-18 receive a reduced sentence based on CW-18's cooperation. CW-18 has been placed in the witness security program CW-18 has additional convictions in state court for drug, firearms and burglary offenses.

185. In 1988, CW-18 began selling powder cocaine with CW-18's older brother, who was

---

[8] MICKIEL is currently charged with possession with intent to distribute over 500 grams of cocaine in the Northern District of Illinois under case 03 CR 771 based on his arrest of July 16, 2003.

a BD member, at both 6215 South Wabash, a public housing building called the "Wabash building," and from the Calumet building. Both buildings were controlled by the BD. CW-18's brother controlled BD drug sales at the Wabash building at this time. CW-18 and CW-18's brother purchased powder cocaine from THOMPSON, who in the late 1980s and early 1990s held the rank of BD minister.

186. In 1988, Coconspirator A was the king of the BD. THOMPSON is now the BD king. BD board members CW-18 knows include: MCAFEE, whose territory includes the Calumet building; EVANS, also from the Calumet building; JEHAN; a BD board member from 39th and King Drive; and COATES.

187. From 1988 until 1990, when CW-18's brother died, they bought 1/2 to 1 kilogram of cocaine from THOMPSON two or three times per month. CW-18 and CW-18's brother met with THOMPSON at CW-18's aunt's apartment at 6007 South Michigan Avenue, where they would give THOMPSON money in exchange for cocaine. CW-18 and CW-18's brother diluted the cocaine with powder supplements, packaged it into dime bags for Street sales and gave it to BD workers to sell.

188. THOMPSON and another BD member asked CW-18 to join the BD, and THOMPSON blessed CW-18 into the gang. CW-18 joined the BD because THOMPSON would only conduct his drug business with other BD members. CW-18 learned some of the BD laws. CW-18 said that a violation is the punishment for breaking a BD law and is ordered by ranking BD members, including THOMPSON and COATES. Punishments ranged from beatings with fists, slamming hands in doors, hands being shot and being killed. Being killed can be the punishment for cooperating with law enforcement. CW-18 witnessed COATES order a beating violation for a BD member who did not respect him properly.

189.    From 1990 to 1993, CW-18 maintained a BD drug operation in both the Wabash, Calumet and 220 East 63rd Street buildings. Other ranking BD members, including CREAMER, HERBERT and THOMAS also distributed cocaine, heroin and marijuana at these locations. CW-18 continued to purchase about 1 kilogram of cocaine from THOMPSON and sell it in dime bags at those BD spots. CW-18 paid HERBERT to provide BD security workers with firearms and ammunition and to help pay for the BD picnic. High ranking BD members gave money to Coconspirator A's family.

190.    When CW-18 was released from state prison in 1994, CW-18 was directed by JEHAN to get some cocaine from another BD member in the Calumet building. CW-18 got 2 ounces of powder cocaine from that BD member, cooked it into crack, and sold it in dime bags. CW-18 used the proceeds to repay JEHAN and bought more cocaine from him and the other BD member. CW-18 was sent back to state prison from 1996 through 1998. During this period, THOMPSON became king when Coconspirator A stepped down.

191.    CW-18 got out of prison in 1998. Another BD member asked CW-18 to cook some powder cocaine into crack. CW-18 did so and learned that the cocaine had been stolen from WILLIAMS. The following day, COATES, WILLIAMS and other BD members came to CW-18's aunt's house and pointed firearms at CW-18 and the BD member who asked CW-18 to cook the cocaine, and took them to WILLIAMS' apartment near 62nd and Michigan. COATES threatened to kill someone if he did not get his cocaine back and pointed a pistol with a 30 shot magazine at the robber member's head. COATES pulled the trigger but the firearm misfired. The robber member admitted to COATES that he and his brother had stolen the cocaine and that CW-18 did not know the cocaine was stolen. COATES shot the robber member's brother in the leg for violating the BD

rule prohibiting stealing from other BD members. COATES recovered about 1/2 of the stolen cocaine.

192. A few months after this incident, COATES began fronting CW-18 with 1/8 kilogram quantities of powder cocaine. CW-18 cooked the cocaine into crack and sold it in dime bags at a BD drug spot at 61st and Michigan Avenue, and at a BD controlled building at 62nd and Wabash, where HERBERT was in charge. CW-18 used HERBERT'S workers to sell the crack. CW-18 sold about an 1/8 of a kilogram of crack every two weeks. CW-18 paid the BD drug workers $50 for every 25 pack of dime bags sold. HERBERT provided armed BD members as security for the drug spots. HERBERT allowed CW-18 to sell from these spots without imposing a "street tax" because CW-18 provided HERBERT with a wholesale source for heroin. CW-18 brokered approximately 20 to 30 1/2 to 1 ounce deals for heroin between CW-18's source and HERBERT.

193. From about 1999 through August of 2000, CW-18 stopped selling dime bags of crack and began buying 1 to 2 kilograms of powder cocaine from COATES per month, and CW-18 sold ounce quantities of powder and crack to BD members, including: EVANS, FORD, REYNOLDS, STEWART, JOHNSON and CW-17. Either CW-18 or his main worker, BROWN, met the customers in the area of 61st and Michigan or at the Calumet building. The BD used code words for drugs and money.

194. In 2000, the FBI intercepted thousands of calls pursuant to Court authorized wire taps of cellular telephones use by CW-18 and COATES. CW-18 listened to hundreds of these calls, identified callers and deciphered the meaning of various calls. Many of these calls involved cocaine deals between CW-18, COATES and other BD members. Some of the BD members on the intercepted calls include the following.

a.     JOHNSON is a BD minister from 78th and Carpenter, who was fronted 1/4 kilogram quantities of crack by CW-18 twice monthly for a year. JOHNSON sold the crack in dime bags and larger quantities at his drug spots.

b.     TURNER is one of COATES' guys from Minnesota.

c.     COPELAND is CW-18's relative and stored CW-18's money and cocaine at her residence.

d.     CLARK is one of JEHAN'S brothers that worked at the Calumet building BD selling operation.

e.     MCDANIELS is one of COATES' main guys who would sell cocaine. COATES fronted MCDANIELS large quantities of cocaine. COATES purchased firearms through MCDANIELS.

f.     FORD is a BD member who worked for a board member from Englewood, CW-1. FORD had a drug spot near 65th and Stewart where he sold crack and powder cocaine. CW-18 cooked powder cocaine in 1/2 to 1 kilogram quantities into crack for FORD about fifteen times during 1999. CW-18 also sold FORD 1/4 kilogram quantities of powder cocaine on two occasions. CW-18 was present when COATES delivered powder cocaine to FORD.

g.     STEWART is a BD member to whom CW-18 sold 1/4 to 1/2 kilogram quantities of crack. CW-18 sold STEWART about a kilogram monthly during 1999 through August of 2000.

h.     EVANS was a BD board member from the Calumet building who bought 1/8 to 1/2 kilogram quantities of powder and crack from 1999 through August of 2000. EVANS bought approximately 1 kilogram a month. EVANS sold his cocaine at the Calumet building.

84

i.  HAWKINS is CW-18's relative and was a member of the Black P Stones gang. HAWKINS purchased kilogram quantities of powder cocaine from COATES.

j.  STREETER was an associate of COATES who distributed cocaine for COATES and participated in violations or beatings of BD members at COATES' direction.

195.  CW-18 was offered the rank of 1st D by EVANS in 2000, but declined the offer. During the summer of 1999, CW-18 was with COATES, HERBERT, and another BD member in the area of the row houses on 61st and Michigan when a group of rival GD members drove by and shot at them. HERBERT returned fire, as did COATES, using his .40 caliber firearm with the 30 round magazine.

196.  CW-18 attended BD meetings during the 1990s. The meetings were called by ranking members such as HERBERT, JEHAN and CREAMER. At the meetings, members would discuss BD ranks, their territories and raising money to purchase more firearms to protect the drug spots. CW-18 attended a meeting in the early 1990s at a gym near 61st and Indiana attended by ranking BD members including HERBERT, EVANS and CREAMER. They discussed the number of BD members killed by rival gangs. JEHAN was upset about the lack of support shown by BD members. JEHAN wanted BD members not to comply with police orders to be searched.

197.  From about 1990 to 1995, ranking BD members at the Calumet building collected dues from members to pay for firearms and to post bond for members who were arrested. In 2000, a BD member was arrested for murder and EVANS and VARNEY VOKER used all of the proceeds from the Calumet building for a period of time to pay for his bond.

198.  In 1993 or 1994 HERBERT, a minister at the time, ordered CW-18 violated for refusing to work security, and the violation consisted of a one minute beating by three other BD

85

members. All BD drug spots have security to protect the operation from police activity and rival gang members. Some BD security workers were armed to protect them against robberies by rivals. Security workers blocked the alley behind the Calumet building with dumpsters, searched drug buyers coming into the building, and posted armed look-outs around the building, including on the rooftop.

199. In 2000, COATES ordered CW-18 violated because CW-18 owed him money for cocaine. COATES was in Cook County jail and CW-18 went to visit him with other BD members including INGRAM, WILLIAMS and PENNINGTON. During this meeting, COATES instructed CW-18 to give the money CW-18 owed to COATES to WILLIAMS. CW-18 gave the money to WILLIAMS, but was still given a violation consisting of a 3 minute beating behind the Calumet building. EVANS eventually stopped the violation. A few days after the violation, INGRAM took CW-18's car. JEHAN told CW-18 he would try to get the car back. Later, after COATES got out of jail, COATES had PENNINGTON return the car to CW-18.

200. In August 2001, CW-18 promoted a party at the Cotton Club in Chicago, and during the party EVANS and other BD members started a fight. Management had to spray tear gas and open the doors to get them to leave. The following day at the Calumet building, a BD board member, MCAFEE, told CW-18 that CW-18 violated BD rules by not supporting the other BD members during the fight at the Cotton Club. CW-18 was taken to the fourth floor of the Calumet building and beaten by four or five younger BD members. CW-18 was hospitalized as a result of the beating and suffered broken ribs.

201. During a party CW-18 promoted at a night club, CW-18 met with THOMPSON in the V.I.P. section. THOMPSON asked CW-18 why COATES had violated CW-18 in 2000 and CW-

86

18 explained what happened. THOMPSON instructed CW-18 that if CW-18 had any future problems with BD members, CW-18 should call him.

202. In June 2002, COATES requested CW-18 to meet with him. CW-18 did not attend the meeting. This violated BD laws because CW-18 had disrespected a higher ranking BD member. CW-18 learned that COATES ordered CW-18 "shot on sight." CW-18 talked to JEHAN about the order, and JEHAN told CW-18 to call THOMPSON. JEHAN told CW-18 he was upset with THOMPSON because THOMPSON told other BD members only to listen to him, which undercut board members' power. JEHAN and CW-18 then drove to 63rd and Wabash and met with COATES, who told CW-18 that CW-18 was lucky that INGRAM did not find CW-18 because he would have shot CW-18. JEHAN and COATES told CW-18 that CW-18 was going to be violated for disrespecting COATES. A number of BD members then arrived and COATES told them that the violation would not start until another BD member arrived, who was one of COATES' guys. CW-18 was taken to an abandoned building at 72nd and Emerald and beaten by fifteen BD members for 5 minutes.

203. In April 2002, prior to the above described violation, CW-18 recorded a conversation with HERBERT. During the conversation, CW-18 asked HERBERT to have THOMPSON intervene with COATES and call off the violation. HERBERT agreed to speak to THOMPSON.

204. CW-18 delivered 2 kilograms of powder cocaine to MICKIEL for COATES on two occasions, and sold MICKIEL 2 kilograms of cocaine once when COATES did not have any for sale. CW-18 said CREAMER ran BD heroin spots in the Calumet and Wabash buildings in the early 1990s. CW-18 said that VARNEY VOKER and VARMAH VOKER were ranking BD members that sold heroin at the Calumet building. CW-18 said another BD member worked with MOTEN

and "the Twins" selling heroin at the Calumet building.

205.    CW-18 is aware that THOMPSON owns several buildings on the south side of Chicago, including one at 67th and Parnell, which is an apartment building with a recording studio in the basement. Another building THOMPSON owns is located at 69th and Halsted and contains a currency exchange. COATES told CW-18 that he gave THOMPSON $400,000 in drug proceeds to purchase real estate.

### 19.    CW-19

206.    In May 2003, CW-19, a GD member, began to cooperate with law enforcement. CW-19 secretly recorded conversations with BD members. CW-19 has been charged federally with a crack conspiracy unrelated to the BD investigation. The government will recommend that CW-19 receive a reduced sentence. CW-19 has been convicted of drug, firearm and stolen car offenses in state court.

207.    CW-19 joined the GD in 1992. CW-19 sold crack in 1992 in the area of 105th and Edbrooke. CW-19 obtained this crack from both GD members as well as from a ranking BD member.

208.    Beginning in about 1992, CW-19 met MOTEN, a BD member. CW-19 came to know several BD members through MOTEN, including JEHAN and THOMPSON. CW-19 met THOMPSON, who was a BD minister then, and who is now the BD leader, in 1993. A BD member from "the 100s" told CW-19 in 1993 that he paid THOMPSON $10,000 per week for the right to sell drugs on the far south side of Chicago, in an area known as "the 100s." In about 1993, CW-19 helped that member count $10,000 in cash that was given to THOMPSON.

209.    Based upon CW-19's relationship with MOTEN, CW-19 became familiar with BD

drug dealing and money laundering. During conversations with BD members, including MOTEN, CW-19 learned that JEHAN asked MOTEN to be a board member, but MOTEN declined because he felt he was too old and did not want the responsibility. CW-19 also learned that JEHAN is a board member who controls the drug dealing in the Calumet building area, MCAFEE is a board member who controls the crack sales in the Calumet building and EVANS is a board member who held MCAFEE'S position previously. WILLIAMS is close to THOMPSON, and like COATES was "untouchable," meaning orders from them were given as if from THOMPSON himself and had to be obeyed.

210. From 1998 through May 2003, CW-19 sold MOTEN approximately 1 kilogram of cocaine each week, about half was sold as crack and the other half was powder. MOTEN had workers who sold the crack in dime bags in the parking lot at Vito's store, which is near the Calumet building. MOTEN brokered cocaine deals in which CW-19 sold cocaine to BD members from the Calumet building.

211. During this time period, CW-19 had access to the Calumet building and the surrounding area because of CW-19's relationship with MOTEN and other ranking BD members. CW-19 cooked powder cocaine into crack in the Calumet building for members such as EVANS and MCAFEE, who then sold it in 25 or 50 packs and sold in different colored bags to signify whose drugs were being sold. MOTEN used blue colored dime bags to sell between 1998 and 2003. Other sellers used different colors or symbols on their bags to signify their line.

212. From about 1998 to 2002, CW-19 sold 2 and 1/4 to 4 and 1/2 ounces of cocaine a week to MCAFEE. CW-19 cooked the powder cocaine into crack for him. In early 2002, following the police raid at the Calumet building, VARNEY VOKER or VARMAH VOKER paid CW-19

89

$20,000 for a kilogram of powder cocaine and said that they were giving the kilogram to MCAFEE because he had just been appointed board member for the Calumet building and they wanted to help him make some money. Thereafter, CW-19 sold MCAFEE approximately 2 kilograms of cocaine per month until May 2003. CW-19 also sold 1/2 kilogram quantities of cocaine to EVANS. CW-19 was supplied with kilograms of cocaine by COATES on about two occasions in about 2002.

213. In early 2002, MOTEN and VARNEY VOKER paid CW-19 $20,000 for a kilogram of cocaine for EVANS. Following the raid of the Calumet building in late 2001, EVANS lost his position because of the murder of a BD member.[9]

214. CW-19 met VARNEY VOKER and his twin brother, VARMAH VOKER, known as "the Twins," in 1998 or 1999. "The Twins" sold heroin at the Calumet building. Their father, G. VOKER, and their Nigerian uncles helped them to purchase heroin. A few months after the police raid on the Calumet building, MOTEN told CW-19 that "the Twins" were going to start selling heroin again at the Calumet building. CW-19 loaned MOTEN $50,000 so MOTEN could join "the Twins" in the operation. A few weeks after the operation began, MOTEN paid CW-19 back $45,000 of the $50,000 that was owed. CW-19 was present at a meeting involving JEHAN, VARNEY VOKER, MOTEN and WILLIAMS. JEHAN told VARNEY VOKER that he wanted $25,000 a month to allow them to continue running their operation. WILLIAMS said THOMPSON wanted $30,000 month

215. VARNEY VOKER and MOTEN said that the operation would run 24 hours a day in 3 shifts, and the mixers and sellers would be BD members. Security would change daily and

---

[9] A BD member pled guilty to the shooting and killing of a BD member in the Circuit Court of Cook County under case 02CR-5159 and was sentenced to 20 years in the IDOC.

typically be staffed by drug users. BD members from the Calumet building were paid about $2,500 a month to oversee the security operation.

216. There are constant security measures in place at the Calumet building to protect drug sales there, including searches of everyone entering the building.

217. JENKINS is an older BD member who worked for MOTEN selling crack. CW-19 was present when one of "the Twins" offered JENKINS the position of running the operation for $15,000 per month and JENKINS accepted. JENKINS was responsible for passing out the packs and collecting the money from the sellers. CW-19 saw JENKINS passing out packs and collecting money in the Calumet building from early 2000 through May of 2003. The operation sold 1 kilogram of heroin at the beginning, even giving away heroin for free to generate more business. VARNEY VOKER, VARMAH VOKER and MOTEN bought 5 more kilograms of heroin and sold it in dime bags as a part of the ongoing operation. "The Twins" and MOTEN were the only group allowed to sell heroin in and around the Calumet building. Other BD members were relegated to selling crack and marijuana. From May of 2002 until May 2003, the operation sold about 2 kilograms of heroin per week.

218. CW-19 allowed VARNEY VOKER, VARMAH VOKER and MOTEN to use some buildings CW-19 owned to mix and package heroin. CW-19 was present when JENKINS, MOTEN and VARNEY VOKER mixed heroin in CW-19's building located at 10747 South Michigan Avenue. JENKINS took the packs of dime bags to the Calumet building, and returned with proceeds from the operation. VARNEY VOKER, VARMAH VOKER and MOTEN stored money at various locations including at the apartments of their girlfriends. VARNEY VOKER, VARMAH VOKER and MOTEN counted the money generated by heroin sales and used money counters to do so

because of the volume of cash. The money was counted and bundled into "stacks" of $1,000 or $10,000. MOTEN and "the Twins" each kept their share of the money and distributed the rest to BD workers, JENKINS, THOMPSON and JEHAN. CW-19 was present when JEHAN was paid "street tax" by "the Twins" and MOTEN. VARNEY VOKER complained to CW-19 about how much money he had to pay THOMPSON and JEHAN per month.

219.    During the winter of 2002, MOTEN told CW-19 that JENKINS was arrested with some of the heroin packs from their operation. Thereafter, CW-19 met MOTEN, VARNEY VOKER and some other BD members to discuss bonding JENKINS out of jail. MOTEN and VARNEY VOKER posted the bond money. MOTEN gave his sister the money and she bonded JENKINS out.

220.    CW-19 has a friend that is a real estate broker and loan officer, who showed THOMPSON property to buy. THOMPSON asked that person to help him start a corporation to facilitate the purchase of real estate in order to launder drug money. THOMPSON wanted to use trust funds to obtain legitimate bank loans. CW-19 has discussed with VARNEY VOKER and VARMAH VOKER their use of drugs proceeds to purchase cars and real estate. VARNEY VOKER told CW-19 that they bought: (a) a nightclub in Atlanta Georgia on Peach Street called "Twinz"; (b) a car wash; and (c) houses in Atlanta. CW-19 has also observed "the Twins" driving Bentleys, Jaguars, Harley Davidson motorcycles, and a Mercedes Benz.

221.    Since 1998, CW-19 has seen many BD members in and around the Calumet building with firearms, and JEHAN has instructed BD workers to make sure that they were armed. VARNEY VOKER also directed MOTEN to purchase firearms for the BD workers to protect their heroin operation.

**20.    CW-20**

92

222.    On October 31, 2003, CPD officers arrested CW-20 for possession of crack. Following that arrest, CW-20 agreed to cooperate with law enforcement. During CW-20's cooperation, CW-20 has secretly recorded telephone calls and in person meetings with BD members. Because of CW-20's cooperation, the Cook County State's Attorney's Office dismissed charges in another drug case in which CW-20 was charged. CW-20 has been convicted of other drug offenses and a robbery offense in state court.

223.    CW-20 was a GD member from the 1970s until about 1985. CW-20 grew up with MOTEN and was familiar with the BD drug distribution operation at the Calumet building. In December 2001, the police raided the Calumet building. From that time through October 31, 2003, CW-20 sold both crack and heroin for MOTEN and VARNEY VOKER and VARMAH VOKER at both the Calumet building and at Vito's store near 63rd and Calumet. MOTEN purchased crack from CW-19 and a Black P Stone gang member. One of MOTEN'S workers was arrested during the Calumet building raid.

224.    Beginning in December 2001, and continuing for six months, CW-20 sold crack provided by MOTEN. MOTEN fronted CW-20 two to six ounces of crack which CW-20 sold in nickel and dime bags at MOTEN'S drug spot in front of Vito's grocery store. Various apartments in the Calumet building and Parkway Gardens projects were used to mix and package the drugs for sale. VARNEY VOKER and VARMAH VOKER usually paid drug users to act as security. Anyone entering the Calumet building was searched by security workers, who are on the look out for firearms or radios in the case of police officers. MOTEN and "the Twins" sold heroin and crack, and "the Twins" sold marijuana at the Calumet building.

225.    In the summer of 2002, VARNEY VOKER and VARMAH VOKER began selling

93

heroin at 64th and King Drive. At the same time, MOTEN began selling heroin at the lot at Vito's. During the summer of 2002, MOTEN told CW-20 that "the Twins" wanted to combine their heroin operation with MOTEN'S. MOTEN agreed. Approximately one month later, CW-20 and MOTEN met with a Nigerian in the Evanston/Chicago area to buy 200 grams of heroin. CW-20 and MOTEN brought the heroin to the Calumet building where it was packaged and sold at the Calumet building. CW-20 said VARMAH VOKER had a girlfriend who lived in the Parkway Gardens and stored money and drugs there.

226. VARNEY VOKER and VARMAH VOKER offered to pay MOTEN $25,000 a month to sell heroin. MOTEN agreed to the deal and continued to assist "the Twins" in their distribution of heroin at the Calumet building. "The Twins" packaged their heroin in peach and orange colored dime bags.

227. CW-20 worked for VARNEY VOKER and VARMAH VOKER from the summer of 2002 through November 2002. "The Twins" used BD members including LOCKHART to sell heroin for them. "The Twins" had three shifts for heroin sales: (a) 12:00 a.m. to 8:00 a.m.; (b) 8:00 a.m. to 4:00 p.m.; and (c) 4:00 p.m. to 12:00 a.m. LOCKHART and other BD members brought heroin to CW-20 in packs of 50 dime bags, and CW-20 distributed the packs to the sellers. The sellers brought the money back to CW-20, who took the cash to a third floor apartment at 61st and Indiana where he, MOTEN, and VARNEY VOKER counted the money. The operation was generating about $25,000 a day.

228. In November of 2002, CW-20 left the operation, and other BD members including LOCKHART took over CW-20's responsibilities. CW-20 was arrested by CPD on October 8, 2002 while working for VARNEY VOKER and VARMAH VOKER. CW-20 had just left a third floor

94

apartment in a building near 61st and Indiana Streets. The apartment belonged to a woman who allowed VARNEY VOKER and VARMAH VOKER and CW-20 to use for storage of packs of heroin for distribution at the Calumet building. CW-20 had gone to the apartment to pick up more packs of heroin to give to the sellers. CW-20 left the apartment with two packs of 50 orange colored dime bags. CW-20 also had $2,700 in cash, of which $700 was CW-20's and $2,000 belonged to "the Twins." MOTEN'S sister posted bond for CW-20.

229.    From November of 2002 through February of 2003, CW-20 sold dime bags of crack for MOTEN at Vito's. MOTEN and CW-20 sold about two ounces of crack per day during this time period. In February or March of 2003, at MOTEN'S request, CW-20 began selling VARNEY VOKER'S and VARMAH VOKER'S heroin again at the Calumet building. The operation ran in the same manner as before. After working for "the Twins" for three weeks, CW-20 returned to selling crack at Vito's.

230.    On October 31, 2003, CW-20 was arrested by CPD with three to four ounces of crack and $800. CW-20 was arrested while transporting the crack from the Calumet building to Vito's. CW-20 has seen the following BD members at the Calumet building: THOMPSON, JEHAN, COATES, MCAFEE, EVANS and other BD members. In November 2003, MOTEN told CW-20 that heroin sales at the Calumet building were picking up in part because LOCKHART was no longer involved in mixing the heroin. MOTEN said that CHISM and another BD member had that responsibility, while LOCKHART just did the packaging of heroin. MOTEN told CW-20 that LOCKHART was demoted because, during a search of an apartment in the Calumet building, the police found a pack of heroin belonging to VARNEY VOKER and VARMAH VOKER in LOCKHART'S apartment. This demonstrated that he was stealing from them.

95

### 21.    CW-21

231.    In March 2004, CW-21, a BD member began cooperating. CW-21 made recorded conversations with a ranking BD member. In exchange for CW-21's cooperation, the government has offered to relocate CW-21 and CW-21's family and has given CW-21 money. CW-21 has state court convictions for drug offenses.

232.    CW-21 became a BD member in 1985 at the age of 12. At the time CW-21 joined the BD, CW-1 was the ranking board member in the Englewood area. Each BD area was called a set, and the gang conducted drug sales and hung out in those areas. After joining the gang, CW-21 was given the BD laws. The penalty for talking with the police is death. Only THOMPSON, the BD king can order this penalty.

233.    In 1986 or 1987, CW-21 began selling dime bags of crack for another BD member near 83rd to 85th and Essex Streets. Eventually, CW-21 began to buy crack from CW-4 and started selling with CW-4 in the area of 64th and Normal and 66th and Lowe. CW-21 sold crack in this area, from the early 1990s until March 2003.

234.    BD members could not set up drug spots in BD territory without permission. In order to establish a drug spot, a BD member had to get approval from the ranking BD in the area. Non-members who attempted to sell in the area were subject to being shot and killed. While CW-21 was selling crack in the early 1990s with CW-4, they obtained powder cocaine from THOMPSON. THOMPSON fronted CW-4 kilogram quantities of powder cocaine, and CW-4 converted the powder into crack and sold it in dime bag and ounce quantities. CW-4, CW-21 and another BD member would count the money and obtain more cocaine as needed from THOMPSON. The spots ran 24 hours a day. CW-4 told CW-21 that CW-4 purchased kilograms of cocaine from THOMPSON for

96

$18,000 per kilogram. THOMPSON supplied the operation with about 2 kilograms of cocaine per week for about two years. CW-21 became a BD co-minister. The operation ended in about 1993 when CW-4 went to prison.

235. After CW-4 was arrested, CW-1 ordered CW-21 violated because CW-1 believed CW-21 was a snitch and CW-21 was stripped of CW-21's rank. Because CW-21 was stripped of rank, CW-21 was no longer able to hold gang meetings called "sessions" for the area CW-21 controlled. Although CW-21 was stripped of CW-21's rank, CW-21 was allowed to continue to sell drugs in BD territory.

236. CW-21 and another BD member began to buy 1/4 kilogram quantities of crack from PENNINGTON, who was supplied by COATES, a board member for the area around 59th or 60th and Normal. COATES asked CW-21 if the quality of the crack provided was good. In the mid-1990s, CW-21 met COATES' Mexican cocaine supplier with COATES in the parking lot of a grocery store in the area of 63rd and Western, where COATES received several kilograms of powder cocaine. COATES gave CW-21 an ounce of powder cocaine for helping him.

237. Later in the mid-1990s, CW-4 was released from prison and resumed selling cocaine with CW-4's crew in the area of 64th and Normal. CW-21 and another BD member continued to buy wholesale quantities of crack from PENNINGTON and COATES through about 2001. During this time, COATES was also supplying FORD with cocaine, and FORD was running a spot a few blocks away on 64th or 65th and Stewart. Because of the competition, in 2001, CW-21's spot began selling heroin. The heroin operation ran from 2001 until early 2002. CW-21 also had competition for heroin sales because COATES had a heroin spot on 66th and Halsted.

238. In 2002, CW-21 met with THOMPSON and learned why the BD thought CW-21 was

97

a snitch. THOMPSON told CW-21 that he had a transcript of CW-4 telling the feds about BD violations which took place at THOMPSON'S building at 67th and Parnell, and about THOMPSON supplying CW-4 with drugs. Because CW-4 and CW-21 were close, the gang assumed that CW-21 was also a snitch. CW-21 knew that CW-4 had in fact cooperated with federal law enforcement following CW-4's second arrest. THOMPSON told CW-21 that he sent another BD member to sit in the courtroom and listen to CW-4's testimony.

239. Another BD member often collected BD dues on behalf of THOMPSON. Failure of BD members to pay dues resulted in a violation. Two BD members came to the 64th and Normal set when CW-21 was there, and collected the dues from the weekly BD meetings and wrote down the names of the members who paid. One of those members also had a second list of all of the members on the set so that they could determine who paid their dues and who did not.

240. The BD have a large set in the Calumet building. JEHAN is the ranking board member for the Calumet building area. JEHAN is second only to THOMPSON. JEHAN owns a number of buildings on the south side and does a large drug business with COATES. CW-21 learned this from conversations overheard over the years between COATES and JEHAN. In the early 1990s, CW-21 began selling crack for JEHAN and CREAMER at the Calumet building. CW-21 mainly worked packaging crack into dime bags. JEHAN provided kilograms of powder cocaine to CREAMER, who cooked the powder into crack. The operation ran 24 hours a day, 7 days a week and sold about 1 and 1/2 kilograms of crack per week for about two years. BD members worked the crack and heroin spots at the Calumet building.

241. Everyone who entered the Calumet building was searched by BD workers to ensure they were not undercover police officers or trying to rob the operation. By 2003, VARNEY VOKER

and VARMAH VOKER controlled most of the drug sales at the Calumet building. VARNEY VOKER told CW-21 that they had to pay JEHAN a fee for the right to sell at the Calumet building. While CW-21 was selling at the Calumet building, JEHAN appointed CW-21 chief of security for the Calumet building during a meeting on the 16th floor, where the weekly BD meetings were usually held. Other topics of BD meetings included who was allowed to sell, what violations were to be done and dues were collected.

242. CW-21 participated in shootings while a BD member at the Calumet building during wars between the BD and GD. CW-21 and another BD member shot at GD members at the 220 East 63rd Street building in retaliation for a shooting of CW-4 in front of that building earlier that day. JEHAN ordered this retaliatory shooting in which EVANS provided CW-21 and another BD member with firearms to use. EVANS is now a board member for the Calumet building along with MCAFEE. The GD members returned fire but nobody was hit.

243. On another occasion during the BD and GD wars, JEHAN and CREAMER directed CW-21 and other BD members to take control of the Wabash building, a public housing building located near 63rd and Wabash, from the GD so that the BD could conduct drug sales there. CW-21, VARMAH VOKER, EVANS and another BD member went to the Wabash building. CW-21 attempted to shoot a GD but the firearm jammed. The GD member then fled. Later, CW-21 argued with VARMAH VOKER, who provided the firearms, for giving CW-21 a firearm that was not operating properly. CREAMER and VARMAH VOKER shot at some GD members in the mid-1990s and PENNINGTON told CW-21 that he shot a ranking BD member on orders from THOMPSON in the mid-1990s.

244. On about March 20, 2004, CW-21 saw a ranking BD member, who asked CW-21

about some cocaine that CW-21 sold to another BD member who was unhappy with the quality of the cocaine. CW-21 told the ranking BD member that CW-21 would reimburse the customer for the bad cocaine. Shortly thereafter, the customer asked CW-21 to go with him to meet another BD member at 64th and Parnell, which CW-21 agreed to do. When they arrived, there were about 100 BD members hanging out with another BD member, who then put a firearm to CW-21's back and told CW-21 that CW-21 could not get out of the gang, and asked why CW-21 no longer attended meetings. At one point, a BD member, while holding a firearm, asked another BD member if he should shoot CW-21. Another BD member said no because there were too many witnesses. Eventually, the BD members punched, kicked, and hit CW-21 with baseball bats.

245.    The day following the beating, CW-21 sent THOMPSON a letter demanding $25,000 for CW-21's work for the BD or CW-21 would go to the FBI. CW-21 learned that the letter was passed out to all BD members who were instructed to kill CW-21 on sight. After the feds arrested the GD leaders in the 1990s, JEHAN and THOMPSON called a meeting at the Calumet building and discussed how to rearrange things out of fear that the feds would pursue the BD next. At the meeting, JEHAN and THOMPSON said that they were still in charge but that no one was supposed to refer to them by their titles. They also changed the BD laws to state that BD members were not allowed to sell drugs, even though BD members continued to sell drugs and nobody followed that law.

246.    During CW-21's cooperation, CW-21 recorded telephone calls with JEHAN regarding the March 20, 2004 attack. On April 5, 2004, in one of those calls, JEHAN told CW-21, "You know who to holler at...don't talk on the phone." CW-21 is familiar with the following BD members: HERBERT is from the Wabash area who conducted drug deals with CW-18 and WILLIAMS;

COATES is the board member for the area of 59th to 79th Streets; INGRAM is an associate of COATES; HOLLOWAY is a BD from the Calumet building; MICKIEL is from the Calumet building area; another BD member works for COATES who distributes crack to BD spots; HUDSON is one of THOMPSON'S guys; and STEWART, is from the Calumet building.

247. CW-21 also knows from conversations with BD members, including THOMPSON, that THOMPSON owns several buildings in the Englewood area at: 65th and Stewart, 67th and Parnell, 64th and Parnell, and 69th and Halsted.

### 22. CW-22

248. CW-22 began cooperating with the BD investigation in August 2003 in the hopes of receiving a reduced sentence for CW-22's finace. CW-22 and CW-22's children have been relocated by the government. CW-22 secretly recorded conversations with and made an undercover purchase of crack from a BD member.

249. In 2003, CW-22 worked as a bartender at the Taste nightclub at 64th and Lowe. CW-22 met the BD member who CW-22 bought crack from on behalf of law enforcement. In about March 2003, CW-22 spoke with a customer at the club, CHISM, who hung out there with THOMPSON. CW-22 saw THOMPSON at the Taste and he would come with an entourage of about twenty people, run a tab of approximately $500, buying mostly champagne, and leave good tips.

### 24. CW-23

250. On December 4, 2001, CW-23 was arrested by CPD officers following a search of CW-23's apartment at the Calumet building where officers found a small bag of marijuana. CW-23 was not charged with possession of that marijuana. Following CW-23's arrest, CW-23 was given

*Miranda* warnings, waived them and gave a signed statement to officers and an Assistant Cook County State's Attorney.

251. As of December 2001, CW-23 had lived in the Calumet building with CW-23's children CW-23's entire life. CW-23 said the BD operated a 24 hour drug operation at the Calumet building. BD security workers searched people entering the building to buy drugs. The security workers checked for radios, cellular phones, walkie talkies, or microphones to ensure customers were not undercover police officers. Drug purchasers were also searched for weapons or firearms. The BD used drug addicts to work security outside the Calumet building. Those addicts work 8 hour shifts. The drugs were sold by BD members on the first and second floor of the Calumet building. Only BD members are allowed to sell out of the Calumet building.

252. CW-23 has seen THOMPSON at the Calumet building talking to both JEHAN and CREAMER on separate occasions. CW-23 stated that CREAMER and JEHAN held rank in the BD and THOMPSON had an even higher rank than them.

253. CW-23 has seen both VARNEY VOKER and VARMAH VOKER at the Calumet building. "The Twins" used to be at the Calumet building all of the time, but since October 2001, they come to the Calumet building twice a month and stay for about 30 minutes. CW-23 has also seen BD members EVANS and COATES at the Calumet building. In approximately 1999, CW-23 saw COATES drive up to the Calumet building in a car, jump out, and run into the Calumet building. The car COATES was in was being followed by the police. The officers chased COATES into the Calumet building but did not catch him, but the officers recovered a taped, square package from COATES' car. CW-23 has a relative that is a BD member.

254. CW-23 related that the BD held gang meetings twice per week in the early evening

102

behind the Calumet building. Typically 20 to 25 members attend. The BD recruit kids to join the gang and use them to sell drugs because they won't face any real jail time if they are caught.

### 24. CW-24

255.    On April 30, 2004, CW-24 was arrested for possession with intent to distribute approximately three ounces of crack. Following CW-24's arrest, CW-24 agreed to cooperate with law enforcement. As part of CW-24's cooperation, CW-24 made undercover purchases of drugs and consensually recorded telephone calls and in person meetings with other BD members. No promises were made to CW-24 concerning any charges that could be brought against CW-24 or what CW-24's sentence would be if charges were brought. CW-24 has state court convictions for armed robbery, theft and drug offenses.

256.    During interviews with agents, CW-24 stated that CW-24 became a BD member at the age of 12 in about 1967. CW-24 was a member of a small branch of the BD, then after the smaller branches joined together to form one BD, CW-24 maintained BD membership and held various ranks. In the late 1970s and early 1980s, the BD ranks had different titles. CW-24 held the equivalent to the rank of minister. In the 1980s, CW-24 sold dime bags of cocaine off and on until about 1988, and began to use cocaine as well. From then, until about 1996, CW-24 robbed drug dealers of cocaine to support CW-24's habit. From about 1996 to 1998, CW-24 was in the IDOC and attended addiction programs.

257.    After leaving prison, CW-24 began to sell dime bags of crack in the area of 62nd and King Drive, and was making about $2,000 per day. During that time, EVANS, a BD board member, told CW-24 to shut down the operation, but CW-24 continued to sell crack. EVANS told CW-24 to stop selling again, so CW-24 went to speak with JEHAN. JEHAN allowed CW-24 to continue

103

to sell because CW-24 was a long time BD member. JEHAN spoke to EVANS on behalf of CW-24 and EVANS has not bothered CW-24 since then. Some time before the police raid of the Calumet building in about 2001, CW-24 began to sell heroin at the Calumet building. CW-24 sold heroin on the second floor and VARNEY VOKER and VARMAH VOKER sold heroin on the first floor of the building. For about one year after the police raid there, nobody sold drugs there. During that time, CW-24 began selling crack and heroin out of the parking lot of Vito's store at 63rd and Calumet.

258. In about April 2002, VARNEY VOKER approached CW-24 about selling heroin together, which CW-24 agreed to do. CW-24 got the heroin from a Nigerian, ASEMOTA, and was paid for picking up the heroin. Typically, CW-24 picked up 100 grams of heroin four to five times each week. CW-24 bought 100, 200 and 500 gram quantities of heroin from ASEMOTA for "the Twins." They sold the heroin in different spots in the neighborhood until they moved back to selling from the Calumet building in about October 2002. The operation continued in this fashion until about November 2003, when VARNEY VOKER was messing with the money they were making. VARNEY VOKER paid CW-24 $15,000 as a buyout package. From that time until April 2004, CW-24 sold heroin to VARNEY VOKER on occasion if "the Twins'" other heroin supplier was out of drugs. VARNEY VOKER paid JEHAN, EVANS and MCAFEE money for the right to sell and control the heroin and cocaine sales at the Calumet building. According to CW-24, the BD is now controlled by 3 kings: THOMPSON for the Englewood area, JEHAN for the southeast side, and SPAN for the west side.

### 25. CW-25

259. CW-25 has cooperated with law enforcement in several investigations. During CW-

25's cooperation, CW-25 has recorded telephone calls and in person meetings with BD members and targets of this investigation. CW-25 has been paid by the government and has been relocated. CW-25 has state court convictions for theft and forgery.

### 26. CW-26

260. On March 31, 2004, CW-26 was taken into custody by FBI agents after leaving a bank. CW-26 was given *Miranda* warnings, waived them and spoke to the agents about the BD. No promises were made to CW-26 concerning any charges that could be brought against CW-26 or what CW-26's sentence would be if charges were brought. CW-26 consensually recorded a meting with BD members. CW-26 has state court convictions for drug and theft offenses.

261. CW-26 stated that CW-26 joined the BD at the age of 13. When CW-26 first joined, CW-26 was a BD member in the 51st and State area. In about 1990 or 1991, CW-26 began to sell packs containing 50 dime bags of cocaine for a now deceased BD member. From about 1991 to 1993, CW-26 was in prison. When released, CW-26 sold cocaine at the Wabash building for another BD member for about one year. In about 1996 or 1997, CW-26 began to buy 4 and 1/2 ounce quantities of cocaine from COATES. COATES fronted the cocaine and CW-26 had a couple of days to pay COATES for the drugs. By 1999 or 2000, COATES was fronting CW-26 four to five kilograms of cocaine, for which CW-26 would have a few days to sell and pay COATES.

262. CW-26 worked transacting drug business with COATES for several years. In about 1999, COATES had CW-26 beaten because CW-26 owed CW-18 $40,000 for two kilograms of cocaine. CW-26 would deliver money, usually $4,000 to $5,000, and cocaine for COATES. One of the people CW-26 delivered cocaine to and received money from was CW-18. In about 2001, CW-26 ceased buying cocaine from COATES because COATES had BD members from COATES'

crew threaten and violate CW-26 due to a drug debt owed to COATES. CW-26 could not come up with the money owed to COATES, so COATES took CW-26's cars and some jewelry.

## B.    Information from Defendants

### 1.    ZEBEDEE THOMAS

263.    On about February 6, 1999, CPD officers executed a search warrant for THOMAS and his apartment at 1169 East 61st Street. Later, THOMAS admitted to owning a 9 millimeter semi-automatic pistol that was recovered during the search. THOMAS was convicted of firearm and drug offenses prior to February 6, 1999. Following the search, THOMAS agreed to cooperate. No promises were made to THOMAS concerning any charges that could be brought against him or what his sentence would be if charges were brought. After initially cooperating in the BD investigation, THOMAS ceased his cooperation. While he was cooperating, THOMAS provided the following information under oath.

264.    THOMAS joined the BD in the mid-1980s. He worked selling heroin and marijuana in the area bounded by 59th, 64th, Halsted and Ashland Streets. Four to five hundred BD members sold heroin and marijuana in this area and the proceeds from the marijuana sales were given to THOMAS, who passed them on to a higher ranking BD member. The BD drug sellers were paid a weekly salary, which was determined by the high ranking member. After the leader THOMAS worked for was killed, THOMAS gave the drug proceeds directly to Coconspirator A, who was the king of the gang at the time.

265.    In the late 1980s. Coconspirator A went back to prison and a gang war erupted between the BD and the GD. THOMAS was shot during this time by GD members. In about 1990 or 1991, THOMAS was held in Cook County jail with Coconspirator A, who directed THOMAS

to meet with JEHAN when he was released. In 1994, THOMAS met with JEHAN and CREAMER at the Calumet building. JEHAN held rank in the BD and CREAMER held a lesser rank. At that time, THOMPSON was the Street leader of the gang.

266. JEHAN and CREAMER gave THOMAS the job of overseeing the drug operation at the Calumet building. That operation was making $10,000 to $20,000 a day in drug sales. THOMAS' role was to provide the drugs to the BD members who were selling and deliver the proceeds to JEHAN and CREAMER. THOMAS obtained 4 and 1/2 ounces of crack every two weeks from JEHAN, which was broken down into dime bags, which sold for $10. Two other BD members also collected the proceeds of drug sales from the BD members selling on the Street and provided the money to THOMAS, who in turn gave it to JEHAN through other BD members. THOMAS was paid $1,000 each week in this position, but he ultimately stepped down after about a year because he was not making as much money for the risks he was taking. THOMAS reached the rank of 2nd D at the Calumet Building and attended BD meetings. The purpose of the meetings was to discuss gang related problems.

267. In 1996, the BD controlled heroin sales at a BD controlled building at 6215 South Wabash, called the "Wabash building." CREAMER ran a heroin operation out of this building through the use of lower ranking BD members. CREAMER did not allow drugs to be sold at the Wabash building unless he provided them, and ordered severe beating violations for anyone who sold drugs not supplied by him. CREAMER stopped running the heroin sales at the Wabash building and HURD, a BD member, and THOMAS took over the operation. The heroin was obtained from an African source. Some of the proceeds from the heroin sales had to go to JEHAN because the operation was in JEHAN'S territory. THOMAS paid JEHAN $100,000 a month for

107

each of the three months he was part of the heroin operation with HURD at the Wabash building. THOMAS stopped working at the Wabash building but returned later. THOMAS was involved in heroin sales at the Wabash building until about late 1996 when the city of Chicago closed the building.

268.     During this time period THOMAS had a conversation with THOMPSON, who offered to guarantee THOMAS could continue controlling drug sales if THOMAS paid THOMPSON $50,000. As of April 2000, Coconspirator A stepped down as leader of the BD in an effort to get out of prison early. THOMPSON is the leader and JEHAN is next in line. There are about twelve board members below THOMPSON, including COATES, CREAMER and HERBERT. Beneath board members are ministers. Beneath the ministers are the first and second demetrius. Another position in the BD is the chief of security, who is responsible for securing each BD drug spot by protecting it from police interference and rival gang members.

### 2.     NICHOLAS BELLA

269.     On June 17, 2000, BELLA was arrested by CPD officers after he sold two dime bags of crack to an undercover officer. Following his arrest, BELLA was given *Miranda* warnings, waived them and gave a signed statement to officers and an Assistant Cook County State's Attorney.

270.     BELLA has been a BD member since about 1995. For the three years prior to his arrest in 2000, BELLA sold crack at a drug spot on 100th Street between State and Michigan. BELLA sold dime bags and earned about $500 per week, selling about 50 dime bags a day. BELLA worked for the minister in this area. BELLA purchased the crack he distributed from his minister. The minister's area included the drug spot on 100th Street through 119th Street. BELLA stated that people could only sell crack in this area with the minister's permission.

271.    BELLA stated that THOMPSON was the king of the BD. BELLA was also given and is familiar with BD laws.

### 3.    GEORGE WASHINGTON

272.    On August 29, 2000, WASHINGTON was arrested by CPD officers in the area of 6613 South Langley after he dropped a firearm that he was carrying. Following his arrest, WASHINGTON was given *Miranda* warnings, waived them and gave a signed statement to officers and an Assistant Cook County State's Attorney.

273.    WASHINGTON joined the GD at age 12. In 1997, WASHINGTON became a BD member. WASHINGTON went to prison for shooting at some Mickey Cobra gang members in 1999. Upon his release from prison, WASHINGTON was made a BD director for the area bounded by 64th, Cottage Grove, 66th and Langley. As a director, WASHINGTON called meetings for the BD, members in his area, made sure the territory was secure and reported to higher ranking members.

274.    WASHINGTON said that BD members obtained firearms for gang security purposes from the Calumet building, and some are stored at 6240 South King Drive and at the Parkway Gardens apartments at 6400 South King Drive. Only ranking BD members can obtain BD firearms. BD members who obtain firearms must return them within a month or so. Ranking BD members also sell firearms to members. The BD also use look-outs at their drug spots to warn members of police activity. WASHINGTON stated the ranking members control who sells drugs in their area, and that ranking members would occasionally shut down the area's drug spots and direct that the proceeds from all drug sales go to BD activities, such as a picnic.

275.    WASHINGTON identified some BD board members as EVANS and STEWART.

109

WASHINGTON stated that the ranking BD members control the terms for BD members who want to sell drugs in BD territory. WASHINGTON stated that he purchased 1/8 ounce quantities of cocaine and sold cocaine in $5, $10 and $20 bags.

### 4.    JULIAN ROBINSON

276.    On March 18, 2004, ROBINSON was arrested by CPD officers after he sold dime bags of crack to an undercover officer on several occasions. Following his arrest, ROBINSON was given *Miranda* warnings, waived them and gave a signed statement to officers and an Assistant Cook County State's Attorney.

277.    ROBINSON began selling crack with other BD members for a drug spot controlled by FORD in about September 2003 around 64th and Stewart, and 66th and Parnell, earning about $500 to $600 per week. In October 2003, the police seized $236 from ROBINSON, who reported the seizure to another BD member, and was told that ROBINSON'S new job at the spot would be to watch the sellers and watch out for police during the same 8 hour shift. ROBINSON stated that he and another BD member picked up packs containing 25 dime bags of crack and took them to the e spot at 64th and Stewart, where they were sold. ROBINSON stated that on his shift alone, the spot sold four to five packs of crack each day.

278.    Around January 2004, the BD drug spot moved from to 66th and Parnell because of heightened police presence at the Stewart location. ROBINSON identified FORD as the boss of the drug operation and under him was another BD member. ROBINSON'S job included collecting money from the sellers and passing it on to another BD member.

### C.    Court Authorized Wire Interceptions

279.    On March 3, 2000, Chief Judge Marvin Aspen signed an order authorizing the

interception of wire communications to and from cellular telephone number (773) 315-6109 ("**Target Telephone 1**"), a telephone used by CW-18. Interception of wire communications began on March 3, 2000 and concluded on March 21, 2000. On May 11, 2000, Chief Judge Marvin Aspen signed an order authorizing the interception of wire communications to and from the following cellular telephone numbers: (a) (312) 504-8948 ("**Target Telephone 2**"), a telephone used by CW-18; and (b) (312) 259-1408 ("**Target Telephone 3**"), a telephone used by COATES. Interception of wire communications to and from **Target Telephones 2 and 3** commenced on May 11, 2000 and concluded on June 9, 2000.

280.    As discussed elsewhere in this Affidavit, agents and officers conducted surveillance during the time periods of the wire interceptions.

281.    For some of the calls summarized below, I have placed in brackets my understanding, other agents' understanding and CW-18's understanding of what is being said during the calls, based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation, including our experience listening to the intercepted conversations as a whole. The times listed for these calls are approximate. In most cases, voice identifications are based on names used during the intercepted conversations, voice recognition that has been accomplished to date by agents, historical information developed during this investigation, telephone subscriber information, comparison of some of the voices intercepted to voices intercepted during consensually recorded conversations and/or surveillance by agents. The summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of the intercepted conversations.

282.     As part of CW-18's cooperation with law enforcement, CW-18 listened to hundreds of intercepted calls over **Target Telephones 1, 2 and 3**. CW-18 was able to relate the content and context of the intercepted calls. CW-18 also assisted in identifying voices and individuals intercepted in the calls. Based on CW-18's close association with COATES and other BD members intercepted over **Target Telephones 1, 2 and 3**, CW-18 was also able to identify numerous individuals engaged in criminal conversations with COATES, and, although not a party to these intercepted conversations, CW-18 was able to provide his understanding of the content and context of the calls. CW-18's information corroborated my understanding of these telephone calls.

### 1.     Purchases of Crack by CW-17 from CW-18

283.     During the period October 13, 1999 through February 16, 2000, at the direction of law enforcement, CW-17 consensually recorded telephone calls and in person meetings with CW-18, and also made approximately six controlled purchases of crack from CW-18 totaling about eight ounces. The controlled purchases took place in the following areas: 61st and Michigan, 442 West Marquette and at the Calumet building. [10]

284.     During one of the purchases, on October 21, 1999, CW-18 contacted CW-17 and instructed CW-17 to meet near 67th and Cottage Grove Avenue. CW-17 met with CW-18, COATES, and several other individuals. At this time, CW-18 asked what CW-17 wanted. CW-17 stated two ounces of crack. CW-18 stated that he had crack for sale and instructed CW-17 to follow

---

[10] Affiant understands the "building" to be a reference to 6217 South Calumet Avenue. During the course of this investigation I have learned that the public housing, multi-unit apartment building located at 6217 South Calumet Avenue is a BD controlled apartment building. The BD controls drug sales there, and from interviews of BD members to include CW-17, CW-18 and others, Affiant has learned that this apartment building is referred to as "the building" or "the Calumet building" by BD members.

him. CW-17 agreed and followed CW-18 to Vito's store located in the vicinity of 63rd and South Calumet. COATES rode with CW-18. Present at Vito's store were COATES, WILLIAMS and VARNEY VOKER or VARMAH VOKER. At approximately 3:28 p.m., COATES got into CW-17's vehicle and asked CW-17 to drive him to 6217 South Calumet Avenue. CW-17 agreed to drive COATES, at which time CW-17 told COATES that CW-17 wanted to purchase a large quantity of cocaine from COATES. COATES told CW-17 to get money together and call him when CW-17 was ready to complete the deal. CW-17 dropped COATES off at the Calumet building and then returned to Vito's store and picked up CW-18. CW-18 told CW-17 that CW-18 had to find a cousin, COPELAND, because she had the keys to a residence located at 6015 South Michigan Avenue. This address was where CW-18 processed powder cocaine into crack. COPELAND arrived at 6015 South Michigan Avenue and gave the key to CW-18. Later, CW-18 exited the residence and gave another BD member approximately 9 ounces of crack. Also, during the course of that day, CW-17 met HURD, who told CW-17 that he could provide CW-17 with heroin.

285. During a controlled purchase on November 4, 1999, CW-18 got into CW-17's car and drove to the rear of an apartment building located within the Parkway Gardens complex at 65th and King Drive.[11] There, a person CW-18 called and told to deliver crack, entered CW-17's car and handed CW-17 ounces of crack.

286. During a controlled purchase on January 10, 2000, CW-17 arrived in the alley at 5939-5941 South Michigan Avenue. When CW-17 arrived, CW-18 and BROWN were present

---

[11] During the course of this investigation, surveillance of known BD members has revealed that the Parkway Gardens complex is frequented by BD members. Several CWs have provided information that BD members involved in drug dealing utilize apartments in this complex as a location in which to sell and store drugs and store money.

discussing a potential two ounce cocaine deal in which BROWN wanted to purchase cocaine from CW-18 and then resell it to his customer. CW-18 stated that CW-18 had to sell each ounce for no less than $600 because the cocaine belonged to COATES. CW-18 stated that COATES had given CW-18 1/2 kilogram of cocaine to sell on COATES' behalf. COATES expected to receive $4,700 for each 9 ounces of cocaine that CW-18 sold. CW-18 stated that CW-18 had already sold 9 ounces of the cocaine and had 9 ounces left to sell. CW-18 then stated that CW-18 had to go to the Calumet building to conduct a drug transaction with EVANS. CW-18 further stated that EVANS wanted to purchase 4 and 1/2 ounces of crack. BROWN told CW-17 that COATES owed him $500 as payment for his efforts in selling 1/2 kilogram of cocaine for COATES. CW-18 instructed CW-17 to meet with COPELAND in the alley behind 6015 South Michigan. CW-18 told CW-17 that COPELAND would get the crack out of CW-18's aunt's residence. CW-17 followed CW-18 where COPELAND took CW-17's money and gave CW-17 one ounce of crack.

## 2. Information Concerning the Wiretaps

287. **Target Telephone 1** was used by CW-18 and was intercepted from March 3, 2000 until March 21, 2000. This wiretap was terminated because service to **Target Telephone 1** ended due to lack of payment. Prior to this termination, CW-17 informed CW-18 that CW-17 could supply supposedly illegally cloned telephones that had unlimited service and were untraceable by law enforcement, which CW-18 agreed to. On March 21, 2000, CW-17 provided CW-18 with **Target Telephone 2**, which had been supplied by the FBI and which CW-18 used. A few hours after receiving this telephone, CW-18 contacted CW-17 and informed CW-17 that COATES also wanted a supposedly cloned telephone. On March 24, 2000, CW-17 met with COATES and gave him another FBI cellular telephone, **Target Telephone 3**, which COATES used.

114

288.    On March 27, 2000, CW-17 made a one ounce controlled purchase of crack from CW-18, during which CW-17 contacted COATES on one of the FBI provided phones.

**3.    The Wire Intercepts**

**a.    Calls Over Target Telephones 1 and 2**

**(i)    Calls with COATES and JOHNSON**

289.    On March 5, 2000, at approximately 7:03 p.m., CW-18 attempted to place an outgoing call. The call did not connect. During this period of time, CW-18 and COATES could be heard speaking in the background. COATES asked CW-18, in part, "Where Jack [a BD member] and them at?" COATES told CW-18 he "needed that little change [money owed for cocaine given to a BD member] from Jack." CW-18 then asked COATES how much he was owed and COATES replied, one nickel [$500].

290.    On March 8, 2000, at 8:17 p.m., a BD member called CW-18 and CW-18 asked a BD member if he wanted to speak to "dog" [COATES]; that BD member did, and COATES got on the telephone. The BD member told COATES that he [a BD member] was right where they had previously met. COATES asked if a BD member was "close to what we talked about?" [had the money owed to COATES for cocaine previously given to him]. a BD member told COATES he was and COATES told a BD member he was coming to meet him right now. A BD member told COATES he would come outside.

291.    On March 8, 2000, at 9:03 p.m., CW-18 received an incoming call from a BD member; that BD member told CW-18 that he had just seen CW-18 driving past his location. CW-18 told a BD member that "dog" [COATES] went "to go do some...to get them niggers"[give a violation or beating to some BD members]. CW-18 also told a BD member that COATES went to

115

"take care of that...who didn't push with him." CW-18 then asked a BD member his current location. [Prior to this telephone call, numerous calls were intercepted during which CW-18 learned that COATES was arrested by the CPD. On March 7, 2000, at approximately 12:03 p.m., CW-18 spoke to COATES' brother, who told CW-18 that COATES and several BD members got into a fight with the CPD, but some BD members ran from the police.]

292.    On March 10, 2000, at 11:14 a.m., CW-18 called JOHNSON.  During this conversation, CW-18 received an incoming call from a BD member. CW-18 told a BD member he was on his way to meet a BD member [bring him cocaine] and told a BD member he had to make a "run for Big Roadie" [COATES].

293.    On March 10, 2000, at approximately 7:05 p.m., CW-18 received a telephone call from JOHNSON.  JOHNSON asked CW-18 if CW-18 had made a "touchdown" yet [had cocaine for sale].  CW-18 told JOHNSON no.

### (ii)    Calls with COATES and HAWKINS

294.    On May 15, 2000, at approximately 2:15 p.m., COATES called CW-18 and asked where he was because COATES was outside blowing the horn.  CW-18 stated that CW-18 was in the basement and asked COATES to meet him in a few minutes at Calumet [6217 South Calumet]. COATES said he did not want to go there because the police are over there. CW-18 stated that CW-18 needed to go over there to see somebody [collect money or deliver drugs]. COATES talked about having money in his pocket to get a cellular telephone and agreed to meet CW-18.

295.    On May 17, 2000, at approximately 10:42 a.m., CW-18 called COATES and asked COATES if he had one of the things [money counting machine], you know what I'm saying one of those to count the loot [money].  COATES replied "that I left over there with you?"  CW-18

responded "no." COATES arranged to meet CW-18 in the back of the parking lot where Will [TURNER] was located.

296. On May 17, 2000, at approximately 3:25 p.m., COATES called CW-18 and told CW-18 he had been taken in to a police station by some detectives and interviewed about a shooting. COATES stated they wanted to put him in a lineup but they released him. COATES told CW-18 that before they released him the sergeant told him some stuff that would "fuck your head up." COATES told CW-18 that he would see CW-18 in person and meet later.

297. On May 19, 2000, at approximately 1:16 p.m., HAWKINS called CW-18 and said "what's up." CW-18 stated that CW-18 was riding with BROWN dropping something off at the Lark [clothing store on 95th and Western]. HAWKINS asked CW-18 if CW-18 was trying to get a "drawing" [cocaine to sell] and stated I'll be trading with you [doing a drug deal]. CW-18 stated that CW-18 "ain't got no draw" and that CW-18 was trying to get a "drawing" too [attempting to get cocaine to sell]. HAWKINS stated he would just get another "drawing, it's cool." CW-18 stated that "on 60th, CW-18 has to get up there and get a "drawing" [cocaine]. CW-18 told HAWKINS to get ready and "I'm going to be ready in a minute." CW-18 further stated, "as soon as I get up with fool [source of cocaine] we be trading" [cocaine deal] and said that CW-18 would call HAWKINS.

298. On May 20, 2000, at approximately 6:36 p.m., HAWKINS called **Target Telephone 2** and spoke to COATES. HAWKINS asked COATES if he had been trading [selling cocaine]. COATES told HAWKINS he was at Tony's sports store and HAWKINS stated he had been looking for COATES for a week. HAWKINS stated, "I'm trying to get a drawing with you" [do a drug deal]. COATES told HAWKINS to "ride down on me right here" [meet with him in person]. HAWKINS stated COATES was "on a hot [police activity] block" and COATES responded "no hotter than

117

where you be trying to get me to come." HAWKINS told COATES he would meet him at Tony's sports.

299.    On May 22, 2000, at approximately 10:13 p.m., CW-18 called COATES and told COATES that he identified the person who stole money from a friend of his last night at a party. COATES told CW-18 he would take care of that [give a violation].

### (iii)    Calls with and about COATES

300.    On March 3, 2000, at approximately 6:02 p.m., COATES used **Target Telephone 1** to call his pager (773) 441-1117 to check his messages. COATES listened to six messages on his pager and three of the messages were from JEHAN, who left a message for COATES to call him.

301.    On March 9, 2000, at approximately 10:11 p.m., COATES called CW-18 and asked CW-18 if he "did that with G" [conducted a drug deal with WILLIAMS, whose nickname is "Freddie G" or "G"] yet. CW-18 stated he did not talk to WILLIAMS and WILLIAMS did not call. COATES asked why CW-18 didn't take care of that [give him cocaine to sell] and why CW-18 was holding him up [keeping him from selling cocaine]. CW-18 responded that CW-18 got that [money owed to COATES for cocaine] from Finnie [HAWKINS] for COATES. COATES became angry and asked CW-18 why CW-18 didn't do it [give WILLIAMS cocaine] when he asked CW-18 to do it yesterday. CW-18 said that CW-18 was busy grabbing that other shit [money from HAWKINS] for COATES but would take care of it in the morning. COATES told CW-18 to do it quickly because he asked CW-18 to do it yesterday. At approximately 10:18 pm, CW-18 called COATES and asked COATES "where are you at so I can give you that" [money]. COATES told CW-18 to "just drop it [money]. You know where to drop it."

302.    On March 7, 2000, at 12:03 p.m., a BD member in COATES' crew called CW-18.

118

During this call, CW-18 and that BD member discussed the allegation that COATES was supposedly beaten by the police after fighting with the police. That BD member told CW-18 that other "folks" [BD members] ran, but COATES fought with fourteen police officers. That BD member stated that some BD members were "bogus" and that BD member was waiting to contact COATES to see what to do because "it's a higher person over there than me...and I can't deal with it" [the BD member in COATES' crew did not have sufficient rank in the gang to dispense punishment, unlike COATES, who is a board member]. Affiant has learned that the Street gangs in Chicago take one of two allegiances, "people" or "folks." The BD is aligned with the "folks" Street gangs in Chicago, and sometimes refer to other BD members as "folks."

303. On March 7, 2000, at 3:33 p.m., the same BD member from COATES" crew called CW-18 and left a voicemail stating, "It's a little too heavy" [telling CW-18 that COATES' bond was too much money].

### (iv)  Calls with TATE

304. On March 6, 2000, at 10:04 p.m., TATE called CW-18. TATE told CW-18 he was at home and "did something on that" [he had sold approximately one ounce of cocaine] but "really needed to holler" at CW-18 [meet in person to discuss drugs]. CW-18 directed TATE to meet CW-18.

305. On March 7, 2000, at 10:09 a.m., TATE called CW-18 and left a message stating that CW-18 was "ready to roll out" and wanted to meet CW-18 because CW-18 had told TATE that CW-18 would be ready in the morning [TATE was contacting CW-18 for the purpose of purchasing drugs because CW-18 had told TATE that CW-18 would be ready to sell in the morning].

306. On March 7, 2000, at 11:53 p.m., TATE called CW-18, who instructed TATE to meet

119

him at CW-18's residence [for the purpose of selling TATE cocaine].

307. On March 11, 2000, at 4:09 p.m., TATE called CW-18, and said in part, "Boy you left me out hanging last night" [CW-18 did not supply TATE with cocaine as promised]. CW-18 told TATE that CW-18 had come over and "that shit [cocaine] been layin'..it still layin'" [CW-18 had cocaine for TATE last night which he never picked up]. TATE then asked, "It's over there now?" CW-18 said it was but that "DeDe" had left and TATE would have to wait until CW-18 "came over there" [to CW-18's apartment where the cocaine was]. TATE and CW-18 then discussed when "DeDe" would be back and CW-18 told TATE to call in an hour.

308. On March 14, 2000, at 10:01 a.m., TATE called CW-18 and got voicemail. TATE left CW-18 a message during which TATE identified himself as "Lawrence" and told CW-18 to call him. TATE then told CW-18, in part, "I got some money, on that last thing" [TATE had money owed CW-18 for cocaine fronted to him]. TATE asked CW-18 to call him at home.

309. On March 15, 2000, at 2:05 p.m., TATE called CW-18. CW-18 told TATE that CW-18 was "out of order" [had no cocaine to sell] and that was why CW-18 wasn't answering the telephone. CW-18 said, in part, "I ain't fittin' to do none of that on the phone" [talk about drugs]. TATE then told CW-18, "It's on another chip we was talking about...I know I can help you with that." CW-18 then directed TATE to meet CW-18 [TATE wanted to talk to CW-18 about another drug related matter and CW-18 did not want to discuss drugs on the telephone].

310. On March 16, 2000, at 6:46 p.m., TATE called CW-18 and TATE told CW-18 he had "some business" [drug business] he needed to talk to CW-18 about and "had something I think you may want" [money owed to CW-18 for cocaine fronted to TATE earlier]. CW-18 told TATE that CW-18 was at the barbershop located in the vicinity of 61st and King. TATE told CW-18 to stay

120

there and he would come meet CW-18.

### (v)    Calls with **BROWN** and **JOHNSON**

311.    On March 4, 2000, at 7:47 p.m. BROWN called CW-18. BROWN told CW-18 that "dude" didn't "have the dust on him" [money owed to CW-18 from a drug customer] and "dude" told BROWN that he would call back in 45 minutes. CW-18 told BROWN that this person was "going to take care of it" and would call back.

312.    On March 4, 2000, at 10:55 a.m., BROWN placed a call to JOHNSON from **Telephone 1**. During the conversation, JOHNSON asked where CW-18 was at and BROWN told JOHNSON that CW-18 was in bed. JOHNSON told BROWN to tell CW-18 that "the thing [CW-18] just gave me right...tell [CW-18] I got everything that I didn't sell, and I got that, but tell [CW-18] 'dude' we took care of the first time...he want the whole thing, man...he want the whole four and a split" [JOHNSON had crack supplied to him by CW-18 that he didn't sell but another customer wanted more crack than JOHNSON had, 4 and 1/2 ounces]. JOHNSON then told BROWN to tell CW-18 he (JOHNSON) had sold a "zone"[an ounce of crack] and had the "money for that." CW-18 then got on the telephone and discussed JOHNSON'S customer and what JOHNSON had already sold. CW-18 then instructed JOHNSON to call CW-18 on CW-18's home telephone.

313.    On March 10, 2000, at 9:10 p.m., CW-18 called BROWN. CW-18 told BROWN that he was with COATES. BROWN asked CW-18 if BROWN could "hit cuz and them with that?" [sell some cocaine CW-18 had]. CW-18 said he could, and BROWN said, in part, "You know what I'm talking about. That's a biggie..that's a biggie. I checked it. It's hard" [the cocaine was either crack or powder cocaine that was broken off of a kilogram brick]. CW-18 agreed. BROWN later stated that, "Cuz tryin' to spend a little money too. Will you bless him with this?" [BROWN had a

121

customer who wanted to buy drugs and BROWN wanted to sell the customer the cocaine CW-18 had]. CW-18 told BROWN CW-18 would come meet him.

314.    On March 11, 2000, at 12:36 p.m., BROWN called CW-18. BROWN told CW-18 he was "tryin' to see what's up with that package" [cocaine supply]. CW-18 told BROWN CW-18 was "on that now" [checking on the cocaine supply].

315.    On March 11, 2000, at 2:05 p.m., CW-18 called BROWN and asked if BROWN was coming outside. CW-18 then told BROWN that CW-18 was coming to BROWN and asked if BROWN was "ready" [had money to purchase cocaine]. CW-18 then told BROWN that he needed to be ready because CW-18 was not "right" [CW-18 did not have money to purchase cocaine and wanted to get money from BROWN to purchase more cocaine]. BROWN told CW-18 he "was getting ready now."

316.    On March 12, 2000, at 10:19 a.m., BROWN called CW-18 and said that "his man just called...I need a little food or something...I'm tryin' to see if you got a little food over there" [code for cocaine to sell]. CW-18 asked BROWN who had called and BROWN told CW-18 that "Little Earl" had called [cocaine customer of BROWN'S]. CW-18 told BROWN that CW-18 would get up [meet with him to deliver cocaine].

317.    On March 12, 2000, at 12:32 p.m., CW-18 called BROWN and told him to grab "that" [money for the purchase of cocaine] and come on. CW-18 told BROWN he had "Dog" [COATES] waiting around the corner. BROWN agreed and told CW-18, "Here I come."

### (vi)    Calls with JOHNSON

318.    On March 4, 2000, at 11:50 a.m., JOHNSON left a voicemail for CW-18 identifying himself as "Breeze" and asking CW-18 to call him.

122

319. On March 4, 2000, at 11:57 a.m., CW-18 returned JOHNSON'S call. JOHNSON asked CW-18 if CW-18 remembered that "thing Derrick was doing?" CW-18 did, and JOHNSON asked, "You got one of them" [ounce of cocaine]. CW-18 said that CW-18 did, and JOHNSON told CW-18 that one of his guys wanted one [JOHNSON had another drug customer]. CW-18 directed JOHNSON to meet CW-18.

320. On March 7, 2000, at approximately 5:17 p.m., JOHNSON called CW-18, who told JOHNSON, "I need to holler at you" [talk to him]. CW-18 stated that CW-18 was going to meet CW-18's man [COATES] because he just got out [of jail] and that he needed "AA" [aid and assistance, one of the BD laws]. CW-18 also told JOHNSON to round up some "motherfuckers" [BD members] and to bring some crutches [CW-18 told agents that this conversation was in regards to COATES wanting to find the BD members who ran from the police when COATES got arrested. COATES wanted CW-18 to get some BD members together to give a violation to the members who ran].

321. On March 8, 2000, at approximately 5:23 p.m., JOHNSON called CW-18 and asked CW-18 to bring some heat [a firearm]. JOHNSON told CW-18 someone came through there "busting" [shooting]. CW-18 told JOHNSON he was leaving from an apartment and would call JOHNSON when he could come and get something [firearm].

322. On March 9, 2000, at 11:08 a.m., JOHNSON called CW-18. CW-18 told JOHNSON he had been up since seven o'clock "tryin' to do something" [trying to purchase cocaine to sell] so JOHNSON could see CW-18 right now. JOHNSON told CW-18 his man [drug customer] had been calling him and that people had been calling JOHNSON'S man all night. CW-18 asked if JOHNSON could come over and then told JOHNSON to "come get them sixty-threes" [several 2 and

123

1/4 ounce, or approximately 63 gram, quantities of crack]. JOHNSON asked, "You had 'em...I didn't know you had 'em." CW-18 told JOHNSON that CW-18 did have them [quantities of crack] and JOHNSON agreed to meet CW-18.

323.    On March 9, 2000, at 11:45 a.m., JOHNSON called CW-18 and asked CW-18 to come downstairs and let him in. CW-18 directed JOHNSON to come up to Apartment #309. [JOHNSON had arrived for the purpose of picking up the crack discussed in the call above].

324.    On March 9, 2000, at 3:01 p.m., CW-18 called JOHNSON. CW-18 said "I need you" [needed money owed CW-18 for prior crack deal] and JOHNSON told CW-18, "I got that...I got that." They agreed to meet in 15 to 20 minutes [CW-18 was meeting JOHNSON for the purpose of collecting drug money].

### (vii)    Calls with EVANS

325.    On March 4, 2000, at 4:25 p.m., EVANS called CW-18. EVANS told CW-18 he thought CW-18 was going to help "on that level." CW-18 stated that CW-18 was and told EVANS that CW-18 had been attempting to contact him. [After reviewing this call, CW-18 stated that EVANS was calling to ask CW-18 for a contribution of money to assist in paying the bond of another high ranking BD member. Based on Affiant's experience in gang investigations, to include the BD investigation, Affiant is aware that BD members are regularly expected to pay dues to the BD leaders, and that the money is used for a variety of reasons, including posting bond money for incarcerated BD members].

326.    On March 7, 2000, at 9:36 p.m., EVANS called CW-18. CW-18 told EVANS he had just dropped "dog" [COATES] off at a hotel. CW-18 and EVANS agreed to meet at the Purple Onion [restaurant] and EVANS instructed CW-18 to call COATES. EVANS agreed to meet CW-18

124

and to give CW-18 something [money owed COATES]. [Based on other intercepted calls, law enforcement learned that, at the time of this call, COATES was released on bond from his incident with the police described above, and was staying at a hotel for several days].

327. On March 7, 2000, at 9:36 p.m. CW-18 called the Super 8 Motel and spoke to COATES. EVANS then got on the telephone with COATES. EVANS told COATES that he had "horns" [cellular telephones] and asked what he should do with them. COATES then told EVANS he had "an autograph blessing" [cocaine for sale] for EVANS and said that the individual he was going to give the "horns" to would touch EVANS with an "autograph blessing" [was going to supply EVANS with good quality cocaine]. The conversation ended with COATES saying "two four" [the second and fourth letters of the alphabet B and D, which indicates membership in the BD].

328. On March 9, 2000, at 9:25 p.m., EVANS called CW-18. EVANS told CW-18 he had talked to COATES, who said that he [COATES] would meet with CW-18 so CW-18 "would have that for me in the morning, ready" [cocaine to sell]. EVANS told CW-18 he would tell someone to "push on that little shit" [COATES wanted to sell the cocaine quickly to make some money]. EVANS also had some more "business" lined up [customers].

329. On March 11, 2000, at 2:53 p.m., EVANS called CW-18. CW-18 told EVANS that CW-18 was at home taking care of "my business" [packaging cocaine]. EVANS told CW-18 he had "a cat over here waiting on you...it's all gravy and good" [EVANS had a customer waiting with money to purchase cocaine]. EVANS then told CW-18 his customer was "ready to play." CW-18 told EVANS that CW-18 would call him within the hour. EVANS told CW-18 to try to rush it.

330. On March 11, 2000, at 4:34 p.m., CW-18 called EVANS. CW-18 told EVANS that CW-18 was on the way. EVANS told CW-18 to wait because EVANS' man [customer] had left but

would return.

331.    On March 11, 2000, at 7:01 p.m., EVANS called CW-18 and asked CW-18 what the good word was [if CW-18 had cocaine to sell]. CW-18 told EVANS, "I got no good word." [CW-18 did not have cocaine for sale to EVANS].

332.    On March 17, 2000, at approximately 12:56 a.m., EVANS called CW-18 and asked what's up [if CW-18 had any cocaine to sell]. CW-18 responded "probably tomorrow I'll have some good news for you, I'm going to get with you" [CW-18 would have cocaine to sell]. EVANS asked if CW-18 was decent [asking if the quality of cocaine was good]. CW-18 stated "you will be decent too. I've been out of order." [CW-18 had poor quality or little cocaine]. CW-18 told EVANS he would see him tomorrow.

### (viii)    Calls with STEWART and EVANS

333.    On May 19, 2000, at approximately 10:34 a.m., EVANS called CW-18 and asked CW-18 "what's up...I'm ready" [had money to purchase cocaine]. CW-18 told EVANS to meet him in front of the building [6217 South Calumet] in about six or seven minutes.

334.    On May 31, 2000, at 7:14 p.m., STEWART called CW-18 to arrange a meeting early the next morning and said that he needed CW-18 [STEWART was asking if CW-18 had cocaine]. CW-18 stated that CW-18 will be ready for him and "it's gravy" [CW-18 had cocaine to sell]. [CW-18 told agents that CW-18 sold quantities of cocaine to STEWART].

335.    On June 3, 2000, at 1:53 p.m., CW-18 called STEWART and asked if STEWART had that "on point" [exact amount of money] for CW-18. STEWART stated that his "boy" left and would be back in a few minutes. CW-18 told STEWART that CW-18 would come over to meet him [CW-18 called STEWART to collect money from the previous purchase of cocaine].

126

336. On June 3, 2000, at approximately 6:35 p.m., CW-18 called COATES and asked COATES if the "colonel" [EVANS] got in touch with him [COATES]. COATES stated he did not hear from him and CW-18 offered EVANS' phone number. COATES said he had the number and would get in touch with him. CW-18 told COATES that EVANS said it was about something important. At approximately 7:05 p.m., EVANS called CW-18 and asked CW-18 if CW-18 "did that [cooked cocaine into crack for sale] yet." CW-18 stated that CW-18 was doing that now and will call him in a minute, and stated "I got you" [CW-18 had crack to provide EVANS]. At approximately 7:45 p.m., STEWART called CW-18 from the telephone used by EVANS in the previous call. STEWART asked CW-18 to hurry up and CW-18 responded "I got you" [had cocaine to sell] in 30 minutes.

337. On June 6, 2000, at 2:27 p.m., CW-18 called STEWART, who told CW-18 he was sleeping. CW-18 stated that CW-18 would not have bothered him but CW-18 needed him now. STEWART told CW-18 he would take care of it [CW-18 stated CW-18 "needed him" meaning that CW-18 needed money to purchase more cocaine, so CW-18 was collecting what money was owed by STEWART].

338. On June 9, 2000, at 10:56 a.m., CW-18 called a BD member, who told CW-18 that he will get "it" to CW-18 this afternoon or early evening [money owed to CW-18]. CW-18 told that BD member that CW-18 needed that because CW-18 was trying to do something [CW-18 was attempting to collect money owed from a BD member so that CW-18 could purchase more cocaine]. At 9:17 p.m., a BD member called CW-18 and asked if CW-18 could come get him and that he was at the building on Parnell over at the studio [THOMPSON'S building at 67th and Parnell that has a recording studio located there] where "Vel" [THOMPSON] was at. CW-18 told him that CW-18

would call him in 30 minutes. At approximately 9:53 p.m. CW-18 called that BD member back and asked for his address because Cw-18 was on the way and the BD member said he was waiting at 6727 Parnell.

### (ix) Calls with and involving WILLIAMS and HERBERT

339. On March 8, 2000, at approximately 5:10 p.m., CW-18 called WILLIAMS, who handed the telephone to COATES and CW-18 asked if he was doing what CW-18 had asked COATES to do yesterday [purchase cocaine]. COATES asked CW-18 if CW-18 was going to bring that [money] with CW-18. CW-18 responded "no question." CW-18 told COATES that CW-18 had to bring him [COATES] his [COATES'] phones and COATES reminded CW-18 to get that dollar from dude [money owed to COATES] [CW-18 told agents that CW-18 was talking to COATES about purchasing a kilogram quantity of cocaine and COATES wanted $1,000 owed to him from another customer].

340. On March 8, 2000, at approximately 6:25 p.m., CW-18 received a call from HERBERT, who asked CW-18 if he met with "Big Roadie" [COATES] yet. CW-18 told HERBERT to call back in 30 minutes because CW-18 was going to meet with COATES. HERBERT then gave the telephone to WILLIAMS, who asked CW-18 to call him later. CW-18 then asked "Hey G, you drop them [quantity of cocaine] off out there?" WILLIAMS responded, "I got that little [money] for you."

341. On March 8, 2000, at approximately 9:38 p.m., CW-18 called HERBERT and told HERBERT to "go over to the white building on Lowe [BD controlled building at 6400 South Lowe] because Big Roadie [COATES] is fucking them niggers up" [violating or beating BD members]. CW-18 told HERBERT that COATES needed "AA" [aid and assistance]. HERBERT stated he

would be right there.

342.    On March 15, 2000, at approximately 2:10 p.m., CW-18 received a call from an individual, who told CW-18 that "these people can't even do anything with this [heroin]." The individual further stated he "gave them a little and they brought it right back [customers returned the heroin because of the poor quality]." CW-18 told the individual that CW-18 checked it [heroin] before CW-18 introduced it [sold it]. CW-18 told the individual that CW-18 could bring it back and the individual responded that he will wait until CW-18 gets it [heroin] from Melbo [HERBERT]. [CW-18 told agents that CW-18 would occasionally get heroin from HERBERT for friends of CW-18's to make money and that HERBERT had a heroin line and could supply CW-18 heroin in exchange for cocaine].

### (x)    Calls with FORD

343.    On March 11, 2000, at approximately 3:35 p.m., FORD called CW-18 and said he was trying to call "my boy" [COATES] but he couldn't get in touch with him. CW-18 stated that CW-18 was also trying. FORD asked CW-18 if he [COATES] was cool [had cocaine to sell]. CW-18 said that CW-18 saw him [COATES] last night and he was cool. They talked about food [code for cocaine]. FORD stated "I know what you are talking about...right, right." FORD asked if COATES' telephone was working right and CW-18 asked if FORD had a hook up [connection to get cellular telephones]. FORD asked CW-18 if CW-18 knew "fat Mark" or "BD Mark" and that Mark was going to get him some phones and FORD was going to give one to "dude" [COATES]. FORD then stated he was just calling to see what was up [if CW-18 had cocaine to sell]. CW-18 responded "you know what kind of drawing [code for an amount of cocaine] I got." FORD said "that's it huh." CW-18 responded that CW-18 would ride through there in 30 minutes and he would

call [COATES]. FORD told CW-18 to set it up [tell COATES that FORD wanted to buy cocaine].

344.    On June 5, 2000, at 7:16 p.m., FORD called CW-18, and told CW-18 that it was a "note" off of what CW-18 had said it was supposed to be. CW-18 told FORD that CW-18 would make it right and told him "it's gravy" [CW-18 told agents that FORD called to tell CW-18 that an amount of cocaine that CW-18 had provided FORD was 100 grams ("a note") less than expected. CW-18 stated that CW-18 had provided FORD with cocaine in the past, and that FORD was regularly supplied cocaine by COATES].

345.    On June 6, 2000, at 1:36 p.m. CW-18 called FORD and asked if FORD had any "good news," [any cocaine for sale]. FORD told CW-18 he was on the block and to come and meet him [CW-18 advised agents that on several occasions, CW-18 used FORD as a source of cocaine]. At 2:44 p.m., FORD called CW-18 and told CW-18 to "come on" and that FORD was waiting. CW-18 responded that CW-18 was waiting on a guy. CW-18 told him to give CW-18 thirty minutes [CW-18 told agents that CW-18 was waiting on a drug customer to arrive and give CW-18 some money to purchase the cocaine from FORD]. At 3:13 p.m., CW-18 called FORD, and during that call, CW-18 had additional, successive conversations with other individuals who called using the call waiting feature of the telephone. In the first call, CW-18 asked FORD if FORD could send someone to CW-18 [to deliver the cocaine]. FORD told CW-18 he was waiting on CW-18 but since CW-18 did not have a car he would send someone now. In the second call, an unknown male known as "D" asked CW-18 if CW-18 had seen COATES. CW-18 stated no, then answered a call from WILLIAMS, who asked where CW-18 was and told CW-18 to come down stairs because he was outside of CW-18's residence [CW-18 told agents that CW-18 was meeting WILLIAMS to get supplied with cocaine from WILLIAMS which WILLIAMS brought from COATES].

### (xi)    Calls with REYNOLDS

346.    On June 3, 2000, at 3:11 p.m., REYNOLDS called CW-18 and stated that he wanted to get up with CW-18 [meet with CW-18 to purchase cocaine]. CW-18 stated that CW-18 was at the barber shop and REYNOLDS asked if CW-18 was ready now [ready to sell cocaine]. CW-18 stated yes, and they agreed to meet at the barber shop [CW-18 told agents that REYNOLDS lived in the Calumet building and usually purchased either 2 and 1/4 or 4 and 1/2 ounce quantities of cocaine which CW-18 sold in the area of the Calumet building].

347.    On June 4, 2000, at 3:44 p.m., CW-18 called REYNOLDS and asked if he was ready and if he wanted to "eat in the same place" [wanted the same amount of cocaine as on previous occasions]. REYNOLDS stated that he did and he was coming by now. Then, on June 5, 2000, at 4:14 p.m., REYNOLDS called CW-18 and said he needed to meet CW-18 at the building [the Calumet building]. CW-18 was driving and REYNOLDS told CW-18 to call when CW-18 arrived there. At 4:38 p.m., CW-18 called REYNOLDS and asked if he was ready [to purchase cocaine]. REYNOLDS stated he was and he would walk over there now [Calumet building]. At 4:51 p.m., REYNOLDS called CW-18, who told REYNOLDS he was on the second floor. CW-18 stated "get some of this candy" [REYNOLDS met with CW-18 in the Calumet building to buy cocaine].

348.    On June 6, 2000, at 11:41 a.m., CW-18 called REYNOLDS and asked if REYNOLDS needed to see CW-18 immediately [to purchase cocaine]. REYNOLDS stated "hell yeah...you know, everything." CW-18 responded "right I know the deal" [CW-18 told agents that REYNOLDS was asking to purchase cocaine]. At 12:40 p.m., REYNOLDS called CW-18 who told CW-18 that he was at the car wash and would meet CW-18 at the building shortly [to deliver the cocaine discussed earlier].

131

349.   On June 9, 2000, at 7:17 p.m., REYNOLDS called CW-18 and said he was going to need CW-18 in about an hour and the stuff was light too [CW-18 told agents that in this call, REYNOLDS was calling to arrange to purchase more cocaine and when REYNOLDS stated the "stuff was light," he was referring to the fact that he did not get the full amount of cocaine that CW-18 sold him on a previous occasion because it weighed less than it was supposed to be].

### (xii)   Calls with PENNINGTON

350.   On May 16, 2000, at approximately 9:12 p.m., PENNINGTON called CW-18, who told PENNINGTON that CW-18 was coming right out. PENNINGTON stated he didn't know if CW-18 wanted him to come up because PENNINGTON had his bacon on him [firearm].

### (xiii)   Calls with MICKIEL

351.   On May 24, 2000, at approximately 2:12 p.m., CW-18 called MICKIEL and left a voice message saying "this is your boy, I got something for you man [money to buy cocaine with]." At approximately 2:15 p.m., MICKIEL called CW-18 back and stated he was getting something to eat. CW-18 stated CW-18 had to holler at him [wanted to know if MICKIEL had cocaine to sell]. MICKIEL and CW-18 agreed to meet at the mall.

352.   On May 31, 2000, at approximately 12:08 p.m., CW-18 called MICKIEL and asked if he had any good news [cocaine to sell]. MICKIEL stated he was waiting on "Backdoor's" [BD member] buddy who was supposed to call him yesterday but he hadn't forgotten about CW-18. MICKIEL stated he would call CW-18 back [when he had cocaine to sell]. [CW-18 told agents that CW-18 purchased cocaine once from MICKIEL and was calling to see if MICKIEL had cocaine to sell since CW-18 knew MICKIEL was usually supplied with cocaine from COATES].

### (xiv)   Calls with MCDANIELS

132

353. On May 21, 2000, at approximately 10:31 a.m., MCDANIELS called CW-18 and asked if there was a picnic today. CW-18 stated the picnic was on Saturday, May 26 on Lowe Street [king David Barksdale day birthday BD picnic].

354. On May 24, 2000, at approximately 2:34 p.m., MCDANIELS called CW-18 asking if CW-18 had talked to him [COATES] because he was not answering his phone. CW-18 stated that CW-18 had not seen him [COATES] since yesterday. MCDANIELS asked what CW-18 was doing and CW-18 stated that "Scan" [JEHAN] and his guys were setting up a picnic at the building [6217 South Calumet]. CW-18 stated that CW-18 wasn't going over there because CW-18 was trying to do something [conduct narcotics business].

### b. Calls Over Target Telephone 3

#### (i) Calls with INGRAM

355. On May 13, 2000, at approximately 10:54 a.m., INGRAM called COATES and asked if he had started and "if it ain't happening today" [INGRAM was asking if COATES had cocaine to sell]. COATES replied that they were not going to start and that they were not going to buy any "meat" [cocaine]. INGRAM then told COATES that that was why he called early, to get "that shit" [cocaine]. COATES continued to discuss how you "need to let the meat set up over night so it wouldn't be tough" [COATES was using code to say he had no cocaine to sell and no drug business was going to be conducted on that day]. Later in the same call, INGRAM told COATES he would meet him when he arrived on the block [CW-18 told agents that INGRAM was a regular drug customer of COATES'].

356. On May 18, 2000, at 4:17 p.m., INGRAM called COATES and told COATES that he did that shit for "C-Mack" [EVANS]. INGRAM continued to tell COATES that, "Dude had

already moved 'em" [firearms]. INGRAM was going to see if someone else had "them" [firearms] and was going to check with someone. COATES told INGRAM to see "if that person had those [firearms] and if he had a problem to give him a call" [Based on information CW-18 provided, Affiant understands that INGRAM was attempting to purchase firearms from EVANS].

357.    On May 20, 2000, at approximately 4:04 p.m., a woman called COATES about his "boy" "Pook" [INGRAM]. The woman had had an argument with INGRAM about going to the prom with another girl and was upset and she wanted "Pook's" things out of her home. COATES asked the woman for a favor, that she not call the police because "that stuff is mine" [firearms or drugs in her home were COATES' and INGRAM worked for him]. The woman stated she would not call the police as long as INGRAM did not put his hands on her [hit her] because she knew "Pook" had COATES' stuff [drugs or firearms belonging to COATES].

358.    On May 24, 2000, at 4:21 p.m., INGRAM called COATES and said that STREETER had been arrested by the police and had his "move" [code for a firearm]. INGRAM asked COATES to send someone to get him because he was on Green Street and he also had his "move" [firearm]. COATES wanted INGRAM to come to Peoria Street. INGRAM replied that the police were everywhere and he had his "move" [firearm]. COATES told INGRAM to stay where he was at and he will call him back.[12]

359.    On May 25, 2000, at approximately 1:39 p.m., INGRAM called COATES and they

---

[12] On May 24, 2000, STREETER was arrested by CPD officers for possessing a firearm. Based on surveillance and the arrest of STREETER, Affiant understands that COATES, STREETER and INGRAM were in the area of 65th and Green to deal with a dispute the BD was having with the GD in that area at the time of STREETER'S arrest, and that INGRAM was also in the area to assist COATES and was armed with a firearm because of the conflict with the GD in that neighborhood.

had a discussion about "T" [STREETER] being in jail. At the end of the conversation, INGRAM asked COATES if he was straight [INGRAM was asking if COATES had cocaine to sell], at which time COATES responded that "it's gravy" [code for saying that he had cocaine to sell].

360.    On May 27, 2000, at 10:33 p.m., INGRAM called COATES, who asked INGRAM why he was "sweating someone" when COATES told the individual to hold "that" [a firearm]. INGRAM told COATES there was nothing [no firearms] over there. COATES asked how nothing was over there and told INGRAM that "Duke" [a BD member] and another BD member were over there so it cannot be the only one. COATES then stated there was plenty over there. INGRAM stated that no one was "bringing it out". COATES told INGRAM to go and get that from T's, [STREETER'S] grandfather [COATES was directing INGRAM where to find a firearm in the neighborhood].

361.    On June 4, 2000, at 8:53 p.m., INGRAM called COATES and told him that the "folks from the park on Lowe" [BD members from the Lowe Street area] called him to say that they have some more "potatoes and bacon" [cocaine and money]. COATES asked if they have some "drawings for us?" [code for supply of cocaine] INGRAM said they did and COATES asked "how many they got." INGRAM stated "they've got a whole lot" at which point COATES told him to wait until he got a call back from those subjects and to make no move because "it's as good as booked" [This is a discussion about COATES and INGRAM arranging to purchase a large quantity of cocaine from a supplier]. At 9:35 p.m., COATES called INGRAM and asked where the subjects they were going to meet were, and INGRAM gave COATES the address of 12342 South Green Street. COATES stated "that is Cal City" and he would be on the way to pick up INGRAM. INGRAM stated he would meet him in front. [COATES and INGRAM were going to meet a drug supplier]. At

135

approximately 10:49 p.m., INGRAM called COATES and told him he was trying to catch "a twenty" [get money to buy cocaine]. COATES told INGRAM they didn't have "twenty". [COATES and INGRAM were discussing coming up with the money to purchase drugs with].

362.    On June 5, 2000, at approximately 11:51 a.m., INGRAM called COATES and stated "dude is ready" [The source was ready to sell cocaine]. COATES stated he would be coming from his house and he would call him.

363.    On June 6, 2000, at approximately 2:48 p.m., COATES called INGRAM and discussed someone who was arrested and taken to jail. COATES was angry with INGRAM and said they [BD members] over there don't know what they are doing. INGRAM stated it was the same person causing them [BD members] trouble and INGRAM believed they "gave him 5" [5 minute beating violation]. COATES asked if the person got his "ass whooped." INGRAM replied, "I guess so." COATES became angry and said "what do you mean you guess, you supposed to know" [INGRAM was supposed to supervise the violation as a higher ranking BD]. INGRAM stated it "was hot over there" [police activity around]. COATES replied he didn't care because it wasn't his shit [cocaine]. INGRAM said he [the BD member who got arrested] was going to get bonded out. COATES told INGRAM he should bond him out and beat him up again. COATES was angry because the guy "just gave it to them" [cooperated and gave the police firearms or cocaine]. COATES told INGRAM if he was "beating their ass, giving the maximum penalty, real good, "he won't do it anymore." COATES told INGRAM "y'all keep that motherfucker around he gonna put one of y'all in the joint, he gonna tell on a motherfucker." [COATES was concerned that he arrestee was going to cooperate with law enforcement if arrested again unless they put him in fear of his life]. COATES said that he told "Duke" [a BD member in COATES' crew] not to keep "the little guys,

the stool pigeons around, but he still does." COATES did not want to hear from anyone if they got put in jail because they were hanging around people who cannot be trusted. COATES told INGRAM that he would send someone to court for "dude" [the BD member in jail].

### (ii)    Calls with STREETER

364.    On May 23, 2000, at 12:45 p.m., STREETER called COATES and asked him if he was straight [if COATES had cocaine to sell] and COATES replied yes. STREETER then asked COATES, "It's gravy then, huh?" COATES asked STREETER to pick him up because he was just walking in the building [Calumet building]. At 1:12 p.m., COATES called STREETER and told him to come over to the "Dub" [Parkway Gardens apartments].[13] STREETER told COATES he was going to get a car from someone then he would come over. [STREETER was going to assist COATES in distributing cocaine].

365.    On May 24, 2000, at 1:03 p.m., STREETER called COATES and informed him that he was just out talking to another BD member, who told him a couple guys from "the avenue" [rival gang members] were on the block. COATES told STREETER he already knew about the problem and to hold off on that "shit" until tomorrow [STREETER was taking instructions from COATES, the higher ranking BD member regarding rival gang members in BD territory]. At 2:15 p.m., COATES had a conversation with FORD and an unidentified male in the background concerning a shooting on the previous night [discussing a dispute between BD and GD members who distributed drugs in the same area near 65th and Halsted]. COATES said that he wanted to arrange a meeting

---

[13] Through information provided by CWs and surveillance, Affiant has learned during the course of this investigation that the Parkway Gardens apartments have been used by COATES, VARNEY VOKER, VARMAH VOKER and other BD members to store, package and distribute cocaine and heroin, and to store money and firearms.

with a high ranking GD instead of talking to the people on the street to put an end to the shootings "before the police or the FBI" get involved. At 2:54 p.m., STREETER called COATES and told him he just came from the building on Halsted. COATES told STREETER not to go anywhere and he would be there in 45 minutes. At 3:03 p.m., PENNINGTON called COATES and told him, "Man I just saw that shit." COATES asked "You can see that with your own eyes," and stated that is a problem [GD members selling drugs in BD territory]. PENNINGTON told COATES "Nobody fucking with them little GDs over there," and "ain't nobody been able to get no money over there" [The BD was not making money selling cocaine because the GD had set up a cocaine sales spot in the area].

366. Based on the above series of calls, FBI agents and CPD officers established surveillance in the area of 65th and Halsted Streets. While in the area, officers observed an unidentified black male standing near 65th and Green Streets holding something in his waist band attempting to disguise it. As an officer approached the subject to investigate further, the subject and another black male on the street turned and ran from the officer. As the subject turned to run, the officer observed the object to be a firearm. The officers pursued the subject but lost sight of him near 6534 South Green Street. The pursuing officer heard the sound of a door being knocked in at that residence and called for assistance there. A female resident at 6534 South Green exited the house and told the officer, "The guy with the gun is in the back." The officer and other officers detained the subject exiting the back of 6534 South Green, who was later identified as STREETER, who was the same person the officer had earlier observed with the firearm. The female resident advised the officers that STREETER, who she did not know, kicked in her rear door and ran through her home flashing a firearm and telling her to shut up. Fearing for the safety of her children, the

138

woman kept quiet as STREETER hid a firearm under her mattress. The woman showed the officer the bedroom, where the 9 millimeter firearm was recovered. STREETER was arrested, advised of his *Miranda* rights, waived them and stated he was carrying a firearm with him for protection. STREETER stated he broke into the house and told the woman to shut up and not make any noise. STREETER admitted hiding the firearm under the mattress then running out of the house where he was arrested by the police.

367. On May 24, 2000, at 6:30 p.m., STREETER called COATES and told him "It's over." COATES stated that he would get an attorney for him and the attorney could beat the case. COATES told STREETER he "can't be held responsible for something [firearm] they found in someone else's house." COATES told STREETER that he would take care of the small problem. [COATES was going to pay for the lawyer and pay for STREETER'S bond because he was working for COATES at the time of his arrest].

368. On May 25, 2000, at approximately 6:50 p.m., COATES received a call from an unidentified female who told COATES she had "T" [STREETER] on a three way call. STREETER [who was in Cook County jail at the time] got on the telephone and told COATES that his bond was 10 stacks [$10,000]. COATES reminded STREETER that they [law enforcement] were on the line [listening to the call recorded from Cook County jail]. COATES asked when STREETER was going to court next and COATES said he would see him on the 8th. STREETER said he needed some money and COATES said no problem, he would drop it off.

### (iii)    Calls with and regarding TURNER

369. On May 18, 2000, at 10:37 a.m., TURNER called COATES and asked if COATES could take him downtown to his "boy" [TURNER wanted to meet with a cocaine connection of

COATES']. COATES stated he was not "fucking" with him like that any more [COATES was no longer dealing with that source]. TURNER asked if there was another place COATES could send him and COATES replied they only deal with him that way [COATES' sources would only deal with COATES directly]. COATES told TURNER he was getting "this shit together" [getting supplied with cocaine] and TURNER should be "cool" because COATES was going to do TURNER'S first [COATES would supply TURNER with whatever cocaine he wanted].

370. On May 20, 2000, at 5:40 p.m., TURNER called COATES, who told him to get "that [money owed to COATES] from his old man," and stated "I need you to do that, I gotta pay a bill man." TURNER told COATES he would "do that right now."

371. According to CW-18, TURNER owed money for cocaine that COATES supplied to TURNER. COATES had information that TURNER was in Minnesota, because TURNER sold cocaine that he received from COATES in that state. COATES contacted BD members in Minnesota and ordered MCDANIELS to fly there in order to locate TURNER and collect the money owed to COATES, or retrieve the cocaine TURNER bought from COATES.

372. On May 28, 2000, at approximately 3:23 p.m., COATES called MCDANIELS and asked MCDANIELS if he had dude's number up there [a BD member in Minnesota]. MCDANIELS said he had not been talking to him. COATES stated he was looking for the fool [TURNER]. MCDANIELS stated he talked to someone who saw him [TURNER] up there [Minnesota] yesterday fronting the shit [giving cocaine on credit to be paid later]. COATES got a phone number for "Beetle," for him to call in Minnesota and was going to find out where he was [TURNER owed COATES money for cocaine he brought to Minnesota].

373. On May 28, 2000, at approximately 4:27 p.m., COATES called "Jermaine" and stated

140

he was trying to reach "Beetle" but could not. "Jermaine" said "Beetle" was in Minnesota and gave him "G-Bo's" number because "G-Bo" was in the area and could tell COATES what was going on. "Jermaine" told COATES if he had to take a trip he would have his full support. At approximately 5:24 p.m., COATES received a call from "G-Bo," who told COATES he [TURNER] did not answer the phone yet. COATES told "G-Bo" he [TURNER] had not been answering his calls. COATES asked "G-Bo" if he [TURNER] had been seen, and said that he [COATES] was going to ask folks [BD members] to gift wrap the motherfucker for me [grab TURNER and hold on to him for COATES to deal with him about the drug debt]. "G-Bo" answered COATES by saying "right."

374. On May 28, 2000, at 5:40 p.m., COATES called MCDANIELS and told him he was having trouble contacting someone [TURNER]. COATES told MCDANIELS "he hasn't been answering his phone calls" and "see if there is a flight going out tonight" [COATES was directing MCDANIELS to fly to Minneapolis and locate TURNER who owed COATES money for cocaine]. At 9:49 p.m., MCDANIELS called COATES and told him that he was leaving "tomorrow at 11:45." COATES said he was going to call them and let them know [BD members in Minnesota that MCDANIELS was going to meet there].

375. On May 28, 2000, at approximately 5:54 p.m, COATES received a call from "G-Bo," who asked if he was speaking to "Big Folks" [COATES]. COATES asked that when they saw him [TURNER], they should ask him "did he have his phone with him." COATES had been trying to call him and he had been ducking his [COATES'] calls [avoiding COATES]. COATES asked "G-Bo" if he [COATES] sent someone up there would they [Minnesota BD members] pick him up at the airport. "G-Bo" agreed and said he would give whoever COATES sent a place to stay. COATES said they would have to stash him [hide him] because if he [TURNER] saw him TURNER

141

would know what they were up there for. COATES said it would have to be a "pop-up move" [surprise]. COATES stated he was going to get the ticket, and "G-Bo" said to let him know about the flight arrangements.

376. On May 29, 2000, at 10:48 a.m., MCDANIELS told COATES that he was there right now and waiting for his flight to leave. MCDANIELS stated he would be there by 1:00 on Vanguard Airlines. COATES stated he would call them [BD members in Minnesota]. At 10:52 a.m., COATES called "Burn" [a Minnesota BD member] and told him that he wanted to send "Pook" [INGRAM] with "Tone" [MCDANIELS] but "Pook" could not go, so "Tone" would be there on Vanguard Airlines at 1:00 p.m. COATES asked "Burn" to find TURNER with "Tone." COATES and "Burn" spoke about a plan to find TURNER and then to call COATES. COATES complained about the disrespect that TURNER showed him and that TURNER should not be ducking "your man's calls" [should not be avoiding COATES' calls and paying his drug debt]. COATES wanted MCDANIELS to bring "my shit" back [money or cocaine in TURNER'S possession]. COATES said he believed TURNER was in it for the "U.S. Currency and no loyalty." "Burn" said they will do whatever "T" [MCDANIELS] wanted. COATES stated they would have to drive him back down here [Chicago].

377. On May 29, 2000, at 1:00 p.m., MCDANIELS called COATES and told him he was up there walking out of the airport. COATES told MCDANIELS to call as soon as they have TURNER and if TURNER does not want to ride back with him, to tell him they have "woo-woo-woo to pop your ass right here" [MCDANIELS was sent by COATES to find TURNER and bring him to Chicago so COATES could talk to him about the drug debt TURNER owed COATES. COATES' instruction to "pop your ass" was COATES giving MCDANIELS permission to kill

142

TURNER if he did not agree to come back to Chicago with him]. FBI agents in Minneapolis stopped and identified MCDANIELS as he left the airport with other individuals who had picked him up when he arrived.

378. On May 29, 2000, at approximately 2:23 p.m. COATES called MCDANIELS and told MCDANIELS that he [TURNER] is in Chicago. COATES told MCDANIELS to thank the folks [BD members] in Minnesota for their help. MCDANIELS stated he will come back tomorrow and he wants to crack him [TURNER] upside the head [wanted to beat TURNER for putting them through the trouble]. At approximately 2:31 p.m., COATES called "Jermaine" and told him TURNER was in Chicago. "Jermaine" asked if COATES wanted him to come over and COATES said he and his dogs [BD members who work for COATES] would take care of it. COATES stated he was going to search the nigger [TURNER] and run his move across his body [hit him with his pistol].

379. On May 29, 2000, at approximately 2:49 p.m., MCDANIELS called COATES and told him the people [FBI] who got "Little Rob" [a federally incarcerated BD member] at "the pyramid" [MCC] had pulled him over. MCDANIELS stated that they "questioned him about some airport shit and let him go." COATES asked how they [FBI] figured it out. MCDANIELS said they questioned him because he paid cash for his ticket. COATES told MCDANIELS he had him [TURNER] and was going to meet with him to figure out what was going on.

380. On May 30, 2000, at approximately 1:12 a.m., COATES received a call from PENNINGTON, who told COATES there were a lot of police around. PENNINGTON was at the Fifty Yard Line club and said that the guy [TURNER] was leaving. COATES told PENNINGTON to block him in. PENNINGTON said they were going to follow him and he was walking to Wabash

143

from Michigan on 75th. COATES said he got people coming out because he thought they were going to catch the guy [TURNER]. COATES stated he was in the area and couldn't see him [TURNER]. PENNINGTON said he "had the nigger [TURNER] in the club and TURNER knew what was going on" [TURNER knew he was going to be violated]. PENNINGTON and COATES agreed to meet at a gas station in the area to talk about what they were going to do. PENNINGTON asked how many police were up there. COATES said only one.

381. On May 30, 2003, at 11:18 a.m., TURNER called COATES, who became angry with TURNER for not calling him back. COATES asked TURNER, "Who are you to be holding me up" and stated he was calling TURNER for a week. TURNER told COATES he did not have his phone with him but was trying to call. COATES told TURNER he was going to make a run and would call TURNER when he got back [COATES was angry with TURNER, who owed him money for cocaine taken to Minnesota and TURNER was not calling COATES for a week to pay or keep in contact].

382. On June 5, 2000, at 10:02 p.m., COATES called TURNER and asked about parking a car at the "dub," [Parkway Gardens apartments] overnight. TURNER told COATES, "no," but then asked if COATES was "cool" [if COATES had cocaine to sell]. COATES replied that he was.

383. On June 6, 2000, at 12:15 p.m., COATES called TURNER, who asked COATES if he was ready to go. COATES then asked TURNER if he had them "in stock" and TURNER replied yes. TURNER asked COATES if he was ready to go around there now and COATES stated "you must want some money." They arranged to meet in 15 or 20 minutes. [TURNER was meeting with COATES to purchase cocaine].

### (iv)    Calls with MCDANIELS

384. On May 24, 2000, at 11:24 p.m., MCDANIELS called COATES, who asked "Did

144

y'all clap em" [shoot firearms]? MCDANIELS responded, "yeah he [a firearm] was nice too. It ain't much like the five-o we had, he alright though, you would like it" [the firearm shot well but not like the .50 caliber firearm they had]. COATES told MCDANIELS that he would call him tomorrow.

385.    On May 25, 2000, at 2:17 p.m., COATES called MCDANIELS and told him to bring his "move" [firearm]. MCDANIELS told COATES he did not have the box and COATES told him to bring it anyway.[14]

386.    On June 5, 2000, at 4:22 p.m., COATES called MCDANIELS and they discussed a cocaine supplier that they did business with. COATES stated, "them folks thought we stupid" when they "back out for the nick" [arguing over $5,000 and the price of cocaine]. MCDANIELS stated "you can never just give them five and ride." MCDANIELS stated he could, "get it for less, way less, you just have to wait a couple of days" [another, cheaper supply of cocaine]. MCDANIELS stated he went right over the "store price." COATES stated that "we're not going to fuck with them anymore" [COATES was no longer going to conduct cocaine deals with that source]. MCDANIELS said that if they "break it down" it should come out to "three dollars." COATES stated "that garbage in the box wouldn't come out to three dollars." COATES stated "we came out decent, you alright" [MCDANIELS and COATES discussed the price and the quality of the cocaine they purchased and how much profit they can make on the cocaine].

---

[14] An investigation by CPD revealed that MCDANIELS purchased six firearms on separate occasions between April 1999 and April 2002 with his Firearms Owner Identification ("FOID") card. When confronted by law enforcement officers, he was unable to produce the firearms or receipts of transfer for those firearms. Two of the firearms were recovered in relation to other crimes by CPD. MCDANIELS was charged with failure to keep records of a firearms transaction in the Circuit Court of Cook County, pled guilty on July 17, 2003 and was sentenced to 2 days in Cook County jail.

387.    On June 5, 2000, at approximately 4:31 p.m., COATES called MCDANIELS and told him to watch out his front window in the air and to get off [be cautious of surveillance]. COATES told MCDANIELS to pull off the road [to see who was following them]. COATES told MCDANIELS it did not look right to him and "they [law enforcement] are not going to follow me like that." COATES told MCDANIELS he had to be careful because "nigger don't be watching his ass is out [someone not aware of law enforcement surveillance can get caught by law enforcement]." At approximately 4:34 p.m., MCDANIELS called COATES and told COATES there were two of them [helicopters] but "Pook" [INGRAM] said it was the news [news reporting helicopters]. COATES told MCDANIELS to park around back and come in his front door [to avoid law enforcement surveillance].

### (v)    Calls with PENNINGTON and WILLIAMS

388.    On May 20, 2000, at approximately 1:15 p.m., PENNINGTON called COATES, who asked if he saw "Pookie" [INGRAM]. PENNINGTON handed the phone to WILLIAMS and COATES asked if he saw "Pookie." WILLIAMS asked what time it was and PENNINGTON said in the background he would call him right now. COATES stated "Pook" was violated [given a beating]. WILLIAMS stated "how long do you want me to walk man [how far should he go to wait on "Pook"]." COATES stated "that's what I'm saying you give the motherfucker an inch and he takes a mile." WILLIAMS stated he saw "Pookie" last night and told "Pookie" to get up with him in the morning. COATES stated he was going to track "Pookie" down right now.

389.    On May 20, 2000, at 1:59 p.m., COATES called PENNINGTON, who told COATES, "I need to get with you...niggers tradin' and shit" [PENNINGTON was asking to meet COATES in order to purchase cocaine because people were dealing and PENNINGTON needed cocaine].

146

390. On June 2, 2000, at 9:31 a.m., COATES called PENNINGTON and said that PENNINGTON knew what he was calling about [money owed to COATES]. PENNINGTON asked if it was what they talked about the other day and COATES responded "yes." PENNINGTON stated he had to do something and then he would come over "with that" [money owed to COATES]. COATES asked if they could do it sooner because he already called "J" and he was on a time limit. At 12:02 p.m., PENNINGTON called COATES who asked where he was. PENNINGTON was on the expressway and COATES told him he was at the crib "waiting on you." PENNINGTON stated he would "keep bringing it over there" [money owed to COATES]. At approximately 4:15 p.m., COATES called PENNINGTON and told PENNINGTON that he wanted the money owed to him. PENNINGTON asked if COATES wanted more and COATES replied "a dollar gone off one of them, it was eleven." PENNINGTON stated he will have to talk to old boy then. [the money PENNINGTON paid COATES, $11,000, was short by $1,000, COATES wanted the rest of the money and PENNINGTON would have to get it from his customer who paid him].

### (vi)     Calls with EVANS

391. On May 29, 2000, at 6:07 p.m., EVANS called COATES and said that someone had just given him some money owed to COATES and EVANS. COATES and EVANS discussed the amount the subject paid and EVANS told COATES the subject gave him "everything but the eighteen [amount of money], that's between you and 'Nose' [a BD member]." EVANS also told COATES that the subject gave him fifteen and stated he already gave COATES "five and twenty five" [COATES and EVANS were discussing the collection of amounts of money owed to them for cocaine they sold].

### (vii)     Calls with WILLIAMS

147

392.    On May 17, 2000, at approximately 3:36 p.m., COATES called WILLIAMS and told WILLIAMS about being arrested and taken to the police station on 51st. COATES told WILLIAMS that he just got out of the car and was lucky because he decided to leave his pistol in the car before the police stopped him. The police tried to get the keys to his car but COATES claimed to have walked to the barber shop. COATES said that he knew one of the detectives and the sergeant recognized them from working in the area. COATES said that he had been stopped at a barber shop and decided not to run from the police because he knew they would search for him. COATES said that the police told COATES he had traffic warrants but released him anyway.

### (viii)   Calls with FORD

393.    On May 17, 2000, at approximately 8:28 p.m., COATES called and told FORD he was at 51st and Wentworth and saw "Forty" down there [BD member in police custody at the police station]. FORD told COATES that he sent a lawyer down there for him but the police said he wasn't there. COATES told FORD the police were looking to put him ["Forty"]in a lineup on serious stuff. FORD stated he would send the lawyer back there.

394.    On May 18, 2000, at approximately 12:03 p.m., COATES called FORD and asked what was up with "folks" [the BD member who was in custody at 51st and Wentworth police station]. FORD stated he was being charged with murder and two attempts [attempted murder]. COATES stated, "I can count on it being fucked up even more now" [COATES was concerned about the increased police attention in his area]. FORD stated that he was waiting for dude [BD in police custody] for two hours then he heard five people picked him out of a lineup. FORD stated he sent an attorney over there but they already took him to county [Cook County jail].

### (ix)   Calls with COATES' Source

148

395. On May 23, 2000, at approximately 8:00 a.m., COATES called one of COATES' sources of cocaine. COATES left a message and said that he would have his sister contact him [COATES' Source]. COATES was going to send his sister with the shit [money] and said "she gonna come holler at you for me [meet to conduct cocaine transaction]."

396. On June 3, 2000, at approximately 5:17 p.m., COATES placed a call to a telephone subscribed to COATES' Source. COATES spoke to a Hispanic male he referred to by nickname. The Hispanic male told COATES he saw the parts [kilograms of cocaine] and "they are defective, they were not even original" [referring to the quality of the cocaine or its availability as not good]. COATES asked if it was a waste of time and the Hispanic male replied that he figured people would be complaining and "cars going to break down [code for poor quality of cocaine that customers would return]. The Hispanic male stated that he was going to go out tomorrow and he will be back in a couple of days, "remember they are imported from over there" [indicating it would take a few days to get a shipment of cocaine to the Chicago area]. COATES stated he would call in a couple of days. The Hispanic male stated he would call if it [cocaine] comes in before then.

### (x) Calls with HAWKINS

397. On May 11, 2000, at approximately 1:33 p.m., HAWKINS called COATES and asked COATES, "what's the drawing" and "what you want me to draw [asking COATES if he had cocaine to sell]?" HAWKINS asked COATES where he had to ride to [where he had to go in order to meet COATES in person]. COATES stated he was getting something to eat and HAWKINS responded, "I'm trying to ride down on you [meet with COATES]." They agreed to meet at a restaurant in ten to fifteen minutes.

398. On May 29, 2000, at approximately 3:52 p.m., HAWKINS called COATES and asked

149

"what you drawing" [whether COATES had cocaine to sell]? COATES called HAWKINS "Finball" and replied, "nothing much man [indicating he did not have cocaine to sell]." HAWKINS stated he would call COATES in an hour.

399. On June 8, 2000, at approximately 3:25 p.m., HAWKINS called COATES, who told HAWKINS that he did not answer blocked calls if HAWKINS was the one who had been calling him. COATES asked HAWKINS for the drawing [money] from the last time [drug transaction]. HAWKINS stated he gave it [money] to him already and he needed another drawing to get a drawing [needed cocaine to make some money]. COATES told HAWKINS he would be able to see him in two days no later than three [COATES would be ready to sell cocaine at that time].

### (xi) Calls with "Jermaine"/"J"

400. On June 5, 2000, at approximately 11:53 a.m., COATES called an individual known as "J" or "Jermaine." COATES said he was at his crib [home] in the 100s [far south side of Chicago] and wanted to meet "J" because he had a "link up [connection to purchase firearms]." COATES told "J," "you know that move [firearm] you got with you that you keep having to throw [shoot]." I got someone who has 18 of those, all sorts of shit [various caliber firearms]. "J" told COATES to come holler at him [meet in person]. COATES told him "they got them all [all of the firearms] right now and you know I ain't got the cash." COATES and "J" agreed to meet and get together to "see what we can squeeze [money we can put together to purchase the firearms]."

401. On June 5, 2000, at approximately 4:28 p.m., COATES called "Jermaine". In the background of the call, COATES was talking to another person and said "you're going to double or triple your profit because some people need it more than others and they are willing to pay" [those who need cocaine will pay more for it]. COATES then told "Jermaine" about dealing with some

150

guys on "some petty little cash [small amount of money]." COATES said they were playing games so he told them to see him next week but he was still decent [still has cocaine]. "Jermaine" stated he would come over to meet COATES.

402. On June 8, 2000, at approximately 4:50 p.m., COATES received a call from "Jermaine," who told COATES that ""Little" [MCAFEE] and them got up with "Johnny" [THOMPSON]. "Yak" [PENNINGTON] was around when they came through saying some bull shit about "Johnny" said or some shit" [MCAFEE giving orders they said were on behalf of THOMPSON]. COATES stated he would come through and straighten it out. At approximately 5:00 p.m., COATES called PENNINGTON and told him he was on his way over there and "J" called and told him [what happened in earlier call]. PENNINGTON stated "they needed their ass whooped for that" and COATES stated he was going to arrange that. COATES stated as soon as he "gets over there and talks to dude [THOMPSON] and [he] finds out you the one who brung that to him, get ready to take your shirt off and clinch up [receive a violation, a five minute, no cover up beating]." PENNINGTON stated he would be around so COATES should call him and tell him what to do. At approximately 6:29 p.m., COATES called "Jermaine" and asked where he was and if dude [THOMPSON] came over there personally. "Jermaine" stated he was at the park and a BD member was the one who came over and he didn't know who the other guy was. COATES stated he would meet them at the park [COATES wanted to talk to him personally to find out what was going on].

### (xii) Calls with "Fleno"

403. On May 13, 2000, at approximately 3:07 p.m., COATES received a call from "Fleno." COATES told "Fleno" he needed a date [wanted to know when he was going to get money owed to COATES for drugs]. "Fleno" asked to have until Tuesday because "shit has been little

151

["Fleno" didn't have the money owed COATES because cocaine sales had been slow]." "Fleno" stated he would definitely call him Tuesday and finished the call saying "2-4" [The second and fourth letters of the alphabet B-D] to which COATES responded "for sure."

404.    On June 1, 2000, at approximately 9:52 a.m, COATES received a call from "Fleno". "Fleno" told COATES that he will have four for COATES on Saturday [$4,000]. COATES said that was cool. "Fleno" stated he was trying to get a hold of dude so he could take care of that [money owed]. COATES stated he should have taken care of that already and called "Fleno" "folks" [BD term of recognition]. "Fleno" said he was giving him a little room so he could do something [make money], but it was gravy and everything is back in effect [cocaine business was going again and he would make the money to pay COATES back]. COATES ended the call by saying "BD folk" [a BD greeting between members].

### (xiii)    Calls with Coconspirator C

405.    On May 17, 2000, at approximately 2:07 p.m., COATES called Coconspirator C, who asked COATES about getting a rental car because too many people have seen him in his car. Coconspirator C said he was making a million dollar run, then he would meet COATES back at the shop. At approximately 2:18 p.m, COATES called Coconspirator C and asked him if he saw those dicks [police detectives] outside. COATES said he knows one of them and he thought they were coming into the shop. Coconspirator C told COATES to run out the back door or hide in the office. COATES can be heard in the background telling someone to hold his keys [car keys he wanted to hide from the police because he had a firearm in the car].

### (xiv)    Calls with "Dante"

406.    On May 20, 2000, at approximately 3:30 p.m., COATES received a call from

"Dante," who asked for "Yomo" when COATES answered the phone. COATES told "Dante" not to say that name [Yomo] on the phone [to avoid identification by law enforcement].

### (xv)  Calls with Unknown Female #1

407.    On May 23, 2000, at approximately 11:40 a.m., COATES placed a call to an unknown female ("UF#1") whose daughter was having a relationship with COATES. COATES called her "mom" during the call and UF#1 called COATES "Tony' [an alias for COATES]. UF#1 gave COATES advice since her daughter was scared by COATES being arrested on a bond forfeiture warrant. UF#1 told COATES, "I know you do what you gotta do but that's how come we gotta do other things too, like the...family [UF#1 was aware COATES made money illegally]. They [other individuals who made money illegally] took what they made and put it into other enterprises and gained honor...and no matter what they did in the past, and your direction has to be similar so you can go into your own company and make $250,000 to $300,000 per year" [UF#1 coaching COATES in hiding proceeds of unlawful activity]. UF#1 told COATES that "during prohibition people who made money illegally started to put that money into legitimate businesses and became members of the community." UF#1 told COATES to drive a new car that he bought and to stay away from what he was doing [unlawful activity]. UF#1 advised COATES that she could set up businesses in her name and in her daughter's name with COATES being the silent partner that nobody else sees. COATES said she [the UF#1's daughter] was going to put his jewelry in a safe deposit box and "I want to stop her" [because he was released from jail]. UF#1 said COATES "can live a future of prestige with UF#1's daughter once they get involved in legitimate business." UF#1 told COATES that he had to "gradually move himself out of one realm and into another" [from unlawful activity into the legitimate world].

153

### (xvi)    Calls with Unknown Female #2

408.    On June 2, 2000, at approximately 1:15 p.m., COATES received a call from a an unknown female ("UF#2") who asked COATES if he wanted to get in on a Nextel [cellular telephone] with her Finnie [HAWKINS] and CW-18. COATES asked if they were burnouts [stolen telephones that do not need the bills paid and are used until the telephone company turns them off], and UF#2 said that she was going to put the telephones on her credit card. COATES said he was into burnouts and needed to talk to guys for other purposes [conduct drug business]. COATES told UF#2 he would take four of them. UF#2 then talked about an apartment being put in her name [stash apartment put in a nominee's name to avoid law enforcement].

### D.    Seizures, Consensual Recordings and Other Events

#### 1.    Visits with Incarcerated BD and GD Members[15]

409.    From February 14, 1993 to October 26, 1994, THOMPSON visited GD leader Larry Hoover six times while Hoover was incarcerated in IDOC prisons. The visits lasted approximately two to seven hours each.

410.    On or about August 16, 1997, THOMPSON visited Coconspirator A at an IDOC prison.

411.    On or about January 20, 1998 and on three other occasions, JEHAN visited Coconspirator A at an IDOC prison.

412.    On or about June 28, 1999, THOMPSON, JEHAN and others visited a BD member

---

[15] Based on my and other agents' experience, I know that gang members often visit incarcerated members of their gang in order to learn what evidence law enforcement has against the members, counsel and reassure the incarcerated member that he will be supported while imprisoned, to get orders from incarcerated gang leaders and to discuss other gang business.

who is Coconspirator A's relative, and who was incarcerated at Cook County jail approximately five days earlier on murder charges.

413.　On or about November 28, 1999, MCCRAY also visited Coconspirator A's relative at Cook County jail.

414.　On or about December 12, 1999, JEHAN visited a BD member, who was incarcerated in Cook County jail at the time.

415.　On or about October 18, 2000, WILLIAMS, FORD and TURNER visited COATES while he was incarcerated at Cook County jail. Also, on October 19 and 22, 2000, TURNER visited COATES at the jail.

416.　On January 31, 2002, SPAN and another BD member visited a BD member from the 45th and Federal area, who was in custody in Cook County jail.

417.　On September 2, 2003, HUDSON and IRVING were arrested for the violation beating of CW-16 which took place in late August 2003, and which is described above. Following their arrest, they were housed in Cook County jail. On September 4, 2003, THOMPSON visited HUDSON at Cook County jail.

418.　Also on November 21, 2003, another BD member visited HUDSON at Cook County jail; and on November 28, 2003, a BD member visited HUDSON at Cook County jail.

### 2.　Events in Chronological Order

419.　On or about July 27, 1990, THOMPSON was arrested for a BD/GD shooting. At the time of his arrest by CPD, THOMPSON was in possession of a .38 caliber firearm and approximately $10,000 in cash.

420.　On or about January 7, 1992, in South Bend, Indiana, MICKIEL was arrested, and

later pled guilty, to possession of 60 bags of crack that he admitted bringing to Indiana from the Chicago area.

421.   On or about March 31, 1994, EVANS and STEWART were arrested with other BD members by CPD officers at the Calumet building because they were stopping people from entering the building who would not tell them why they were entering the building. The charge was stricken with leave to reinstate in state court.

422.   In or about November to December 1994, PENNINGTON and MCDANIELS were interviewed by CPD detectives and both admitted that they were BD members.

423.   On or about September 2, 1996, JEHAN, CREAMER and approximately twelve other BD members were arrested by CPD officers for yelling BD slogans and flashing BD signs at the Calumet building. The charge was stricken with leave to reinstate in state court.

424.   On or about March 12, 1997, EVANS and STEWART were arrested by CPD officers at the Calumet building for criminal trespass and both admitted to being BD members.

425.   On or about May 16, 1998, law enforcement surveillance at the Calumet building revealed vehicles belonging to JEHAN and CREAMER were parked at that building.

426.   On or about June 16, 1998, law enforcement surveillance at the Calumet building revealed vehicles belonging to WILLIAMS and MICKIEL were at that building.

427.   On or about July 14, 1998, CREAMER was arrested at the Calumet building along with other BD members for mob action.

428.   On or about July 30, 1998, HERBERT was interviewed near 6215 South Wabash by CPD officers. HERBERT told the officers he was a BD member and held the rank of chairman of the board, which placed him above all other board members at the time. HERBERT stated that he

156

met with the GD governor for the area of 59th and Wabash and that he and the GD governor had agreed to stop the shootings that were taking place between BD and GD members at that time.

429.    On or about August 13, 1998, CPD officers interviewed EVANS at the Calumet building, who said that he was a BD member whose girlfriend lived in the Calumet building.

430.    On or about October 31, 1998, CPD officers executed a search warrant for apartment #305 at 5212 South Cornell, Chicago, the residence of HERBERT and CW-6. In the apartment, officers recovered numerous baggies used to packaged drugs and 240.4 grams of cocaine.

431.    On or about December 1, 1998, CPD officers received information from a CW that BD members at 3835 South Federal stored firearms in a laundry room at that address in preparation for a war against a rival Street gang. Officers went to that location and recovered five firearms, a shotgun and numerous rounds of ammunition.

432.    On or about December 22, 1998, CPD officers interviewed a ranking female BD member. During the interview, the female member stated that she was a BD member, and was given the rank of first lady for the area of 60th to 67th and State to Cottage Grove by HERBERT. On or about January 17, 1999, CPD officers interviewed the female member a second time. During this interview, she again stated that she held the rank of first lady in the BD, and identified the following BD members: THOMPSON is the king of the BD; JEHAN is a board member for the south side and makes money by dealing drugs; EVANS is a board member for the Calumet building area; HERBERT controls all of the board members in the city and sells heroin and crack at 61st and Wabash, and at 64th and Cottage Grove; HURD and THOMAS sold heroin at the Calumet building and pay a "street tax" to THOMPSON for the right to sell there; MICKIEL has no rank but sells large quantities of powder and crack at the Calumet building; and WILLIAMS does not have any

157

rank but sells large quantities of powder and crack.

433. On or about January 24, 1999, COATES, CW-5 and another individual were in a car driving toward the Calumet building, CPD officers attempted to pull them over. The driver of the car sped off and stopped at the Calumet building, where COATES got out with approximately three kilograms of cocaine, two of which he dropped as he ran. Officers recovered the two kilogram packages and found them to contain 1,978 grams of cocaine.

434. On or about February 7, 1999, CPD officers executed a search warrant for the first floor east apartment at 1169 East 61st Street, where THOMAS was living. During the search, a loaded 9 millimeter pistol was recovered. THOMAS admitted that the firearm was his.

435. On or about February 19, 1999, CPD officers executed a search warrant for apartment 1W at 6162 South Michigan, WILLIAMS' residence at that time. During the search, officers recovered from the apartment: 253.7 grams of crack, 249.1 grams of powder cocaine, pyrex containers used to cook crack, baggies used to package drugs, an electronic scale and documents showing proof of residency for WILLIAMS. WILLIAMS was not charged at that time in order to protect the secrecy of the ongoing BD investigation.

436. On or about March 16, 1999, HERBERT was interviewed by CPD officers. Just prior to the interview, HERBERT was in a car with CW-18. HERBERT told the officers that he was a BD member, that he made $20,000 to $25,000 weekly, and that the officers knew how he made his money, but that some of it also came from gambling. HERBERT stated that he possibly would make money legally later in life. HERBERT stated that he and THOMPSON are in constant contact, and that THOMPSON has calmed situations between BD members under HERBERT and BD members from other parts of the city. HERBERT told the officers that he will always have loyalty for

158

THOMPSON.

437.    On or about April 5, 1999, THOMPSON received a call from Coconspirator B, who was calling from an IDOC prison. The call was recorded by IDOC. During the call, Coconspirator B asked THOMPSON for money. THOMPSON told Coconspirator B that "Rollo" [HUDSON] was supposed to send him money. THOMPSON added that he was paying Coconspirator B's attorney $1,200. HUDSON then got on the telephone and told Coconspirator B that he just caught another pistol case.[16]

438.    On or about October 6, 1999, THOMPSON was observed by officers conducting physical surveillance in the area of 6723 South Parnell, a building owned by THOMPSON.

439.    On or about October 10, 1999, officers received information from an informant, who provided accurate information in the past regarding BD members, that COATES was packaging heroin in apartment #107 at 6162 South Michigan. Officers went to that location and received written consent to search the apartment from the tenant. During their search, officers recovered the following items of drug processing paraphernalia: a scale, strainers, a mixer, razor blades and baggies.

440.    On or about November 5, 1999, VARMAH VOKER was arrested by CPD officers at the Calumet building for criminal trespass. VARMAH VOKER gave officers consent to search his car, a 1992 BMW, where officers found $4,900 in cash. VARMAH VOKER gave conflicting stories about the source of the money.

441.    On or about December 12, 1999, CW-17 consensually recorded a meeting between

---

[16] According to law enforcement records, HUDSON was arrested approximately eight months earlier for unlawful possession of a firearm in Chicago.

CW-17 and other BD members at the Calumet building. While at that building, CW-17 met STEWART, JEHAN and THOMPSON. During their conversation, CW-17 spoke to THOMPSON and JEHAN about stolen televisions, and they balked at the price CW-17 offered. CW-17 mentioned to JEHAN and THOMPSON that CW-17 knew a drug user who had stolen building supplies for sale. JEHAN asked CW-17 if the drug user would give the stolen supplies to JEHAN in exchange for heroin.

442. On or about January 6, 2000, CW-17 consensually recorded a meeting with BD members at the Calumet building. While at that building, CW-17 saw CLARK, EVANS and a BD member. CLARK said that JEHAN was in the building. CW-18 arrived at the building. CW-17 then met with JEHAN and CREAMER in the building. They spoke about obtaining cloned cellular telephones, and CREAMER searched CW-17 for recording devices, saying, "I'm tryin' to stay away from the police [CREAMER was attempting to determine if CW-17 was cooperating with law enforcement]." During their conversation, CREAMER gave CW-17 his pager number with the code "2-4." In the background, JEHAN yelled "someone wants blows," which is a term for packets of heroin and demonstrates JEHAN'S control of the drug operation at the Calumet building.

443. CW-17 stated that on or about January 8, 2000, CW-17, COATES, and BROWN were in a bar when COATES showed CW-17 a loaded, 9 millimeter pistol that was equipped with an extended 30 round magazine. COATES told CW-17 that he also had a second loaded magazine for the pistol.

444. On or about January 10, 2000, officers were conducting a surveillance in the area of 67th and Parnell. During their surveillance, officers saw HERBERT exit the rear of 6723-27 South Parnell [THOMPSON'S building] and meet two other individuals in the rear. Officers approached

HERBERT for an interview, during which HERBERT said, in part, that he was there to see a friend.

445.     On or about January 18, 2000, CW-17 consensually recorded meetings CW-17 had with BD members at the Calumet building. While at that building, CW-17 spoke with CLARK about drugs. CLARK said that he sold heroin for JEHAN and CLARK wanted to buy cocaine to sell. CLARK related to CW-17 that a BD member was being accused by COATES of stealing COATES' drugs, and that JEHAN took COATES' side in the dispute, even though JEHAN, CLARK and the BD member who was accused of stealing drugs are brothers. CLARK said that he and his brother went to see JEHAN about the situation and JEHAN said that he will have BD members "move" on them [use violence against them if necessary] if they [CLARK and his other BD brother] did not leave. CW-17 continued a conversation with CLARK, who asked CW-18 to quote him a price for a couple of ounces of powder cocaine that his brother, the BD member wanted to buy. CW-18 quoted prices for CLARK and CW-17 for various quantities of crack and powder cocaine, which were referred to as "hard" and "soft" respectively. CLARK said that he had been running JEHAN'S heroin distribution spot, but quit after they got into an argument. CLARK stated that MOTEN was running a heroin spot on King Drive, and that HURD had been running a heroin spot but let the spot deteriorate due to lack of attention. CLARK stated that a drug spot must be monitored to make money. CLARK told CW-17 what it takes to open and operate a heroin spot and that he made hundreds of dollars each week selling heroin. CLARK stated that if CW-17 and he started a heroin spot, JEHAN could provide them with heroin at a good price.

446.     On or about March 27, 2000, CW-17 consensually recorded conversations with BD members. CW-17 spoke with CW-18 [who was not cooperating with law enforcement at the time of this conversation], who said that COATES provided CW-18 with quantities of cocaine to sell.

161

CW-18 stated that CW-18 was going to take about 3 and 1/2 ounces of cocaine to the Calumet building to sell there.

447.     On or about April 12, 2000, CW-17 consensually recorded conversations with BD members. CW-17 spoke with COATES while they were in a vehicle. COATES told CW-17 that he owned $400,000 worth of jewelry and a Bentley, and that he had recently stopped supplying MCDANIELS with drugs.

448.     On or about August 23, 2000, a BD member was interviewed by CPD officers and an Assistant United States Attorney regarding his knowledge of the BD. That BD member stated that Coconspirator A was the king and THOMPSON was the assistant king. He described the BD hierarchy in a similar fashion as included elsewhere in this Affidavit. The BD member stated that he sold cocaine in the area of 66th to 68th and Union, and that there are 25 to 30 BD members in the area, which includes Emerald Street. He stated that COATES is the board member for that area. Security at their drug spot was provided by BD members or drug users and the minister calls meetings for their set. The BD member stated that COATES provides heroin to PENNINGTON, who mixes and packages it then gives it to a BD member, who gives it to the sellers for the area of 66th between Halsted and Emerald. The BD member stated that a BD member supplies him with cocaine to sell and that a BD member is the BD head director for the area of 64th and Lowe.

449.     On September 14, 2000, law enforcement in Henderson, Nevada interviewed VARNEY VOKER, who told agents that he had no means of legitimate income and had not filed tax returns for the last few years.

450.     On or about October 3, 2000, Virginia State Police officers stopped a car for a traffic violation in which TURNER was a passenger. In a second car was COATES. After questioning of

the driver of the car that was stopped and TURNER, the car was searched and officers recovered approximately $27,600 from the trunk. COATES, TURNER and the other two individuals in the vehicles denied knowledge of the presence of the cash.

451. On or about October 27, 2000, officers conducted a surveillance at the Calumet building and saw EVANS exit the rear of the building with a male who was counting money. Also observed was a meeting between JEHAN and WILLIAMS, and BD members greeting each other with the BD handshake.

452. On or about November 27, 2000, THOMPSON sent a $50 money order to CW-1, who was in federal prison at the time.

453. On or about December 28, 2000, a BD member called THOMPSON from an IDOC prison. The call was recorded. During the call, THOMPSON spoke about sending $300 to a BD member's IDOC account and said that he would tell JEHAN that another BD inmate needed a television.

454. On or about January 25, 2001, officers conducting surveillance saw THOMPSON in a vehicle at 69th and Halsted. They followed THOMPSON to 6725 South Parnell, back to 69th and Halsted and to two banks on the south side of Chicago.

455. On or about January 27, 2000, officers conducting surveillance saw a 2000 Denali SUV registered to JEHAN parked at THOMPSON'S building at 69th and Halsted. Later that day, officers saw JEHAN driving that same SUV in the area of the Calumet building.

456. On February 12, 2001, CPD officers conducting a license check at a business called "Mob Records" located in THOMPSON'S building at 69th and Halsted, found that the business did not have a retail license. Present and interviewed at that time was a BD member, who said that

THOMPSON owned the company but that he was paid by THOMPSON'S mother.

457.    On February 26, 2001, officers observed STEWART running from them at the Calumet building. In STEWART'S and another BD member's path of flight, officers recovered 18 dime bags of cocaine. STEWART was charged, and there was a finding of no probable cause in state court.

458.    On March 14, 2001, WHITE sold 51 dime bags containing approximately 11.4 grams of cocaine [confirmatory testing to determine if the cocaine was crack is pending] to a CW in exchange for $510 at 4555 South Federal. Both prior to and immediately following the transaction, the CW was searched and found to be free of contraband.

459.    On May 8, 2001, CPD officers working in an undercover capacity approached the BD controlled public housing apartment building at 4555 South Federal for the purpose of making covert buys of drugs. After one of the officers left his vehicle, WHITE, who was working armed security for the BD drug operation, approached the officer and began to pat him down. After WHITE discovered the officer's bullet proof vest under his clothes, the officer saw a firearm in WHITE'S hand. The officer, unable to get to his firearm, struggled with WHITE, punched WHITE and ran. As the officer ran, WHITE fired several shots at the officer, striking him in the vest and in the rear of his body. WHITE fled, but was quickly detained. In WHITE'S path of flight, officers recovered the firearm that WHITE used to shoot the officer. Following his arrest, WHITE was given *Miranda* warnings, waived them and stated that he was working security for the BD drug operation while armed with a firearm at the time of the shooting. WHITE said that he was given the firearm and told to watch the Federal Street entrance to the building while other BD members sold drugs there, but denied shooting the officer. WHITE was charged in state court. The case is pending.

460. On May 17, 2001, officers conducting surveillance at the Calumet building heard BD security workers alert others about the presence of police and saw STEWART and two other BD members running with bags of drugs in their hands. The officers stopped them and found STEWART in possession of approximately 64 dime bags of suspected crack. The other individuals stopped with STEWART had a total of 156 dime bags of suspected crack, 90 dime bags of suspected heroin and about $1,470.

461. On May 25, 2001, while patrolling the Calumet building, officers arrested two individuals who admitted they were BD members and found them in possession of 161 dime bags of suspected crack.

462. On June 24, 2001, officers conducting a surveillance in the rear of the Calumet building saw garbage dumpsters placed in a way to block the alley. Officers saw an individual conduct drug deals and approached him. The individual ran but was stopped. He was searched and found to be in possession of 100 dime bags of suspected heroin.

463. On June 25, 2001, MCAFEE and HAMPTON were at the Calumet building. Officers arrested HAMPTON for possessing about 23 dime bags of suspected crack after they saw him drop the drugs to the ground. MCAFEE dropped a small bag of marijuana to the ground, was arrested, searched and had $1,100 on him. Both admitted that they were BD members.

464. On or about June 28, 2001, CW-29, at the direction of law enforcement, CW-25 met with a BD member regarding the lease of an apartment at THOMPSON'S building at 67th and Parnell. A BD member instructed CW-29 to make the rent payments in THOMPSON'S name.

465. On or about August 8, 2001, CW-11 was driving on the west side of Chicago with CW-11's two small children and girlfriend, when CARTER drove up next to CW-11's car.

GARRETT was the front seat passenger in CARTER'S car. GARRETT began shooting at CW-11, striking CW-11 several times, and striking CW-11's six year old child in the chest. During the investigation of the shooting by CPD officers, the firearm that GARRETT used to during the shooting was recovered from the purse of a woman GARRETT was with about one month after the shooting. As described elsewhere in this Affidavit, CW-11 was attacked by CARTER and GARRETT, in part because of CW-11's reluctance to employ BD members at CW-11's BD controlled rug spot.

466. On or about August 10, 2001, CPD officers executed a search warrant for the first floor rear apartment at 6502 South Harvard, the residence of FORD. During the search, officers recovered the following: a scale, numerous empty dime bags, documents showing proof of residency for FORD at that location, (a moving company's document showing that FORD had furniture delivered to that address) approximately $24,000 in cash (mostly in small denominations which were bundled and marked), a .25 caliber firearm with a defaced serial number, a loaded .45 caliber pistol, approximately 450 dime bags containing 69.8 grams of crack and 266.9 grams of powder cocaine. FORD was not present at the time of the search. Following that search, an additional approximately $2,400 was recovered in a consent search from an apartment where one of FORD'S drug workers kept drug proceeds from the operation.

467. On or about September 12, 2001, CW-25 consensually recorded a conversation with THOMPSON'S mother at THOMPSON'S building at 67th and Parnell. During that conversation, she was using a computer, CW-25 spoke with her about fixing a broken intercom in the building. An undercover agent was present in the building with CW-25. She said that her son was out of town and had to approve the work. When CW-25 requested that CW-25 and the undercover agent be

allowed to do the work that they would have to be paid in cash, she said that her son (THOMPSON) needed to show expenses for the building [to launder drug proceeds]. During that time, she called out for "Rollo" [HUDSON] who allowed CW-25 and the agent into the basement of the building, where the agent saw approximately fifty banker's boxes.

468.    On September 17, 2001, while patrolling the Calumet building, a CPD officer in uniform was chasing HOLLOWAY, who pointed a firearm at the officer from about fifteen feet away. HOLLOWAY was eventually caught, the firearm was recovered and found to be a loaded .25 caliber pistol with a defaced serial number. HOLLOWAY admitted that he was a BD member.[17] Earlier that day, officers conducting surveillance in the rear of the Calumet building observed HOLLOWAY meet with an armed security worker in the alley behind the Calumet building.

469.    On or about September 19, 2001, IRVING was arrested after leaving the Calumet building in possession of 100 bags of suspected marijuana.

470.    On or about September 29, 2001, CW-7 was driving a 2000 Jaguar with another woman, a ten year old child and a four month old child inside in the area of 800 South Wells. As she drove, two unknown men began to shoot at CW-7's car, striking the woman passenger. CW-7 drove a short distance and called the police. After officers arrived, they noticed that CW-7's car contained a large amount of clothes and other items. While still investigating the shooting at the scene, officers saw VARNEY VOKER drive up in a 2001 Jaguar. Officers saw a large bulge in VARNEY VOKER'S pants pocket, which was found to be $9,150 in cash, which was seized. A subsequent investigation revealed that both of the Jaguars driven by CW-7 and VARNEY VOKER

---

[17] On June 3, 2003, following a trial in the Circuit Court of Cook County, under case 01CR-23806, HOLLOWAY was found guilty of aggravated assault and aggravated unlawful use of a weapon.

were purchased on September 17, 2001. The rear seat area of the Jaguar driven by VARNEY VOKER was searched, and officers found $15,000 wrapped in plastic, denominated in 413 $10 bills, 449 $20 bills and the rest in $1, $50 and $100 bills.[18] While still at the scene, officers saw and heard the woman who was shot talking on her cellular telephone while in the ambulance. Officers heard the woman say to the person she was talking with, "When you come here, don't park too close, there's too many police here." VARMAH VOKER arrived at the scene shortly after in a 2001 GMC Denali SUV. VARMAH VOKER gave consent to search the SUV and officers recovered $1,740 in cash. When interviewed later by investigators, VARMAH VOKER said that, "Where I get my money is nobody's business." The SUV driven by VARMAH VOKER was registered to a resident of the Calumet building.

471.    On November 11, 2001, CPD officers received information that drugs were hidden under a dumpster in the rear of the Calumet building. Officers searched that area and found about $2,600 in cash, a .357 caliber firearm and approximately 600 dime bags of suspected heroin.

472.    On November 16, 2001, officers saw and heard an individual yelling "ice cream cones" at the Calumet building, which was the name for a line of crack run by the BD. The individual offered to sell drugs to one of the officers, who was working undercover, and was arrested with 35 dime bags of suspected crack. The BD member admitted that he was a BD member.

473.    On November 19, 2001, BROWN was arrested at the Calumet building after officers observed him conducting drug transactions at the Calumet building. Officers arrested BROWN and found him to be in possession of approximately 50 dime bags of suspected crack. BROWN stated

---

[18] Based on my experience and the experience of other law enforcement officers, I know that most street level drug sales are made in $5 and $10 increments and that drug dealers often accumulate large amounts of those denominations of bills.

that he was selling drugs at that time.

474.    On November 23, 2001, officers conducting surveillance at the Calumet building arrested an admitted BD member with 120 dime bags of suspected heroin. The officers arrested a second person after watching that person conduct drug transactions. The second person possessed approximately $1,625 in cash, 52 dime bags of suspected heroin and 6 dime bags of suspected crack.

475.    On November 27, 2001, CW-11 consensually recorded a meeting with MCCRAY, SPAN and other west side BD members in the area of the North Riverside mall. During that meeting, MCCRAY told CW-11 that THOMPSON had made changes to a BD law. SPAN told CW-11 that GARRETT felt bad about shooting CW-11's child, but that all CW-11 had to do is let BD members work CW-11's drug operation. SPAN told CW-11 that if CW-11 did not drop the case against CARTER and GARRETT, then CW-11 should be very careful.

476.    On November 29, 2001, two individuals attempted to sell drugs to undercover officers at the Calumet building. Both individuals were arrested and found to be in possession of a total of approximately 165 dime bags of suspected crack and 97 dime bags of suspected heroin, along with $680 in cash.

477.    On December 4, 2001, officers from several law enforcement agencies conducted searches of numerous apartments in the Calumet building. Most of the searches were done pursuant to federal search warrants, while others were done with consent of the residents of the apartments, and with the consent of the Chicago Housing Authority. During the search of the building the following items were recovered: (a) from apartment #1105, $1,610; (b) from apartment #501, $2,798 and numerous empty dime bags; (c) from apartment #1202, a .40 caliber pistol with a defaced serial number and different caliber ammunition; (d) from apartment #1504, boxes of shotgun shells and

numerous empty dime bags; (e) from apartment #1108, a .380 caliber pistol; (f) from apartment #508, 50 dime bags of suspected marijuana; (g) present in apartment #1203 and #1302 were EVANS and LOCKHART respectively; (h) from apartment #504, $1,025 in cash; (i) from apartment #1007, numerous empty baggies and items of drug distribution paraphernalia; (j) from apartment #801, approximately 240 grams of suspected heroin; (k) from apartment #905, approximately 68 dime bags of suspected crack, a scale, empty baggies and $9,800; (l) from apartment #707, 1 bag of suspected heroin, numerous empty dime bags, night vision devices, false bottom cans and $12, 293 in cash, SLAUGHTER was present in the same bedroom where the heroin and money were found, there was an IDOC letter addressed to SLAUGHTER there as well, and he made a post-*Miranda* statement to officers that he lived in that apartment; (m) from apartment #1508, $2,000; (n) from BD member HAMPTON'S apartment #1001, $3,103 in cash, which HAMPTON said were proceeds of drug sales, and as officers entered the apartment, they saw HAMPTON flushing drugs down the toilet, where 13 dime bags of suspected crack were recovered, which HAMPTON admitted was his crack; (o) from HOLLOWAY'S apartment #1602, a scale, empty baggies and $2,318 in mostly $20, $10 and $5 denominations; and (p) thrown out of windows in the building by unknown individuals during the search and recovered were 2 bags containing 27.8 grams of suspected crack and empty dime bags.[19]

478.    On or about December 17, 2001, officers executed a search warrant for STEWART'S residence at 4591 Provincetown, Country Club Hills, Illinois. During that search, officers recovered numerous photographs of STEWART and other BD members, some of which depicted BD members

_____

[19] Following the search, SLAUGHTER, HAMPTON and HOLLOWAY were charged in the Circuit Court of Cook County with drug offenses relating to the items seized during the searches. All of those defendants were convicted in state court of their respective charges.

flashing gang signs.

479.    On December 31, 2001, HOLLOWAY was arrested at the Calumet building for criminal trespass. HOLLOWAY admitted to the officers that he was a BD member.

480.    On or about January 1, 2002, INGRAM and one of COATES' BD members, were arrested for murder. Following his arrest on that case, COATES' BD member was given *Miranda* warnings, waived them and stated, in part, that he and INGRAM were BD members.[20]

481.    On or about January 15, 2002, COATES and HERBERT were in a car when it as stopped by officers in the area of 6643 South Langley. During an interview of COATES, he admitted that he was a BD member.

482.    On January 17, 2002, MCCRAY, after agreeing to sell CW-11 crack in consensually recorded conversations, sold approximately 2 and 1/4 ounces of crack to CW-11 during a consenually recorded meeting by CW-11.[21]

483.    On January 24, 2002, an undercover officer was at 4555 South Federal where the officer was approached by a BD member, who, after agreeing to sell the officer crack, was arrested and found in possession of 6 bags of crack.

484.    On or about January 28, 2002, CW-11 consensually recorded a meeting with SPAN at Victor Herbert park. During the meeting, SPAN told CW-11 that THOMPSON would meet with CW-11 regarding the ongoing dispute with other BD members about the employment of BD

---

[20] Following his arrest, INGRAM'S bond was set at $500,000, 10% of which had to be posted for his release. On or about September 3, 2002, THOMPSON posted $50,000 for INGRAM'S bond. At the time he signed the documents regarding INGRAM"S bond, THOMPSON noted that he was INGRAM'S friend.

[21] MCCRAY pled guilty to distributing over 50 grams of crack in the Northern District of Illinois in case 03 CR 109, and was sentenced to 120 months in the BOP.

members at CW-11's drug operation.

485.    On January 31, 2002, CW-11 consensually recorded a telephone conversation with MCCRAY, about CW-11 meeting with THOMPSON to discuss CW-11's problem with other BD members. During the call, MCCRAY told CW-11 that SPAN said that it was fine with him if CW-11 wanted to talk to THOMPSON about the situation.

486.    On February 4, 2002, CW-11 consensually recorded a meeting between CW-11, CARTER, GARRETT, MCCRAY and others. During that meeting, CARTER talked about a west side BD member who had lost a firearm.

487.    On or about February 13, 2002, CW-11 consensually recorded a meeting with CARTER, MCCRAY and other BD members. During that meeting, CARTER and MCCRAY expressed their desire that CW-11 recant his statements to the police about the attack on CW-11 by CARTER and GARRETT, and to meet with MCCRAY'S attorney.

488.    On February 28, 2002, CW-11 went to THOMPSON'S building at 67th and Parnell for the purpose of meeting with him to discuss the dispute with west side BD members. CW-11 had a recording device at the time. Upon arriving at the building, THOMPSON was not present, but a BD member was there and took CW-11 to a recording studio in the basement of that building. The BD member attempted to locate THOMPSON for CW-11, but was unsuccessful.

489.    On March 12, 2002, CW-11 placed a consensually recorded call to MCCRAY and read for MCCRAY a recantation of CW-11's statements to law enforcement regarding the attack by CARTER and GARRETT on CW-11. CW-11 drafted the recantation pursuant to CW-11's cooperation with, and under the direction of, law enforcement, and purposely contains false information. After reading the recantation to MCCRAY, MCCRAY stated that it sounded good.

172

Later that day, CW-11 consensually recorded a meeting between CW-11, MCCRAY and REID. REID and MCCRAY picked up CW-11 and REID drove them to a currency exchange so that CW-11 could have the written recantation notarized and given to the attorneys for CARTER and GARRETT. After having the recantation notarized and copied, CW-11 gave the original and copies to MCCRAY.[22]

490.    On March 13, 2002, CW-11 consensually recorded a telephone conversation with MCCRAY, who stated that CARTER said the recantation was okay.

491.    On March 14, 2002, CW-11 consensually recorded a telephone conversation with MCCRAY, who said that he was waiting to hear what "they" [CARTER, GARRETT and SPAN] wanted him to do with the recantation provided by CW-11.

492.    On March 15, 2002, CW-11 consensually recorded a meeting and telephone conversations with MCCRAY, who said that "they" wanted CW-11 to go to the courthouse at 26th and California and meet with CARTER'S attorney. MCCRAY and CW-11 went to that courthouse and met with SPAN, other west side BD members and CARTER'S attorney, where CARTER'S attorney asked CW-11 questions about the shooting.

493.    On April 10, 2002, CW-11 consensually recorded a telephone conversation with MCCRAY, who said that the shooting of CW-11 by CARTER and GARRETT was not supposed to involve CW-11's child, but that CW-11 brought the shooting on by fighting with the BD. MCCRAY told CW-11 that SPAN wanted CW-11 to be part of the BD future. MCCRAY told CW-11 that he was a BD member for life.

_____

[22] Prior to CW-11's meeting with MCCRAY and REID, law enforcement made a copy of the original written recantation for evidentiary purposes.

494. On April 25, 2002, CW-18 consensually recorded a telephone conversation with HERBERT to discuss the violation ordered by COATES that was pending against CW-18. During the conversation, HERBERT said that he "has been "hustling" and "making moves" [conducting drug business] all along for many years" and asked CW-18 why COATES wanted to violate CW-18. HERBERT stated that WILLIAMS was back around "doing decent again" [making money selling drugs] and that THOMPSON was out of town. HERBERT said that he would call a BD member to see when THOMPSON would be back. HERBERT agreed to talk to THOMPSON about COATES' violation order against CW-18 and asked CW-18 if CW-18 was sure that CW0-18 wanted HERBERT to go that far [up the hierarchy of the BD] in trying to resolve the situation with COATES.

495. On May 19, 2002, MCAFEE was arrested at the Calumet building by CPD officers for criminal trespass and could not explain why he was in possession of approximately $928 in cash.

496. On May 22, 2002, CW-12 consensually recorded a meeting with CARTER, SPAN and other BD members on the west side of Chicago. During that meeting, CARTER said that he had to speak with CW-11 about the shooting.

497. On June 6, 2002, MCCRAY was stopped for a traffic violation at 2222 West Adams. MCCRAY had $1,938 in cash in small bills. MCCRAY said that he was unemployed.

498. On June 16, 2002, agents conducted surveillance at Victor Herbert park on Chicago's west side. On that day, the BD held a party which CW-12 attended. During the surveillance, agents observed MCCRAY, CARTER and other BD members meeting with each other. The next day, June 17, 2002, agents met with CW-12, who said that in addition to the BD members seen by agents, REID, SPAN, GARRETT and THOMPSON were there as well. CW-12 told agents that

174

THOMPSON arrived in the evening hours (after agents concluded their surveillance and left the area). CW-12 told agents that THOMPSON met with MCCRAY, SPAN, CARTER GARRETT, REID and other BD members while THOMPSON was there.

499.    On July 9, 2002, CW-12 notified agents that a BD member told CW-12 that CW-12 had to work security for a meeting that was going to take place at Victor Herbert park between SPAN and south side BD members.  Agents conducted surveillance in that area and saw THOMPSON, JEHAN and SPAN meet and talk in the park.  Also in the park at that time were MCCRAY and other BD members.  After meeting for approximately one hour, THOMPSON, SPAN and JEHAN began to walk away, followed by a group of BD members.  THOMPSON and JEHAN then left the area in JEHAN'S Cadillac Escalade SUV.

500.    On July 29, 2002, THOMPSON was arrested by CPD officers after officers saw THOMPSON in possession of a .38 caliber firearm at 6708 South Normal.  That case is currently pending in state court.

501.    On August 29, 2002, CW-11 consensually recorded a telephone conversation with a BD member.  During the call, they discussed the problem between BD members and CW-11's crew of workers.  The BD member said that it was up to "dude" [SPAN] to make the decision about that situation and that the BD member was staying out of it.

502.    On September 8, 2002, officers were assigned to investigate a call for police at a park located at 330 East 72nd Street.  When they arrived, officers saw several individuals drinking on a public way.  As they approached, they saw THOMPSON toss a dime bag of suspected crack to the ground.  As officers attempted to arrest THOMPSON, several individuals surrounded the officers and grabbed THOMPSON away from the officers.  That group included: HUDSON, JEHAN,

MCAFEE and other BD member. The group of individuals who were obstructing the officers began to threaten the officers, saying that they had firearms and will kill the police. The officers called for assistance and when more officers arrived, THOMPSON and those that interfered with the officers were arrested. During a custodial search of THOMPSON, officers found $1,127 in cash on him. JEHAN'S Cadillac Escalade SUV was towed from the scene.

503.    On September 30, 2002, officers arrested an individual who admitted he was a BD member and that he was selling drugs at the Calumet building. Officers recovered 33 dime bags of suspected heroin and 25 dime bags of suspected crack.

504.    On October 8, 2002, JENKINS was stopped in a vehicle he was driving at 6614 South King Drive. The stop was based on a traffic code violations. JENKINS was arrested for driving without a valid license. At the time of the stop, JENKINS was in possession of approximately 100 dime bags of heroin and $2,733 in cash.

505.    On November 9, 2002, HOLLOWAY was arrested at the Calumet building for possession of marijuana. At the time of his arrest, HOLLOWAY was in possession of approximately $734 in cash. He also admitted he was a BD member.

506.    On November 20, 2002, officers arrested three individuals, who admitted they were BD members, at the Calumet building after officers saw them conducting drug sales, via hand-to-hand exchanges of money for drugs with buyers, and acting as look-outs for the police. Officers recovered 41 dime bags of suspected crack and $400 in cash.

507.    On November 22, 2002, officers arrested an admitted BD member at the Calumet building when he was found to be in possession of 121 dime bags of suspected crack.

508.    On January 10, 2003, CHISM was arrested on the second floor at the Calumet

building by officers for criminal trespass because he was unable to give the officers a reason for his presence at the building.

509.  On January 11, 2003, COPELAND was arrested at the Calumet building for soliciting drug buyers. She possessed $700 at the time of her arrest.

510.  On January 31, 2003, officers executed a search warrant for apartment #4312 at 555 West Madison, MCCRAY'S residence. During the search, officers recovered a 9 millimeter pistol with a defaced serial number, drug distribution paraphernalia, over 10 grams of cocaine and over 25 grams of marijuana.

511.  On February 26, 2003, VARNEY VOKER was interviewed after officers saw him driving a silver Bentley at 79th and Indiana. During the interview, he stated that the car was his father's [G. VOKER].

512.  On March 13, 2003, officers entered the Calumet building and heard someone yell "heads up," a warning of police presence. Officers then saw IRVING running and stopped him. Officers found him to be in possession of 25 dime bags of suspected crack and $791 in cash.

513.  On March 14, 2003, HOLLOWAY was arrested at the Calumet building after officers saw him drop a bag that contained seven smaller bags of suspected marijuana. At the time of his arrest, HOLLOWAY admitted he was a BD member.

514.  On March 18, 2003, an individual was arrested at the Calumet building after officers saw and heard him soliciting drug buyers and warning of police presence by yelling "rocks...heads up." Following his arrest, that individual told officers that he was working security for the drug operation and was paid $40 to work an 8 hour shift.

515.  On March 30, 2003, an individual was arrested at the Calumet building. Following

his arrest, that individual told officers that he was working security for the drug operation and was paid $50.

516.    On May 24, 2003, CW-17 consensually recorded conversations with BD members at the king David day party at the Calumet building. At the party, CREAMER told CW-17 that he was looking for BROWN in regard to marijuana. CW-17 had a brief conversation with THOMPSON and JEHAN, who were seated with each other during the party. CW-17 and officers observed other BD members present included CHISM and a BD member. Later that day, officers recovered approximately three tec shirts that, according to CW-16, BD members were ordered to purchase, from a BD member in the area of the Calumet building.

517.    On July 1, 2003, CW-17 consensually recorded conversations with BD members at the Calumet building. At that time, CW-17 was with CLARK. Another BD member described for CW-17 the security for the drug operation that was in place at that time. They also discussed BD violations at the Calumet building, and that MOTEN was running some drug sales there.

518.    On July 16, 2003, MICKIEL was seen by officers who were conducting surveillance in vehicles in the area of 4601 South Rockwell. Officers saw an individual place a bag containing suspected drugs into a car MICKIEL was driving alone in. Officers followed MICKIEL, who failed to stop at a stop sign, then began to flee. Officers stopped MICKIEL while he was still in his car and recovered three kilograms of cocaine from the bag that was placed into his car. Officers also recovered about $1,036 and 2 cellular telephones.[23]

519.    On or about August 25, 2003, officers observed HUDSON driving the same black,

---

[23] MICKIEL was charged with possession of in excess of 500 grams of cocaine with intent to distribute in the Northern District of Illinois, under case 03 CR 771. The case is still pending.

Ford Excursion officers had observed THOMPSON driving on prior occasions, in the area of 7143 South Emerald.[24] Officers saw HUDSON hand something to an individual, who began to make hand-to-hand exchanges with other individuals. Officers followed HUDSON to 6725 South Parnell.

520. On September 10, 2003, a BD member was arrested in the area of 6400 South Eggleston with a loaded 9 millimeter pistol and other contraband.

521. Beginning in about the fall 2003 and continuing through March 2004, CPD officers conducted an investigation of FORD'S drug distribution spots in the areas of 64th and Stewart and 66th and Parnell. Officers conducted video taped surveillance of BD members selling drugs at those locations; made undercover purchases of drugs from the sellers; and seized drugs and money from the sellers. In March 2004, several individuals were arrested and charged in state court, including ROBINSON, whose case is pending. Many of the arrestees, who worked as sellers or security workers for the drug spots admitted that they were part of the drug operation and told officers that FORD controlled the spot.

522. On October 15, 2003, ROBINSON sold dime bags of crack to an undercover officer in the area of 6432 South Stewart.

523. On October 21, 2003, ROBINSON sold dime bags of crack to an undercover officer in the area of 6432 South Stewart.

524. On October 30, 2003, officers executed a search warrant for apartment #510 at the Calumet building. During that search, officers recovered 49 dime bags of heroin, $490 and money order and other documents showing proof of residency for LOCKHART in that apartment.

---

[24] As described above, this is the same vehicle that CW-16 was driven in by HUDSON, when CW-16 was beaten by HUDSON and IRVING on August 26, 2003 as part of a BD violation.

LOCKHART was not home at the time of the search.

525.  On November 5, 2003, officers arrested an admitted BD member at the Calumet building with approximately 109 dime bags of suspected crack and $1,107 in cash.

526.  Also on November 5, 2002, ROBINSON sold dime bags of crack to an undercover officer in the area of 6432 South Stewart.

527.  On November 7, 2003, ROBINSON sold dime bags of crack to an undercover officer in exchange for cash at 6432 South Stewart.

528.  On about November 10, 2003, while executing a search warrant for a home leased by VARMAH VOKER in a suburb of Atlanta, Georgia, officers recovered a .357 caliber firearm and a green Bentley. Also at that location was a 2001 Denali SUV registered to a resident of the Calumet building.

529.  On November 13, 2003, CW-20 consensually recorded a conversation with MOTEN. During that meeting, MOTEN stated that VARNEY VOKER and VARMAH VOKER had CHISM and another BD member mixing their heroin for sale at the Calumet building, and that LOCKHART packaged the heroin for street sales as part of "the Twins'" operation. MOTEN said that CHISM keeps him informed about the operation. MOTEN told CW-20 that VARNEY VOKER and VARMAH VOKER were planning on buying the crack selling operation at the Calumet building.

530.  On November 14, 2003, officers conducting surveillance observed MOTEN enter the Parkway Gardens apartment complex, then drive to the Calumet building, where VARNEY VOKER and VARMAH VOKER were also present.

531.  On November 21, 2003, FORD was questioned by officers investigating firearm purchases made by FORD. During the interview, FORD admitted that he gave a BD member a 9

millimeter pistol that a BD member was arrested with on about September 10, 2003. FORD was charged with state firearms offenses. A custodial search revealed $975. FORD stated that he was unemployed at that time.

532. On November 21, 2003, a BD member sold dime bags of crack to an undercover officer in the area of 6432 South Stewart.

533. On December 9, 2003, officers inte4viewed VARMAH VOKER at the Calumet building regarding information CPD received about a potential threat to VARMAH VOKER. During that interview, VARMAH VOKER told officers that whoever would try to harm him is the one who needs protection. He said that he had a lot of firearms and has made a lot of money from the Calumet building. During the interview, VARNEY VOKER arrived.

534. On December 17, 2003, officers attempted to stop FORD in the area of 6300 South Yale after observing him commit a traffic violation. After FORD'S car stopped, his eleven year old son ran from the car and into a nearby gas station. The son was caught and found to be in possession of about $1,060 in $20 bills, and said that FORD gave him the money when the police pulled them over.

535. On June 21, 2000, a BD member was arrested by CPD officers after he sold marijuana to an undercover officer. Following his arrest, that BD member was given *Miranda* warnings, waived them and gave a signed statement to officers and an Assistant Cook County State's Attorney. That BD member stated that the last BD meeting he attended was at CHISM'S home on 61st Place. At the meetings, members worked out their differences and the leaders were kept up to date on what was happening in a particular area. Also, the gang collected dues of at least $3 per member at the meetings and members who did not pay were violated.

536.    On December 18, 2003, ROBINSON sold dime bags of crack to an undercover officer in the area of 6432 South Stewart.

537.    On January 27, 2004, ROBINSON and another BD member sold dime bags of crack to an undercover officer in the area of 535 West 66th Street.

538.    On January 29, 2004, ROBINSON sold dime bags of crack to an undercover officer in the area of 535 West 66th Street.

539.    On January 30, 2004, on two occasions, an individual sold dime bags of suspected crack to an undercover officer in the area Vito's store at 63rd and Calumet. The individual was arrested and an additional approximately 68 dime bags of suspected crack was recovered, along with $230 in cash.

540.    On February 5, 2004, officers conducting surveillance of Vito's store at 63rd and Calumet observed MOTEN meet with CHISM. CHISM then entered the Calumet building, came out, and got into MOTEN'S vehicle. CHISM exited the vehicle quickly after entering, and MOTEN drove to 6522 South Ashland, where JEHAN got into the vehicle with a bag in his hand. They drove to 7820 South Morgan, where they stopped and met with JOHNSON. Officers approached MOTEN and JEHAN after conducting a stop of their vehicle because officers saw the driver fail to stop at a stop sign. MOTEN gave officers consent to search the van, where they recovered approximately $7,000 in bundles of $20, $10 and $5 bills. The money was inside of the bag that the officers saw JEHAN bring into the vehicle with him. MOTEN and JEHAN gave conflicting stories as to the source of the money. MOTEN had an additional $948 on his person. JEHAN said that he was a BD and has BD tattoos, but is an inactive member. JEHAN had an additional $426 on his person. MOTEN and JEHAN signed disclaimers regarding ownership of the seized money.

182

541. On March 9 and 10, 2004, CW-17 consensually recorded conversations with BD members at the Calumet building. On those days, COPELAND told CW-17 that EVANS now has two Jaguar cars. CLARK told CW-17 that he was docked $10 pay because when he was working security for the BD drug operation at the Calumet building, he let a buyer in without searching him. CW-17 spoke with CLARK about opening a heroin selling spot at the Calumet building. CLARK said that doing something like that would require JEHAN'S blessing, and that JEHAN might tell CW-17 to see someone else. CLARK said that VARNEY VOKER and VARMAH VOKER pay JEHAN $50,000 per month to sell drugs at the Calumet building, and they make $20,000 each day, but the quality of heroin they are selling is bad. CLARK said that "the Twins" have a drug operation at the Parkway Gardens, which makes $15,000 each day. CLARK told CW-17 that MCAFEE is currently the BD member in charge of the Calumet building. CLARK related to CW-17 that on one occasion, JEHAN sent CLARK and another BD member to New York and they each brought back 1/2 kilogram of cocaine for JEHAN. CLARK said that MOTEN is involved with "the Twins'" heroin operation. CLARK told CW-17 that another BD member was selling drugs at the Parkway Gardens complex.

542. On April 30, 2004, officers observed MOTEN driving a vehicle. MOTEN was stopped after committing a traffic violation. Following the stop, officers recovered approximately three ounces of crack. Following his arrest, MOTEN was given *Miranda* rights, waived them and told the officers that he was taking the crack to sell it at a drug distribution spot he controlled at Vito's store at 63rd and Calumet. Later that day, CW-24 made a consensual call to ASEMOTA, who was MOTEN'S source of heroin. ASEMOTA agreed to sell MOTEN 100 grams of heroin. CW-24 and an undercover officer met ASEMOTA in the area of 50th and Lake Park where ASEMOTA

handed CW-24 a bag with approximately 100 grams of heroin. ASEMOTA was arrested.

543. On April 30, 2004, officers executed a search warrant for REID at his residence in apartment #3607 at 2 East Erie, Chicago. REID was observed by officers, prior to the execution of the warrant entering his vehicle with a bag. Officers stopped REID and recovered the bag he had, which was found to contain two plastic bags containing approximately two kilograms of powder that field tested positive for heroin. Officers then executed the warrant for the apartment and recovered the following: 1 bag containing suspect heroin, 1 bag containing crack, approximately 407 MDMA pills, 1 bag of marijuana, approximately $22,442 in cash, a bag of firearm ammunition, drug paraphernalia and documents showing proof of residence for REID. In a post-arrest interview, REID admitted that he was a BD member.

544. On May 5, 2004, CW-24 consensually recorded a meeting with JEHAN, CREAMER and another BD member in the parking lot of Vito's store at 63rd and Calumet. During this meeting, JEHAN and CREAMER discussed their membership in the BD. Specifically, JEHAN discussed the founder of the BD, David Barksdale, and expressed his desire to invite some "OGs" [original gang members] to the BD king David day picnic that month. JEHAN related to CREAMER and CW-24 that he wanted to invite one "OG" in particular and that "Vel" [THOMPSON] asked JEHAN "who the fuck is that?" During this meeting, JEHAN, CREAMER, and CW-24, also discussed the probability that they would be arrested and given lengthy prison sentences in the near future that would prevent them from continuing to oversee the operation of the BD. CREAMER stated "they [federal law enforcement] gonna try to make a grand move; they don't want to leave no motherfucker behind, they don't want to leave no "Al-Macks",[CREAMER'S nickname] and no motherfucking "Scans" [JEHAN'S nickname], no none of that behind, where some shit can flare up again; they

184

want to cut the head off the snake and the tail."

## VI.    CONCLUSION

WHEREFORE, Affiant submits that the foregoing evidence establishes that the above listed

defendants conspired and agreed with each other and with others known and unknown to possess

with intent to distribute and distribute controlled substances, namely, in excess of 50 grams of

cocaine base, commonly known as "crack" cocaine, in excess of 5 kilograms of cocaine, in excess

of 1 kilogram of heroin and marijuana, in violation of Title 21, United States Code, Section 846, and

did aid and abet said conspiracy, in violation of Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

Michael J. Culloton
Special Agent, FBI

SUBSCRIBED AND SWORN TO BEFORE
ME THIS 11TH DAY OF MAY 2004.

EDWARD A. BOBRICK
MAGISTRATE JUDGE

185