1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3  UNITED STATES OF AMERICA,        )  No. 2004 CR 464-9
                                     )
 4               Plaintiff,          )  Chicago, Illinois
                                     )
 5         v.                        )  August 6, 2010
                                     )
 6  JAMES STEWART,                   )  10:50 a.m.
                                     )
 7               Defendant.          )

 8           TRANSCRIPT OF PROCEEDINGS - DISPOSITION
              BEFORE THE HONORABLE ELAINE E. BUCKLO
 9
    APPEARANCES:
10
    For the Plaintiff:  MR. CHRISTOPHER R. McFADDEN
11                      ASSISTANT UNITED STATES ATTORNEY
                        219 South Dearborn Street, 5th floor
12                      Chicago, Illinois 60604
                        (312) 353-1931
13
    For the Defendant:  MS. ANNE BENSKY
14                      GARVEY, McNEIL & ASSOCIATES, S.C.
                        One Odana Court, 2nd floor
15                      Madison, Wisconsin 53719
                        (608) 231-9160
16

17

18

19

20

21
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22               TRANSCRIPT PREPARED BY COMPUTER

23                     MICHAEL P. SNYDER
                        Official Reporter
24              United States District Court
              219 South Dearborn Street, Room 1432
25                Chicago, Illinois 60604
                   Telephone (312) 435-5563
```

```
 1          THE CLERK:  2004 CR 464, USA versus James Stewart;
 2  for sentencing.
 3          MR. McFADDEN:  Good morning, Your Honor.  Chris
 4  McFadden on behalf of the United States.
 5          THE COURT:  Good morning.
 6          MS. BENSKY:  Good morning.  Anne Bensky on behalf of
 7  James Stewart.
 8          THE COURT:  Good morning.
 9          All right.  I'll listen to what anybody has to say.
10          MS. BENSKY:  I just have a few points, Your Honor.
11          The Fair Sentencing Act of 2010 -- and I sent your
12  office a copy of it yesterday -- was passed on this past
13  Tuesday, and it lowers the mandatory minimums for crack cases
14  by adopting an 18-to-1 ratio.
15          And just to get it out of the way, this law as it is
16  right now does not apply to Mr. Stewart because he pled to five
17  kilograms of cocaine and one kilogram of heroin, which puts him
18  at the mandatory minimum of 10 years.
19          However, the law gave the sentencing commission
20  emergency authority to amend the guidelines, and it's likely or
21  possible that the commission will amend them, amend the drug
22  quantities table to adopt an 18-to-1 ratio.  That may happen in
23  90 days, and we don't know whether that would be retroactive.
24          However, it appears that the guidelines in effect in
25  2006 when Mr. Stewart was sentenced are going to apply today
```

1  per 18 USC 3742(g)(1).  However, there is a Seventh Circuit

2  case that suggests that it's appropriate to look at any current

3  laws for guidance when coming back for resentencing, so I'd ask

4  the Court to consider that this new legislation is --

5          THE COURT:  Okay.  So if it's 18-to-1, his guidelines

6  would be 262 to 327 months, is that right?

7          MS. BENSKY:  No, it's not.  Mr. McFadden and I

8  discussed this a couple days ago.  I'm looking at page 5 of his

9  sentencing memo.

10          MR. McFADDEN:  I want to apologize for that, Judge.

11  That was a mistake in my brief, that one number was.  If you

12  apply the 18-to-1 ratio, it would be 188 to 235 months instead

13  of 262 to 327.

14          THE COURT:  It would be 188 to?

15          MR. McFADDEN:  To 235 if you used 18-to-1.  And I

16  apologize for that.  I was looking at a different criminal

17  history when I came up with that number.

18          THE COURT:  All right.  Ordinarily I would say, and

19  maybe I will in this one, that that makes sense.  I mean,

20  frankly, in most cases I would have said that, you know, the

21  guidelines certainly, one, they were very harsh.  On the other

22  hand, this is a harsh, this is not an ordinary case.

23          MS. BENSKY:  Certainly, Your Honor.

24          THE COURT:  And I've got several considerations, one,

25  you know, just how very serious the criminal conduct was.

1          And the other thing is, and I'll let you argue about

2     it if you want, you know, I've got 40 some other defendants

3     that were sentenced.  I pulled the ones that were sentenced

4     later yesterday to try to look at the sentences.  I didn't go

5     back and compare all their criminal histories.  I can look at

6     them and make guesses as to who cooperated and who didn't.

7          I'm not revisiting anything that I decided that

8     should have been raised on appeal such as his role in the

9     offense, but, you know, and it's just, it's too old to go back.

10    I mean, apart from the fact that I don't think it would be

11    appropriate at this point, I did go back and look at as much as

12    was just reasonable, and I read most of the transcripts that

13    you attached to try to refresh my own recollection as well as

14    at the sentencing hearing, and I have a sense of where this is,

15    and I think I know why I sentenced him where I did.

16         You may be correct that I might have given him some

17    benefit of the doubt just because of the harshness of the

18    guidelines, but he certainly didn't end up with the most severe

19    sentence.  And as I remember, he didn't do anything to help

20    himself either.

21         MR. McFADDEN:  That's right, Judge.

22         THE COURT:  I'll listen to anything that you people

23    have to say, and then I guess I'm supposed to sort of look at

24    this under 3553.  But part of 3553 to me seems to be looking at

25    where this is and where he is and, to the extent I can, and

1  just the fairness of it and the justification of what his

2  sentence should be considering his role with and length of time

3  in this criminal conduct in comparison with others.

4          I'm sure I didn't do it perfectly, but I tried as I

5  was sentencing every one of these 47 people to keep in mind and

6  to look at and to compare their role in it, where they were,

7  certainly their criminal history, I mean, you know, their

8  individual factors.  But I don't know.  Those are a little bit

9  maybe vague, but those are considerations that I have here

10 today.

11         MR. McFADDEN:  Sure.  I'm sorry.  I didn't mean to

12 interrupt.

13         THE COURT:  No, I've meandered enough.

14         MR. McFADDEN:  Okay.  Initially, Judge, the

15 guidelines in effect in this case would be the same ones in

16 effect at the time of his last sentencing.  So his range is

17 still 292 to I think it was 365.  The 18-to-1 ratio does put

18 him down to 188 to 235.

19         Now, one thing that complicates this, and Miss Bensky

20 said "however" a bunch of times, there are a bunch of howevers.

21 One of the howevers in this particular case is there was

22 Amendment 706 to the crack/powder disparity, and what that did

23 is it said if somebody was sentenced based on their crack

24 guidelines and this amendment was made retroactive, that you

25 could knock off two levels if it was based on the crack.

1          Now, in this case, he was sentenced based on crack,

2    powder, as well as marijuana.  So while there may be room in

3    the future to do a 3582 motion, it hasn't been teed up, and I

4    think it's a lot more complicated to say he should

5    automatically get two points off of where he was when he was

6    sentenced back in 2006.

7          So the guideline range is the same now as it was

8    before because the guidelines in the Fair Sentencing Act

9    amendment just from the other day that the President signed,

10   those are in cases going forward.  But in this circuit, on a

11   case in remand, you apply the guidelines that were in effect on

12   the day of the prior sentencing.

13         So just so we are clear where he is, the properly

14   calculated range at this point would be the same as what his

15   range was before.

16         THE COURT:  Okay.  They sent it back because he had

17   raised -- oh, the issue that then the Supreme Court later

18   decided.

19         MR. McFADDEN:  He raised the Kimbrough issue of the

20   100-to-1 ratio.  So obviously you can look at anything you

21   want.  I'm just saying for purposes of starting off with the

22   proper guideline range, it's the same as before.

23         THE COURT:  Okay.

24         MS. BENSKY:  Your Honor, if I may just respond to

25   that point specifically?

1          I characterized it in my brief in footnote 3 on page

2    5 that he could go back under 18 USC 3582(c)(2) to ask for this

3    two-point reduction, and from the cases I read, it appears that

4    he would qualify for it.

5          The amount of cocaine and heroin that he pled to was

6    a level 32, so it's way lower.  And even converting everything

7    to marijuana, it doesn't change it that much.

8          So I think that he clearly would apply to that

9    amendment and it would make sense today to address this so we

10   don't get a sentence today and then tomorrow I'm filing another

11   motion under 3582, and then we all have to come back here.

12         So I think that because this Amendment 706 is

13   retroactive, that it is appropriate to look at his proper

14   guideline sentence today as a starting point as being a level

15   35 instead of a level 37, and that's adjusted based on the

16   aggravating and mitigating factors.  So I think that a

17   guideline range of, it was 235 --

18         MR. McFADDEN:  Judge, if you give him --

19         MS. BENSKY:  -- to 293, that starting with that under

20   the 3553 factors, that that would be the proper guideline range

21   to start at today.

22         THE COURT:  It would be what?

23         MR. McFADDEN:  235 to 293, Judge.

24         MS. BENSKY:  He's at a level IV, and then --

25         THE COURT:  All right.  So his actual sentence was?

MICHAEL P. SNYDER, Official Reporter

1          MR. McFADDEN:  You sentenced him to 292 the first

2  time.

3          THE COURT:  All right.  Tell me this again.  What did

4  you just say?  I don't want him to come back again.

5          MR. McFADDEN:  235 to 293.

6          THE COURT:  Okay.

7          MR. McFADDEN:  And if we want to treat that as a

8  guideline range, I'm not going to object to that.

9          THE COURT:  Okay.  Let's say that's the guideline

10  range.

11          MR. McFADDEN:  All right.  I mean, in terms of this

12  case, Judge, this was before I was in the office.  However, I

13  did write the appeal, and I've been handling everything since

14  then.

15          THE COURT:  I know.  You inherited it.

16          MR. McFADDEN:  I did, from Mr. Alesia and

17  Mr. Rubinstein.

18          But this, as you know, Judge, this was one of the

19  most serious gang cases brought in the federal courts in the

20  last 20 or 25 years.  The place where Mr. Stewart, the

21  headquarters for this gang was the Calumet Building.  He was a

22  high ranking person there every day where $30,000 gross in

23  crack cocaine and heroin was being sold.  He charged street

24  taxes.  If you have the ability to charge street taxes in the

25  neighborhood of 15,000 to $20,000 a month like he was doing,

1   that shows that he's not just a mope.  You're somebody who is

2   high up there.

3           THE COURT:  Right, there's no question about that.  I

4   actually, it may be it was what the hearing was we were going

5   to end up with another day.  I don't remember why, what I tried

6   to figure that out that day.  I figured it wasn't going to make

7   that much difference, I suppose, but actually I'm guessing as

8   to why I did it.  But, anyway.

9           But I certainly agree he wasn't -- there's no

10  question that he was not, you know, I mean, as his sentence

11  reflected, he was not -- I don't want to use the word you used,

12  but --

13          MR. McFADDEN:  I understand.  He was not a low

14  ranking member.

15          THE COURT:  Yes.

16          MR. McFADDEN:  Even though he was not enhanced for

17  being a high ranking member, you understand that he had a

18  significant role in the --

19          THE COURT:  I certainly do.  And there was no

20  question and that was reflected I think in the sentence.

21          MR. McFADDEN:  I think so too.  So I'll just hit two

22  points.  I know Miss Bensky has things she wants to say, so

23  I'll just be brief.

24          That high-rise building, you said several times at

25  various sentencings, you couldn't imagine what it would be like

MICHAEL P. SNYDER, Official Reporter

1  to live someplace like that.  It had to have been terrible to

2  walk outside and your building is controlled by gang members

3  who are carrying guns or checking who is coming in, who is

4  coming out.

5          You know, the drug sales were the highest around the

6  times of the 1st of the month and the 15th of the month when

7  people were getting their government assistance checks.  These

8  people were preying on people who didn't have anything.  They

9  were making addicts out of them.  Drugs ruin lives and destroy

10  communities.  I'm not going to belabor that.

11          In terms of his sentence compared to other people,

12  Judge, he wanted to plead guilty, but he did not cooperate with

13  the government.  We cannot put somebody in there unless they

14  fully accept responsibility for everything that they have done,

15  and we were not able to reach a plea agreement with him in this

16  case.

17          I can tell you from having worked on this case the

18  last couple years, there were people who testified, there were

19  people who are now in witness security.  Their lives have been

20  completely changed.  Some of these people which they were in

21  custody were assaulted or they had threats of assault visited

22  upon them.  This is what happens when you cooperate in a case

23  like this.

24          He for whatever reason did not cooperate, and so

25  comparing him to people who did, and a lot of the people who

1   you sentenced did get cooperation agreements, but he did not.

2   So when you compare his sentence to people who did, it's an

3   apples-to-oranges comparison.

4           Melvin Herbert, who did not cooperate, got 310

5   months, Judge.  Marvel Thompson, who did not cooperate, got 540

6   months.

7           THE COURT:  He was the leader, but okay.

8           MR. McFADDEN:  Correct.  But most people did

9   cooperate.  Derrick White who went to trial got a sentence

10   somewhere I believe 300 months or higher.  That was the one

11   case that went to trial.

12           THE COURT:  Yes, I know.

13           MR. McFADDEN:  And so given -- and this was said by

14   Mr. Rubinstein.

15           THE COURT:  Ironically he was low-ranking.

16           MR. McFADDEN:  He was, but --

17           THE COURT:  And he shot somebody.

18           MR. McFADDEN:  That was the one who shot the police

19   officer, right, who was undercover.

20           I think Mr. Rubinstein said at one point that in no

21   event should his sentence be below about 240 months, because

22   that would put him in a better position than if he had taken

23   the deal that we offered him.  And without being vindictive --

24           THE COURT:  That deal was 15 years?

25           MR. McFADDEN:  It would have, we guidelined him to

1  360 to life.  So a third off of that would have been 240, a

2  half would have been 180.  He probably would have gotten a

3  third.  So he would have probably got 240 months under the deal

4  that we offered him, Judge.

5         So, again, my only point is that at this point when

6  you look at the nature of the cooperation, he did plead, he's

7  entitled to acceptance, but I think 240 months at the minimum

8  is the appropriate sentence in this case.  You obviously the

9  first time around thought out that it should be higher and that

10  it should be 292.  I note that a 240-month sentence is right in

11  the middle of what would be this amended guideline range if he

12  gets the two points from Amendment 706.

13         So, again, I just think it should be a reasonable

14  sentence.  You had reasons for doing 292 months the first time,

15  but we don't think it should be much lower than that, Judge,

16  and certainly not below 240.

17         THE COURT:  Go ahead.

18         MS. BENSKY:  Thank you.

19         Going through all this stuff, and I represented

20  Mr. Stewart or I assisted in representing him on the appeal as

21  well, so I am very familiar with Mr. Stewart, I've spent three

22  years working with him and meeting with him and getting to know

23  him.

24         It is very clear that this Court took enormous

25  efforts to treat each person in this case as an individual,

MICHAEL P. SNYDER, Official Reporter

1   even though they are all lumped into the same activity.  And I

2   think that was, I think that was a very important thing to do.

3            I want to just address some of the points that

4   Mr. McFadden brought up.  Particularly I'm just going to go

5   through his brief.

6            I don't want to go back and rehash was he a minister,

7   what rank did he have.  That was discussed for three days three

8   years ago.  However, a lot of this stuff, there's just, a lot

9   of this stuff that he has in his brief, just doesn't come from

10  anywhere.  It says defendant rose through the ranks to become a

11  minister of the gang.  We know that he was the chief of

12  security in the early 1990s, but there's no evidence that he

13  became a First D or a Second D.  At one point I think Varney

14  Voker said he was a co-minister.  Someone else was saying he's

15  a minister.  The indictment says that he was chief of security.

16  And I think that looking through all the transcripts after

17  Mr. Stewart spoke and explained to you more of what his role

18  is, that was when this Court made the decision not to apply

19  that role, and I think because it was still very up in the air,

20  we were talking about grand jury testimony trial testimony

21  where somebody representing Mr. Stewart's interest didn't have

22  an opportunity to cross-examine, and I think if I had Varney

23  Voker here right now, I would want to know when he says he paid

24  Mr. Stewart 15 to $20,000, who else was he paying that money

25  to.  I believe he said that he was paying one of the board

```
 1   members -- it may have been Evans -- $50,000 a month.  Well, if
 2   he's paying hundreds of thousands of dollars a month for street
 3   tax, how is he making any money selling drugs?  It just
 4   doesn't -- a lot of these things don't add up.  So I think that
 5   there is some doubt about what his rank was.  I don't think
 6   there is --
 7            THE COURT:  Okay, but I didn't give him the
 8   enhancement.
 9            MS. BENSKY:  Right, and you didn't give him the
10   enhancement, and I'm just saying that from my reading of this
11   and looking at the case, it appears, and I'm not going to
12   attempt to explain what you were thinking at the time, but I
13   think you made the right choice because it's very unclear what
14   was going on.  A lot of the testimony was contradictory.
15            There is absolutely no doubt that this was a terrible
16   operation and that it went on for a long time.  There is no
17   doubt that Mr. Stewart spent a lot of years of his life selling
18   drugs.  It wasn't only every single day 12 hours a day of work,
19   but it was on and off for 15 years, and he has said over and
20   over again "I have sold drugs, I have done wrong, and I
21   apologize, and I want to change my ways."
22            He did attend gang meetings, as probably every person
23   that you saw here did.  At those gang meetings we don't contest
24   that they did plan violations and beatings.  Nobody has come in
25   here and said Mr. Stewart beat him.  I think there is one young
```

MICHAEL P. SNYDER, Official Reporter

1    man Paris O'Brien who said, and I don't remember if it was at

2    White's trial or at the grand jury, he said that Mr. Stewart

3    may have been present for a violation or had ordered a

4    violation.  It was very unclear.

5            Again, that's the only evidence that he was violent,

6    personally violent at all within this conspiracy.  Nobody else

7    in the conspiracy said that Mr. Stewart violated them or

8    ordered violations or was any part of that at all.  So even

9    though he was among a group of people who were very violent,

10   that doesn't mean that he himself is a violent person and that

11   he was never caught with a gun.  He was caught with drugs lots

12   and lots of times throughout the years, but he was never caught

13   with a gun.

14           And that's not backing away from the fact that he was

15   aware that there were guns in the operation, and he got two

16   points for that, and he accepted responsibility for that.  But

17   when we are talking about the danger to the community, is he a

18   danger to the community now?  Well, when he was a teen-ager 17

19   years old or 20 years old, he had an aggravated battery, he

20   served some time, and that was it.  There hasn't been anything

21   since then.  He's almost 40 years old now.  He was 33 when he

22   was picked up.

23           So to say that he was part of this gang and that

24   means that he should be responsible for what everybody else did

25   is going against the enormous effort that this Court put in to

1  make sure that each person was treated as an individual.

2       Now, as far as Corey Evans, he was a board member, he

3  got 325.  I don't know the circumstances behind that.  I don't

4  know if that is a guideline sentence or not.  I know that

5  Melvin Herbert got 310.  He guidelined out at 360, I believe,

6  and please correct me if I'm wrong.  But he was a board member,

7  and he served two operations, and he was a board member for one

8  place and another location as well.  He got 310.  That's not

9  even two years more than what Mr. Stewart got.

10      There is evidence I think in the, in Mr. McFadden's

11  appellate brief on page 82 that Mr. Herbert during the course

12  of this conspiracy ordered and executed the beatings of gang

13  members who violated gang laws.  We don't have that.  Again, I

14  don't know where that came from.  It's in the government's

15  brief.  I'm assuming that it's correct.  We don't have that

16  same conduct for Mr. Stewart and some when we are looking -- I

17  looked at this in many different ways.

18      Oh, I am sorry again.  In terms of the cooperation,

19  he did go to the grand jury.  The reason that he didn't

20  ultimately sign the plea agreement was because he just didn't

21  get it, he didn't understand the guidelines, he didn't

22  understand what he was facing, he didn't understand how he

23  could be responsible for somebody else carrying a gun, and he

24  should have listened, and he probably should have signed it.

25  We can't go back there right now.  That's over and done.  But

1    it was a mistake on his part because he just didn't get it.

2          He never told the government that he didn't want to

3    cooperate.  He never explained everything that -- he has always

4    said throughout this case was I will testify, I will do

5    whatever you want me to do.

6          THE COURT:  I think I actually was pretty clear at

7    times to the defendants that I, you know, as far as I could go.

8    I can't say "Negotiate a plea," but I think from an earlier

9    gang case where I had seen people that, believe me, in

10   comparison to a lot of these were innocent in the sense that

11   there was much smaller and some of them were really young, and

12   they had insisted on either going to trial or pleading blind,

13   and it was painful to have to give them the mandatory guideline

14   sentence.

15         So I think on this one I probably said, I suspect

16   that there are no defendants that weren't told, "Okay, if you

17   really want to plead blind, but I don't recommend it."

18         MS. BENSKY:  I'm sure he was told that, and at one

19   point in the sentencing you made a comment that you didn't

20   think that Mr. Stewart was listening to anybody.

21         THE COURT:  Yes, I remember when I saw that again

22   yesterday.  And that's not uncommon.  I mean, that's part of

23   how people get in trouble is that they don't, not only hear,

24   but that they are not listening is probably a lifelong problem

25   is that they don't want to listen because they think they know

1  better in this case than their attorneys, who are certainly

2  telling them.  And I wouldn't have said that to a defendant,

3  but I think I probably, I don't know if I said it to his

4  attorney, but I do often say it to attorneys, "You have talked

5  to your client about the repercussions of not."

6         MR. McFADDEN:  The transcript bears that out in this

7  case too, Judge.  I mean, everything in the rule, everything in

8  the plea colloquy, and I also think before that and after that,

9  the transcript will bear it out.  You went over things with

10  Mr. Stewart.  His attorney said on the record that Mr. Stewart

11  understood what was going on.  Sometimes people just don't want

12  to plead because they don't like the numbers.

13         THE COURT:  That's right, and I think that's what

14  happened here:  He thought he knew better than his attorney.

15         MS. BENSKY:  Even if that was the case, and nine

16  years is a very stiff penalty for that, and when we are looking

17  at what a lot of the other defendants got, especially

18  Mr. Herbert --

19         THE COURT:  We are talking about other noncooperating

20  defendant?  I mean, the government has just reiterated what,

21  the issues in terms of people deciding to cooperate.  But the

22  government has also talked about what this place was like, and

23  I tell you, one of the other pictures I have from Mr. White's

24  trial was showing slides one day of something, you know,

25  pictures:  Oh, yeah, that's so and so.  He died.  That's so and

1  so.  He died.  That's so and so.  He died.

2          It was a lasting impression to see how many people

3  down there.  It's probably his fellow gang members or fellow

4  people involved down there that, I mean, you're saying he

5  didn't know anything about guns?  I mean, people died, let

6  alone the people who tried to live in this building.  I mean, I

7  don't know.  It's a terrible scourge on the community, and he

8  was certainly part of it.

9          MS. BENSKY:  Your Honor, I'm certainly not saying

10  that he was not aware of the violence that the gang was

11  inflicting on the community.  He pled to that and he accepted

12  responsibility for being part of that.  But I think when we are

13  looking at the 3553 factors and we are asking ourselves is

14  Mr. Stewart a danger to the community if he is out in 15 or 16

15  years instead of being out in 24 years.

16          THE COURT:  Okay.  You started to talk about

17  comparing other sentences of people.  Who were you saying that

18  he should have a lesser sentence than and why?

19          MS. BENSKY:  Well, I was specifically looking at

20  Melvin Herbert who got 310, which was 50 months off of his

21  guideline range.  He was far more culpable than Mr. Stewart.

22          So what I would suggest is we can argue about all of

23  this stuff until the cows come home, but I think one of the

24  easiest ways to deal with this is to take that 235 and knock 50

25  off.  That would be doing for Mr. Stewart what was done for

1  Mr. Herbert.  That puts us at 185.  We are asking for the top

2  of the guideline range if 100-to-1 or if 1-to-1 ratio is

3  applied.  That's --

4          THE COURT:  Why would I do a 1-to-1 ratio?

5          MS. BENSKY:  Well, I don't want to rehash everything

6  that I --

7          THE COURT:  I mean, you were saying I should look at

8  the law that's going into effect, but that's 18-to-1, not

9  1-to-1.

10         MS. BENSKY:  The law that's going into effect is

11  18-to-1.  We are not sure what the sentencing commission is

12  going to do.  The Obama administration has certainly

13  recommended that the disparity is completely eliminated.  Other

14  district courts have done so, and the Gully case in Iowa I

15  think did a great job explaining that the 100-to-1 ratio should

16  not be a proxy for other behavior.

17         So in that way, looking at a 1-to-1 ratio, if he had

18  only been dealing in powder cocaine and everything else being

19  equal, he would have guidelined out at 131 to 188, all of the

20  conduct being exactly the same.  Maybe this Court would have

21  said, "Well, I don't think 188 is good enough; I'm going to

22  give him more."  I don't know that.  But if he was only dealing

23  in cocaine, that's what his guidelines would have been.  It's

24  the form of the drug that put him up to 292 in this case.  So

25  that's why we think that the 1-to-1 ratio is the most

 1   reasonable ratio to apply.

 2          The sentencing commission has been working on this

 3   for 10 or 15 years.  They recommended it.  Congress didn't do

 4   anything.  This 18-to-1 ratio, we had a unanimous Senate, which

 5   was unheard of, saying that the 18-to-1 ratio is the reasonable

 6   ratio.  We have the Obama administration saying:  The position

 7   of this administration is that the 100-to-1 crack/powder ratio

 8   at sentencing is simply wrong, and it's unjust to hand down

 9   widely disparate prison sentences for materially similar

10   crimes.  It is unjust to have sentencing disparity that

11   disproportionately and illogically affects some racial groups.

12          Now, I was not suggesting in any way that the

13   government was discriminating against Mr. Stewart because he's

14   an African-American.  It's the 100-to-1 ratio itself that has

15   the discriminatory effect, and that is why the 1-to-1 ratio is

16   more reasonable.  And if this Court does not agree with that,

17   then we are saying that if we look at the 18-to-1 ratio that

18   just passed, now we have a guideline range of 188 to 235, and

19   that's where we think he should be, and that's why I was

20   focusing on that 188 number.  It would be the top of the

21   guideline range with a 100-to-1 ratio.  It would be the low end

22   of the guideline range with an 18-to-1 ratio.  He was sentenced

23   at the low end of the guideline range originally, so it would

24   make sense to do that again.

25          And again, looking at Mr. Herbert who was similarly

1   situated in that he had a blind plea, he got 58 months off his

2   guideline sentence.  He got 26 years.  He is far more culpable

3   than Mr. Stewart.  And I'm not saying that to back away from

4   the, from Mr. Stewart's conduct, but the evidence in the case

5   suggests that Mr. Herbert ordered violations, violated people,

6   that he is a danger to the community, that he was a board

7   member, he was a leader in that organization, he was getting

8   lots of money for a long, very long period of time.

9           And here's Mr. Stewart.  Maybe he was a co-minister

10  for some time.  He says he's not.  A lot of people in this case

11  have said very different things.  So did he have rank?  Well, I

12  think he had rank, but I don't know what rank means.  Does that

13  mean that he was supervising other people through this whole

14  time?  There's just not enough information to know, and I don't

15  think this Court wants -- we can pull 20 guys in and ask them,

16  but I don't think that this Court wants to do it, and I don't

17  know that we would get a clear answer, especially right now.

18          And that's why I'm -- so we are looking at Melvin

19  Herbert.  He got 50 months off his sentence, off of his

20  guidelines.  If Mr. Stewart got 50 months off his guidelines,

21  he would be at 185, and we think that that would be above the

22  15 years that, the agreement that the government was going to

23  give him was between 15 to 20 years.  Mr. Stewart is very

24  strongly under the impression that the recommendation would

25  have been 15 years, so we are still higher than he likely would

1   have gotten had he signed the agreement.

2          So I think this 188, no matter how I do the math,

3   whether it's 100-to-1, whether it's 18-to-1, looking at

4   similarly situated people, that's the most reasonable sentence

5   to him.  That's going to be sufficient to protect the community

6   and to provide deterrence.

7          He has been at Oxford.  He has a whole bunch of

8   certificates.  I don't know if the Court wants to see them.  He

9   has completed the drug programs, he's paid his assessment, he's

10  had a job consistently for the last --

11         How long have you?

12         THE DEFENDANT:  I've been almost four years.

13         MS. BENSKY:  So he's been working there.  He's kept

14  in touch with his children.  We have attached to Mr. Walters'

15  sentencing memo of, docket 1487, I believe, we have letters

16  from his wife who he has a child with and the mother of his

17  three children explaining that he's a good father to them.

18         He should be back in the community after 188 months.

19  I think that is the most just result.

20         THE COURT:  Do you want to say anything, Mr. Stewart?

21         THE DEFENDANT:  I was just trying to find out, Your

22  Honor.  I'm not trying to contradict what you were saying, but

23  I didn't understand the part where you said that, you say you

24  seen some slides about that I was killing somebody?

25         THE COURT:  I didn't say that.

1          THE DEFENDANT:  Oh, somebody was getting killed?

2          THE COURT:  Lots of people down there were killed.

3   Lots of people died, not necessarily from, as part of the

4   conspiracy, but just the violence, the general violence and the

5   drugs, and all that was around there that --

6          THE DEFENDANT:  That's true.

7          THE COURT:  Just how many people died.  And, you

8   know, it wasn't as a result, certainly not a direct result, but

9   it was just one of the really shocking things about, you know,

10  what a horrible life this is in which you were part of in terms

11  of creating an, you know, this atmosphere and the drugs and all

12  was -- I don't know how many people died.

13         But, no, you misunderstood me if you thought I was

14  saying that.  I wasn't saying that.

15         THE DEFENDANT:  I'm sorry.

16         THE COURT:  Anyway, do you have anything you want to

17  say?

18         THE DEFENDANT:  I just want to go back to the part

19  when the prosecutor said that, you know, we took over the

20  building and the people couldn't leave there and this and that.

21         Your Honor, like I said before when I was at the last

22  sentencing, it was never like that, you know.  I know that you

23  might not believe me because I know I'm at a sentencing right

24  now and my life is in your hands.  But I know.  I was there,

25  you know.  He's going off just, just some papers.

MICHAEL P. SNYDER, Official Reporter

1          People, we, we never, I never, we never threatened

2    the community, threatened the people who lived in the building.

3    We never -- if that was so, they could have had the people come

4    to court on us and say that we was making them do things,

5    searching them when they come in the building, Your Honor.  All

6    that was not going on.  That's just a lot of hype just to make

7    it look even worse at the projects.

8          Yeah, we sold drugs there, Your Honor.  Yes, some

9    people have got killed because gangbanging was going on there,

10   and rival gangs ride through there and people shooting and

11   whatever.  That was happening in the community, Your Honor.

12   But we never did anything to people in the building, made them

13   do anything that they didn't want to do themselves, Your Honor.

14   We never did that, never.  I'm not that type of person.

15         I been locked up for almost seven years now.  I know

16   I have did wrong in the past.  But, you know, I know I have

17   changed my ways.  I know my kids are out there in the world

18   right now.  I'm scared for them, the things that's going on in

19   Chicago.  I'm scared for them.  My oldest son is 20 years old.

20   I talk to him on the phone every day to stay away from areas.

21   But there's only so much I can do.  I'm in jail, you know.  I

22   wish I could be there with them and show them another way to go

23   than start being like I was.  I don't want that for my kids.

24   And I know -- I been locked up for seven years, and I learned

25   my lesson.  I learned a lesson.  I know it don't take me 21

1    years to learn a lesson to know I done wrong.  I know I done

2    wrong.  I know the prosecutor is just doing his job by saying,

3    bringing back up what happened before, but I'm, I'm trying to

4    change from that.  I'm done with that.  You can ask the people

5    down there at the jail I'm at.  I'm a totally different person.

6    The people down there, the gang, SSI, people that's over the

7    gangs, that need to know what's going on with the gang, you can

8    call and ask them.  They talk to me.  They know I ain't a part

9    of that no more.  I don't affiliate myself with them, with the

10   BDs no more or none of that.  They don't have no say-so about

11   me.  I'm not affiliated with them anymore.  I've been going to

12   school getting certificates, taking different classes, courses.

13   I've been trying to better myself.  I just don't want to live

14   the rest of my life in jail, Your Honor.

15        THE COURT:  I understand that.

16        MS. BENSKY:  No matter what, we are looking at a

17   tremendous amount of time.  It's very easy to look at the

18   guideline range and to look at this matrix and try to figure

19   out where somebody fits in it.  But 15 years is a very, very

20   long time to be incarcerated; 24 years is an even longer time

21   to be incarcerated.  It's just a very, very long time, and

22   asking for 15 years or 188 months is not minimizing the terror

23   put upon this neighborhood, it's not minimizing the deaths,

24   it's not minimizing what's happened.  It's looking forward and

25   saying, given Mr. Stewart as the individual and the progress

1  that he's made and his role in the past in that he's not a

2  violent person, maybe you believe that he was a manager or a

3  supervisor of some sort at some time, but he's, he is not Corey

4  Evans, he's not Melvin Herbert, he's not Marvel Thompson.  He's

5  not Derrick White who shot a cop.  There are a lot of people

6  who did a lot of very, very bad things in this case, and there

7  are a lot of people who have assisted the government and had to

8  go into the witness security program.  It's a very, very

9  difficult situation, and it's difficult to assign a number to

10  his life, but I think that 188 months is, no more than that is

11  what he needs to be able to reenter the community.  He's going

12  to be on supervised release for five years.  He's going to

13  continue working at Oxford developing his skills.  He's there

14  for another nine years.  He's going to be in his fifties when

15  he gets out.  What is he going to be able to do for himself or

16  for the community at that point?  Both of his parents died in

17  their forties.  So he doesn't, in terms of longevity, he

18  doesn't have a good track record.

19        MR. McFADDEN:  Judge, if I can just pause a second,

20  because I've listened to Miss Bensky for a while, and I've

21  listened to the defendant.  I just want to make a couple

22  points, if I could.  I would be remiss if I didn't.

23        When we talk, Mr. Stewart has been in prison, and I

24  assume he's making some progress, and that is, prison is

25  supposed to work that way, it's supposed to help rehabilitate

1    people, and I'm hoping that that's working.

2           Another goal is to deter him and to deter the

3    community, Judge.  And when I heard him say a few minutes ago

4    that things were not horrible at that building and this is just

5    rhetoric by the prosecutor at the Derrick White trial, Judge,

6    you heard Chicago police officers and other witnesses who said

7    people could not get in or out of the building where Derrick

8    White worked security.  Granted, that was in the Robert Taylor

9    Homes, but the situation was the same whether it was at Calumet

10   or Robert Taylor.  You could not get in or out of that building

11   unless you were searched, they knew who you were, and you

12   didn't get in there for no reason.

13          The building that he was, whether you call him chief

14   of security or a minister, there was an apartment, apartment

15   1007, that was a stash house where they stashed the drugs,

16   where they cooked the drugs, where they kept the guns.  Search

17   warrants there found I believe it was thousands of bags of

18   personal use drugs that were going to then be sold.

19          He sold those drugs himself or he put the drugs in

20   the hands of other people to sell those things.  And there was,

21   I believe it was a video played at trial of somebody working

22   security at that building where he was certainly involved with

23   security.  There's an armed person standing out there with a

24   gun seeing who's coming in and who's going out.

25          So to say that everything is hunky-dory and this is

1   just rhetoric by the prosecutor, he's saying that still seven

2   years later.  I think that needs to be weighed into his

3   sentence today and to whether he's accepted responsibility.

4           When we talk about Melvin Herbert, that's the only

5   name that I really heard brought up.  He guidelined 360 to

6   life, and you gave him 310.  There's a big difference between

7   giving somebody 310 in that situation and giving him the low

8   end of an amended guideline range that none of these other

9   people pled to, all these other people waived appeal and pled

10  under the old regime.  To give him low end in this situation,

11  Judge, I don't think it accounts for the factors in this case.

12  I don't think the sentence that they are recommending is the

13  proper one.  I think it should be a reasonable sentence and not

14  higher than that.

15          THE DEFENDANT:  Excuse me, Your Honor.  I want to say

16  something if I may?

17          THE COURT:  Yes.

18          THE DEFENDANT:  Don't get me wrong.  I wasn't never

19  saying that it was all peaches and cream at the Calumet

20  Building, Your Honor.  I said to you that it was bad things

21  going on there, Your Honor.  I did not say that, you know, it

22  wasn't bad, what's going on there.  I did not say that.  I said

23  people where they got killed there, people got shot, they sold

24  drugs, they rob a bank, yeah, they had shootings out there.

25  Your Honor, I'm not saying that it wasn't, it was peaches and

1   cream.  Don't get me wrong.  If the Court thought that, I'm not

2   saying that.  I know that.  I don't want the Court to think

3   that, because I would never say that.  I knew it was wrong.

4   That's why I turned myself in when I knew I had a warrant.  I

5   knew it was wrong.

6         THE COURT:  All right.

7         Well, I start off to impose a sentence under 3553.

8   We talked quite a bit today I think about the nature and

9   circumstances of the offense, and, of course, it was discussed

10   among other places in Seventh Circuit opinion in this case.

11         You know, as I said, I dealt with this case for

12   years.  You know, I can't imagine what it must be like to try

13   to raise your children in that atmosphere of drugs and guns and

14   incredible danger.  And you were a major part of this just

15   huge, huge conspiracy, you know, that went on, and your part

16   lasted years.  So it's, I mean, the nature and circumstances of

17   the events are just extremely serious.

18         In terms of history and characteristics, you know,

19   you did plead, but you certainly were part of this for a long

20   time.  And, you know, the other part about getting older is you

21   weren't a kid when you were still participating in this.  You

22   were old enough to know better.  I mean, I've never heard

23   anything at all about, you know, some inability to not be part

24   of this.

25         The other thing about kids being raised in this is

1   then they grow up and then they become part of it too.

2            I really didn't find any mitigating circumstances

3   that I could think then and even now.  I mean, you made, it

4   sounds like you've made some progress maybe in prison, and you,

5   and you are getting older, that's true.

6            But then the other part I've got is to look at the

7   need for this sentence to reflect the seriousness of it,

8   promote respect for the law and just punishment, afford

9   adequate deterrence.  Maybe protecting the public, you know,

10  okay, what kind of a sentence that, maybe there's some

11  flexibility there.  But as I said at the very beginning, I also

12  have the issue of just basic fairness.  I mean, you've gotten

13  the benefit of the doubt, the benefit of the fact that your

14  attorney before raised an issue that it turned out because of

15  the subsequent case that you get the benefit of coming back

16  here.  But it doesn't change the Court -- I mean, it doesn't

17  change the crime, it doesn't change the seriousness of it.

18           It's really hard to know how to look at the

19  prospective guideline.  If they came back and said, okay, you

20  should redo every single one of these and change the amount and

21  change the guidelines, that would be one thing.  But they

22  haven't said that.  And I don't know what the reason was for

23  deciding -- I mean, I understand that apparently there's

24  agreement that 100-to-1 overstates the difference, and I've

25  heard arguments on why 18-to-1 may be reasonable.

MICHAEL P. SNYDER, Official Reporter

1          You could make arguments that, you know, the victims

2   of crack are too often people just as people in this Calumet

3   Building and that there was a reason for making it a

4   difference.  But I'm not going to get into that.  Frankly, I

5   don't have those guidelines before me, and I don't think I'm

6   going to use those.  If I was doing this just one person

7   instead of one out of so many, I think I would feel a little

8   bit more like that maybe it was appropriate.

9          But we are not also just talking about this just, you

10  know, sale of, okay, was this some crack or was this cocaine?

11  We are talking about this huge conspiracy, this huge scourge on

12  this community, and all that it did.  We are talking about it,

13  as counsel just reminded me, all of the, just to look at what

14  was found in that particular building in terms of the, well,

15  how much, you know, all the drugs that just happened to be

16  found at one time and guns.

17         I'm not sure that whether it's 100-to-1, 1-to-1,

18  18-to-1, that it all fits each case.

19         At any rate, I think the guideline I'm dealing with

20  today is the 235 to 293.  I really think I need to look at what

21  other people who did cooperate and the difficulties that they

22  have faced.  And your decision, it's your right not to.

23         But I am supposed to look at how sentences, try to

24  make them fair in terms of each person's sentence, and one of

25  those specifically is affording adequate deterrence to criminal

MICHAEL P. SNYDER, Official Reporter

1  conduct and respect for the law, and it seems to me that

2  sentences in the same crime in the same case where, because of

3  a change in the law, that it doesn't seem right to me that one

4  person gets the benefit of that when others don't.

5          But you do, you were here, and I will give you a

6  lower sentence, but I have to agree with the government that I

7  find it really hard to justify a sentence that would be lower

8  than what you would have gotten if you had agreed to cooperate

9  in terms of justifying, promoting respect for the law, and

10  adequate deterrence.  So I think I have to include that in

11  talking about a sentence that's sufficient but not greater than

12  necessary.

13          MS. BENSKY:  Your Honor, if I may say one thing?

14          I'm looking at document 1487, it's the defendant's

15  original sentencing memo.  I know that there are a lot of

16  different circumstances and a lot of people cooperated.  I

17  don't know the full extent to what everybody did or why they

18  got the sentences they got, but just looking at this, Albert

19  Span, one of the three kings, got 120 months; Randy Carter, a

20  defendant who had attempted murder as part of the conspiracy,

21  sentenced to 120; Paul Slaughter supervised a heroin line,

22  sentenced to 60 months; the Vokers, who were really the big

23  major suppliers for the area, I believe got 10 years and 12

24  years.

25          THE COURT:  You know, if we are going to go back and

1  compare every one of these, one, I actually would have to dig

2  out every one of these, but --

3          MR. McFADDEN:  I didn't think --

4          THE COURT:  I don't think we are going to find, I'm

5  not sure that it's going to help you.

6          MS. BENSKY:  I mean, the point is he has --

7          THE COURT:  I can tell you that -- well.

8          MS. BENSKY:  The point is that he has gotten one of

9  the highest sentences in a scheme where a lot of other people

10  who were involved in the same behavior got much lower sentences

11  under various different circumstances.  There are 47 of these

12  guys.

13          MR. McFADDEN:  Judge, almost all of those people if

14  not all of them had cooperation agreements.  If we are going

15  to, if we really, if the Court thinks it would help for us to

16  go one by one, I'm going to need a week or two to put it

17  together.  I will go and look at that.  I'm almost certain

18  that's not correct about Albert Span.  I think he was closer to

19  360 or life, but I could be wrong on that one.

20          THE COURT:  No, actually, according to, unless it was

21  a -- well, I can look it up pretty quickly.

22          THE DEFENDANT:  Excuse me, Your Honor.  I can tell

23  you.  I know he got, Albert Span, he already had life on

24  another case.  So you gave him 120, 120 months on his case.  He

25  copped out.  I guess they --

1          THE COURT:  He testified.

2          THE DEFENDANT:  Because he already had life.

3          THE COURT:  I'm pretty sure.  Yes, that may be the

4     case.  I mean, I'd have to go back and look at the sentencing

5     hearing on every single one of these.  But I think --

6          MS. BENSKY:  I think the point --

7          THE COURT:  If you want me to go back and compare,

8     then what I should compare is, okay, then why shouldn't I

9     continue to weigh heavily the guideline sentences that, the

10    guidelines that were in effect then?

11         MS. BENSKY:  Well, because most of those people

12    received below guideline sentence.  And I understand that a lot

13    of these, a lot of the people involved in the conspiracy had

14    cooperation agreements, and certainly it's reasonable to take

15    that into consideration.  But Mr. Stewart got nine more years

16    than he likely would have received with a cooperation

17    agreement.

18         MR. McFADDEN:  But that's the point, Judge.

19         MS. BENSKY:  At some point it becomes punitive, it

20    doesn't work to serve any of the purposes of deterrence or

21    cooperation.  At some point -- I don't know how much

22    cooperation is worth, I don't know if it's quantifiable, but

23    looking at the actual numbers and looking at what people got as

24    a whole, and I'm not saying it's necessary to go back and look

25    at everybody's sentence and for the Court to go back and try to

1   remember why each person received the sentence that they

2   received, but at the end of the day Mr. Stewart was certainly

3   not the most culpable person in the organization.

4         He should have taken the agreement.  He didn't.  My

5   interpretation from reading the transcripts and from talking to

6   him is that he just didn't get it.  He made a mistake.  He

7   never told the government that he wanted to cooperate.

8         MR. McFADDEN:  And now he wants the benefit of that,

9   Judge, nine years later.  He did not cooperate, Judge.  It's an

10   apples to oranges comparison.

11         Only the government can make a 5K recommendation.  We

12   did not make one in this case.  Any attempts that he made to

13   cooperate with us are vitiated when he does not sign a plea

14   agreement, which he did not do in this case.

15         We don't know what he would have been able to do

16   because he never gave us the opportunity to do that because he

17   never entered into a cooperation agreement with us, Judge.  We

18   don't know if he would have been able to help us or not.  These

19   other people, as I said earlier, put their safety, the safety

20   of their families on the line.  They are, some of them are in

21   WITSEC now.  Their lives are completely different.  This

22   defendant wants the same benefit of that nine years later,

23   Judge, and that ship has sailed.  Only the government,

24   respectfully, can move for a cooperation discount, and we are

25   not able to in this case.

 1          MS. BENSKY:  And that's not what we are asking.  We

 2  are asking that if he be given equivalent of what Melvin

 3  Herbert got with no cooperation, with 50 months off a guideline

 4  sentence or applying this 18-to-1 ratio.

 5          MR. McFADDEN:  I have his transcript in the office if

 6  you don't have it right at hand, or I'm sorry --

 7          THE COURT:  Whose, his?

 8          MR. McFADDEN:  No, I have Herbert's PSR in my office.

 9          THE COURT:  We keep them.  We should have them.  Just

10  a minute.  I'm looking at something else.

11          Well, frankly, I think Mr. Span was a major witness.

12  It's a choice, and as Mr. Stewart says, I think he had another

13  case; this one wasn't going to make any difference.  I'm not

14  positive of that.  If he wants to say that, it doesn't strike

15  me as incorrect, although I'm not going to pretend I remember

16  it.

17          THE DEFENDANT:  He already -- excuse me, Your Honor.

18  He already had life on another case before that.

19          THE COURT:  Well, then it didn't make much

20  difference, probably.

21          THE DEFENDANT:  That's what I'm trying to, you know,

22  he already had life.

23          THE COURT:  So he's not one to talk about.

24          THE DEFENDANT:  As far as the prosecutor said I

25  didn't cooperate, I did.  I went to the grand jury twice, they

1   came and got me twice to go to the grand jury.  I talked to the

2   agents multiple times, multiple, talking to the agents multiple

3   times.  They came and got me from the MCC building multiple

4   times.  But it just was when it came down to the plea, I didn't

5   understand, and I didn't sign it.  Now they are saying that I

6   didn't.  Well, I'm not, you know, I did.  I was cooperating.

7           MS. BENSKY:  And the testimony he did provide at the

8   grand jury, some of it was pretty significant against Marvel

9   Thompson and Mr. Thompson's relationship with an older person

10  very likely led the government down that road.

11          MR. McFADDEN:  Judge, respectfully, Miss Bensky

12  should not speak for what led the government to do what or not.

13  If somebody goes in the grand jury and is not available to

14  testify at trial, which was the case in this point, then that

15  grand jury testimony is worthless.

16          THE DEFENDANT:  I was available.

17      (Pause.)

18          THE COURT:  I think the only comparison that I could

19  make would be what I had done before in terms of if you are

20  really wanting me to do that, which would be to use, which

21  actually I think I still am allowed to do, to use the original

22  guidelines.  Or do I --

23          MR. McFADDEN:  The original guidelines are still in

24  effect right now.

25          THE COURT:  All right.  So you say you would come

1  back on that.  But in terms of fairness, you know, I don't
2  think that there was anything raised on appeal to say that I
3  didn't fairly and individually consider each defendant.  It's
4  really not realistic, unless I'm told I actually have to, to go
5  back and try to reconstruct exactly why I sentenced Mr. Herbert
6  where I sentenced him.  I mean, there are so many individual
7  factors involved in terms of criminal histories, individual
8  circumstances.  The point seems to me that he had, I think he
9  actually had a career offender status, which is probably why
10 his was where it was.  And if you're saying, well, he should
11 get less than him, then explain to me why he shouldn't get more
12 than all the people who cooperated.
13        MS. BENSKY:  He will still be, I believe he still
14 will be getting more than a lot of the people who cooperated.
15        THE COURT:  A lot of the people.
16        MS. BENSKY:  Again, well, I shouldn't say that.
17        THE COURT:  Right.  This is the problem with deciding
18 what you're going to, if you want to focus on one person, then,
19 indeed, it seems to me I would need to focus on all of them,
20 including those people who have cooperated.  And I think that
21 it's, could hardly minimize indeed what that may mean.
22        I think, as far as I know, considering how many
23 people in this case cooperated, and there were many, I'm
24 assuming that it was a choice, maybe not made out of any fear,
25 it hardly seems like it, but, you know, I don't know if it was

1    or not, but that it was a choice made because he thought you

2    knew better than your lawyer.  I think it's reflected in the

3    transcripts that I reviewed, that it's like well, wait a

4    minute.  And you weren't the only one.  And you're not, it's

5    not the only case where that happens where somebody comes in

6    and says, "Well, wait a minute, I'm not going to take that.  I

7    shouldn't get that."  Well, then, that's fine.  You make a

8    decision not to go with an agreement.

9            The agreement would have given him what?

10           MR. McFADDEN:  Mr. Rubinstein is in the transcript

11   saying that the defendant should not have gotten below 240,

12   that was assuming a guideline range of 360 to life; so it was a

13   third off of the low end.

14           MS. BENSKY:  The agreement was between 15 and 20

15   years.  Mr. Stewart was under the impression that the

16   government would have recommended the 15 had he signed the

17   agreement.

18           THE DEFENDANT:  That's what they told me.

19           THE COURT:  Well, it really makes me uncomfortable to

20   try to do that.  It looks to me like we should focus today

21   on going to make it a lower sentence as to trying to take all

22   of this into consideration and to impose a sentence that I

23   think is sufficient but not greater than necessary, taking into

24   account the entire conspiracy, the history of it, the time

25   going back.  I will reduce it somewhat, and I think, you know,

1  maybe it isn't totally irrelevant that you, although I'm not

2  really sure that it's -- I mean, I can look at you today since

3  I am sentencing you today.  I have to say I am still not sure

4  that I'm seeing that you really understand the real terrible

5  seriousness of the crime that you were part of.  I do agree

6  that it's a long time, so I will resentence you, I will change

7  the 292 to 239 months.  I understand that's still a very long

8  time.  It is a difference.  I just think in terms of this whole

9  thing, I can't fairly take into account the seriousness of it

10 or all of the other defendants and reduce it further than that.

11 So that's what I will do.

12         MS. BENSKY:  Did you say 239, Your Honor?

13         THE COURT:  Yes.

14         All right, thank you.

15         MS. BENSKY:  Thank you, Your Honor.

16         MR. McFADDEN:  Does he need to be readvised of

17 anything?

18         THE COURT:  Well, I suppose you have I think 14 days

19 to file a notice of appeal of your sentence.

20         Okay, thank you.

21         MR. McFADDEN:  Thank you, Judge.

22         MS. BENSKY:  Thank you.

23     (End of proceedings.)

24

25

```
 1                    C E R T I F I C A T E

 2          I, Michael P. Snyder, do hereby certify that the

 3     forgoing is a complete true, and accurate transcript of the

 4     proceedings had in the above-entitled case before the Honorable

 5     ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,

 6     Illinois, on August 6, 2010.

 7

 8     /S/ Michael P. Snyder              September 13, 2010
       _____               _____
 9     Official Court Reporter            Date
       United States District Court
10     Northern District of Illinois
       Eastern Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL P. SNYDER, Official Reporter